Case No. 24-5035

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

AUSTIN P. BOND, as Personal Representative of
the Estate of Terral Ellis, II, deceased,
*Plaintiff/Appellee*

vs.

THE SHERIFF OF OTTAWA COUNTY, in his official capacity,
*Defendant/Appellant*

---

**OPENING BRIEF OF DEFENDANT/APPELLANT**

---

APPEALED FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
4:17-cv-00325-CRK-CDL
HONORABLE CLAIRE R. KELLY, JUDGE[*]

Wellon B. Poe, OBA No. 12440
Jamison C. Whitson, OBA No. 18490
Alison B. Levine, OBA No. 33021
Justin P. Ashlock, OBA No. 33459
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105
Telephone:  (405) 524-2070

ATTORNEYS FOR DEFENDANT/
APPELLANT SHERIFF OF OTTAWA
COUNTY

June 12, 2024                                    **ORAL ARGUMENT REQUESTED**

---

[*] Judge Claire R. Kelly, of the United States Court of International Trade, sitting by designation.

## **TABLE OF CONTENTS**

TABLE OF CONTENTS........................................................................i-iii

TABLE OF AUTHORITIES ...........................................................iv-viii

I.      STATEMENT OF JURISDICTION ............................................1

        A.    Subject Matter Jurisdiction of the District Court ..................1

        B.    Timeliness of Appeal ...........................................................1

        C.    Appellate Jurisdiction..........................................................2

II.     STATEMENT OF RELATED APPEALS....................................2

III.    STATEMENT OF THE ISSUES ................................................3

IV.     STATEMENT OF THE CASE ....................................................3

V.      STATEMENT OF THE FACTS ..................................................4

VI.     SUMMARY OF ARGUMENT....................................................7

VII.    STANDARDS OF REVIEW.......................................................10

VIII.   ARGUMENT AND AUTHORITY .............................................13

        1).   DENYING JUDGMENT AS A MATTER OF LAW WAS
              ERROR...................................................................................13

        2).   THE VERDICT IS NOT SUPPORTED BY THE EVIDENCE ........15

              A.    No Underlying Constitutional Violation...................16

              B.    No Policies, Procedures, or Customs Caused a Violation........20

              C.    No Systemic Failure/Inapplicability of *Crowson* .....................24

              D.    The Evidence Did Not Support a Failure to Train....................26

3).     DENYING THE MOTION FOR NEW TRIAL WAS ABUSE OF DISCRETION ................................................................28

      A.     The Jury's Verdict Was Against the Weight of the Evidence................................................................29

      B.     Erroneous and Inadequate Jury Instructions............................30

          1.     Instruction No. 17 was Erroneous ...................................31

          2.     Abusive Language Instruction Not Given......................33

      C.     Admitting Testimony Regarding NCCHC and State Jail Standards Was Error ................................................35

      D.     Improper Arguments and Conduct of Appellee's Counsel.......40

          1.     Pervasiveness.................................................................41

          2.     Ineffective Curative Action ...........................................46

          3.     The Size of the Verdict was Shocking and Excessive ......................................................................49

4).     THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING REMITTITUR ................................................................50

      A.     Awards in Comparable Cases ..................................................51

      B.     The Damages Award Was Impermissibly Punitive.................60

5).     ATTORNEY FEE AWARD WAS AN ABUSE OF DISCRETION ................................................................63

IX.     CONCLUSION................................................................65

X.     ORAL ARGUMENT REQUESTED ................................................................66

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................67

CERTIFICATE OF COMPLIANCE ........................................................................67

CERTIFICATE OF SERVICE ........................................................................ 67-68

LIST OF ATTACHMENTS:

Judgment entered September 8, 2023 [Dkt. 400]

Opinion and Order entered February 29, 2024 [Dkt. 435]

Opinion and Order entered February 29, 2024 [Dkt. 436]

Opinion and Order entered June 5, 2024 [Dkt. 452]

LIST OF EXHIBITS:

Exhibit 1 – Unpublished Memorandum Opinion and Order in *Young v. Correctional Healthcare Companies, Inc.*

Exhibit 2 – Unpublished Opinion and Order in *Dougal v. State Farm Mutual Auto. Ins. Co.*

Exhibit 3 – Unpublished Order in *Edwards for Blasingame v. Grubbs*

# TABLE OF AUTHORITIES

## CASES

*Abuan v. Level 3 Comm.,* 353 F.3d 1158 (10th Cir. 2003) ......................................40

*Adkins v. Rodriguez*, 59 F.3d 1034 (10th Cir. 1995) ................................................34

*Angelo v. Armstrong World Indus,* 11 F.3d 957 (10th Cir. 1993) ..........................41

*Berry v. City of Muskogee,* 900 F.2d 1489 (10th Cir. 1990) ...................................17

*Bill Barrett Corp. v. YMC Royalty,* 918 F.3d 760 (10th Cir. 2019) ......................14

*Blangsted v. Snowmass Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250
   (D. Colo. 2009) ....................................................................................................51

*Board of County Commissioners of Bryan County v. Brown*,
   520 U.S. 397 (1997) ....................................................................................... 16, 17

*Burke v. Deere & Co.*, 6 F.3d 497 (8th Cir. 1993) ..................................................45

*Burke v. Regalado,* 935 F.3d 960 (10th Cir. 2019)....................44-47, 51-55, 59, 61

*Carey v. Lovett*, 622 A.2d 1279 (N.J. 1993)............................................................42

*City of Canton v. Harris*, 489 U.S. 378 (1989)................................................. 26, 27

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) ...........................................16

*Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir. 1980) ......................45

*Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979) ....................................................34

*Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001)...................61

*Crowson v. Washington Co.*, 983 F.3d 1166 (10th Cir. 2020) ........ 16, 24, 26, 31-33

*Dansie v. Union Pacific Railroad,* 42 F.4th 1184 (10th Cir. 2022) .......................29

*Dougal v. State Farm,* 2006 WL 1141621 (N.D.Okla. April 26, 2006)..................45

*Edwards for Blasingame v. Grubbs*, 2022 WL 4363631
  (N.D. Ga. Sept. 14, 2022) ..........................................................................58

*Estate of Briones v. Ardrey*, 2021 WL 4170460 (D. Colo. Sept. 14, 2021) ..... 37, 38

*Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005) ...................................58

*Estelle v. Gamble*, 429 U.S. 97 (1976) ....................................................................17

*Evans v. Fogarty*, 241 Fed. App'x 542 (10th Cir. 2007).........................................51

*Farmer v. Brennan*, 511 U.S. 825 (1994)................................................................17

*Fields v. City of Chicago*, 981 F.3d 534 (7th Cir. 2020) ................................... 57, 58

*Fresquez v. BNSF,* 52 F.4th 1280 (10th Cir. 2022) ..................................................50

*Gasperini v. Center for Humanities,* 518 U.S. 415 (1996)......................................56

*Gilliam v. Allen*, 62 F.4th 829 (4th Cir. 2023)................................................... 56, 57

*Glover v. Vest,* No. CIV-14-936-F, 2015 WL 13344116 at *2
  (W.D.Okla. Dec. 23, 2015) .........................................................................52

*Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994) ......................................................63

*Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989)...........................52

*Hardeman v. City of Albuquerque*, 377 F.3d 1106 (10th Cir. 2004)............... 10, 11

*Henning v. Union Pacific Railroad,* 530 F.3d 1206 (10th Cir. 2008)....................30

*Hinkle v. Beckham Co.*, 962 F.3d 1204 (10th Cir. 2020) ........................................22

*Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) .......................................16

*Holmes v. Wack*, 464 F.2d 86 (10th Cir. 1972) .......................................................29

*Hunt v. Uphoff*, 199 F.3d 1220 (10th Cir. 1999) ......................................18

*Jane L. v. Bangerter*, 61 F.3d 1505 (10th Cir. 1995) ..............................63

*Jiminez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013).......................57

*Lederman v. Frontier Fire Protection,* 685 F.3d 1151 (10th Cir. 2012)................12

*Leprino Foods v. Factory Mut. Ins. Co.*, 653 F.3d 1121 (10th Cir. 2011)..............11

*M.D. Mark, v. Kerr-McGee,* 565 F.3d 753 (10th Cir. 2009) ........................... 12, 50

*Martinez v. Caterpillar, Inc.*, 572 F.3d 1129 (10th Cir. 2009)...............................30

*Mason v. Texaco,* 948 F.2d 1546 (10th Cir. 1991) ...................................................50

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) ...........................................................18

*McBride v. Deer*, 240 F.3d 1281 (10th Cir. 2001) ....................................................34

*Metz v. Merrill Lynch, Pierce, Fenner & Smith*, 39 F.3d 1482 (10th Cir. 1994)....63

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) .......................................................................... 15, 16, 24, 25

*Moody v. Ford Motor Co.*, 506 F.Supp.2d 823 (N.D. Okla. 2007) ........... 42, 47, 61

*Mountain Dudes v. Split Rock Holdings,* 946 F.3d 1122 (10th Cir. 2019).............14

*Osterhout v. Bd. of Cty. Comm'rs*, 10 F.4th 978 (10th Cir. 2021) .........................41

*Oxendine v. Kaplan,* 241 F.3d 1272 (10th Cir. 2001) ..............................................17

*Paugh v. Uintah County*, 47 F.4th 1139 (10th Cir. 2022) .......................................16

*People v. Brown*, 2015 Ill. App. 4th. 130412 (Ill. App. Ct. 2015) .........................42

*People v. Dukes*, 12 Ill.2d 334, 146 N.E.2d 14 (1957)...........................................42

*Phelps v. Hamilton*, 120 F.3d 1126 (10h Cir. 1997)................................................63

*Praseuth v. Rubbermaid*, 406 F.3d 1245 (10th Cir. 2005) ......................................63

*Racher v. Westlake Nursing Home,* 871 F.3d 1152 (10th Cir. 2017)......... 45, 61, 62

*Ramos*, v. *Lamm*, 713 F.2d 546 (10th Cir. 1983) ............................................ 63, 65

*Sanjuan v. IBP,* 160 F.3d 1291 (10th Cir. 1998) ....................................................11

*Smith v. Nw. Fin. Acceptance,* 129 F.3d 1408 (10th Cir. 1997)..............................51

*Stokes v. U.S.*, 967 F.3d 1034 (10th Cir. 2020) ......................................................54

*Supre v. Ricketts*, 792 F.2d 958 (10th Cir. 1986) ...................................................13

*Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008) ............................................ 18, 19

*Tanberg v. Sholtis*, 401 F.3d 1151 (10th Cir. 2005) ................................... 21, 37, 38

*Therrien v. Target Corp.*, 617 F.3d 1242 (10th Cir. 2010).....................................60

*U.S. v. Murry*, 31 F.4th 1274 (10th Cir. 2022) ........................................................39

*U.S. v. Rivera*, 900 F.2d 1462 (10th Cir. 1990)......................................................40

*U.S. v. Smith*, 13 F.3d 1421 (10th Cir. 1994)................................................... 30, 35

*U.S. v. Winchell*, 129 F.3d 1093 (10th Cir. 1997) ..................................................30

*United Intern. Holdings v. Wharf,* 210 F.3d 1207 (10th Cir. 2000) .......................11

*Wagner v. Live Nation Motor Sports,* 586 F.3d 1237 (10th Cir. 2009)............ 11, 14

*Waller v. City and Cnty. of Denver*, 932 F.3d 1277 (10th Cir. 2019) ........ 22, 23, 27

*Weaver v. Blake*, 454 F.3d 1087 (10th Cir. 2006) ............................................ 12, 39

*White v. Conoco,* 710 F.2d 1442 (10th Cir. 1983)...................................................29

*Whitehead v. Food Max*, 163 F.3d 265 (5th Cir. 1998)..................................... 45, 62

*Whittenburg v. Werner Ent.,* 561 F.3d 1122 (10th Cir. 2009)..........41-42, 46, 48-49

*Wollard v. JLG Industries,* 210 F.3d 1158 (10th Cir. 2000) ..................................12

*Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir. 1989)..........................................51

*Wyatt v. Cole*, 504 U.S. 158 (1992) ........................................................................45

*Young v. Correctional Healthcare Companies, Inc.*, ___ F. Supp. 3d ____,
   2024 WL 866286 (N.D. Okla. Feb. 29, 2024) ..................42-44, 46, 51, 53-55, 59

## FEDERAL STATUTES AND RULES

28 U.S.C. § 1291 ........................................................................................................2

28 U.S.C. § 1331 ........................................................................................................1

42 U.S.C. § 1983 ........................................................................... 1, 4, 15, 61

Fed. R. App. P. 4(a)(1)(A) .........................................................................................2

Fed. R. Civ. P. 50(a)(1)-(2) .....................................................................................13

Fed. R. Civ. P. 50(b) ................................................................................. 10, 13, 14

Fed. R. Civ. P. 50(b)(1)-(3).....................................................................................14

Fed. R. Civ. P. 59(a)(1)(A) .....................................................................................29

Fed. R. Evid. 403 ....................................................................................... 37, 38, 39

<u>**APPELLANT'S OPENING BRIEF**</u>

Defendant/Appellant Sheriff of Ottawa County, in his official capacity, appeals from the District Court's Judgment entered September 8, 2023, the Opinion and Order awarding fees entered on February 29, 2024 and the Order denying Appellant's Motion for Judgment as a Matter of Law, Motion for New Trial, and Motion for Remittitur entered on February 29, 2024. Appellant hereby submits his Opening Brief for the Court's consideration on appeal.

## I.    STATEMENT OF JURISDICTION

### A.    Subject Matter Jurisdiction of the District Court

Plaintiff/Appellee Austin Bond, as the personal representative of Decedent Terrill Ellis brought this action against the Sheriff of Ottawa County, his official capacity, alleging violations of Decedent Ellis's Eighth and Fourteenth Amendment rights under the United States Constitution and 42 U.S.C. § 1983 in the United States District Court for the Northern District of Oklahoma. [App. Vol. I, 0044-0062]. The District Court therefore had jurisdiction of the matter under 28 U.S.C. § 1331.

### B.    Timeliness of Appeal

At a jury trial conducted in this matter on August 15-23, 2023, the jury returned a verdict in favor of Appellee, awarding him $33 million in compensatory damages. [App. Vol. IV, 1011]. The District Court entered judgment in favor of Appellee on September 8, 2023. [App. Vol. IX, 1821]. On October 5, 2023,

Appellant filed a Rule 50(b) Motion for Judgment as a Matter of Law, a Rule 59 Motion for New Trial, and a Rule 59 Motion for Remittitur [App. Vol. XI, 2269-Vol. XII, 2667]. The District Court denied those three Motions in a single Order and entered its Opinion and Order awarding attorney fees, both on February 29, 2024. [App. Vol. XIV, 3088-3133; 3134-3164]. Appellant filed his Notice of Appeal twenty-eight (28) days later on March 27, 2024. [App. Vol. XIV, 3244]. This appeal is timely pursuant to Fed. R. App. P. 4(a)(1)(A).

### C.    Appellate Jurisdiction

The Judgment entered by the District Court and Orders being appealed disposed of all claims against all parties. [App. Vol. IX, 1821; Vol. I, 0073-0095; Vol. X, 2266]. The Tenth Circuit has appellate jurisdiction over this matter pursuant to 28 U.S.C. §1291.

## II.    STATEMENT OF RELATED APPEALS

There is one prior related appeal in this matter, *Bond v. Horn*, Appeal No. 22-5101.[1] The appeal was an interlocutory appeal taken by Appellant's former Co-Defendants who had been sued in their individual capacities and denied qualified immunity. The interlocutory appeal was dismissed at the request of the Appellees

---

[1] This appeal was consolidated with *Bond v. Bray and Shoemaker*, Appeal No. 22-5103.

2

and those parties were dismissed as Defendants in this case. [App. Vol. I, 0087-0095].

## III.    STATEMENT OF THE ISSUES

On appeal, Appellant seeks resolution regarding whether the District Court (1) erred in denying Appellant's Motion for Judgment as a Matter of Law; (2) abused its discretion in denying Appellant's Motion for a New Trial; and (3) abused its discretion in denying Appellant's Motion for Remittitur. Resolution of those issues in turn requires resolution of the following issues: (4) whether the jury's verdict was against the weight of the evidence; (5) whether the improper argument and conduct of Appellee's counsel influenced the jury's damages award; (6) whether the compensatory damages verdict was excessive and shocking to the judicial conscience; (7) whether the jury instructions were inadequate and contained erroneous law; (8) whether admitting testimony regarding state jail standards and voluntary National Commission on Correctional Health Care ("NCCHC") standards was erroneous; and (9) whether the District Court abused its authority in awarding attorney's fees. Appellant seeks resolution of those issues.

## IV.    STATEMENT OF THE CASE

This case arises from the detention of Terral Ellis in the Ottawa County Jail from October 10, 2015 until his death on October 22, 2015. Appellee, as personal representative of Ellis's estate, brought suit against Appellant pursuant to 42 U.S.C.

§ 1983 claiming Ellis was denied medical care in the jail in violation of his Eighth and Fourteenth Amendment rights. Specifically, Appellee alleged Ellis's death was the result of deliberate indifference by jail staff to Ellis's serious medical needs. Suit was brought against Appellant only in his official capacity, thus Appellee's sole claim against him was premised on a theory of municipal liability. [App. Vol. I, 0044]. At trial, Appellee sought to establish municipal liability on the basis of a systemic failure of the healthcare delivery system in addition to traditional municipal liability and failure to train theories.

Following an eight-day trial, the jury returned a verdict in favor of Appellee, awarding $33 million in compensatory damages. [App. Vol. VIII, 1821]. Appellee was awarded $970,402.00 in attorney's fees and expenses and $19,480.54 in costs. [App. Vol. XIV, 3134-3164]. Appellant timely filed a Motion for Judgment as a Matter of Law, a Motion for New Trial, and a Motion for Remittitur, all of which were denied by the District Court. [App. Vol. XI, 2269-Vol. XII, 2667]. Appellant sought reconsideration of the denial of the Motion for New Trial and Motion for Remittitur, which was denied by the District Court on June 5, 2024. [App. Vol. XIV, 3165-3243; 3266-3282].

## V.    STATEMENT OF THE FACTS

Ellis was booked into the Ottawa County Jail on October 10, 2015. [App. Vol. XV, 3292-3302]. During book-in, Ellis disclosed he had asthma but did not disclose

any other medical conditions. [App. Vol. XV, 3292-3302]. At that time, Theresa Horn, LPN, was employed as the jail nurse with responsibility for providing medical care to inmates. [App. Vol. XV, 3337-3340; 3362-3364]. The jail additionally contracted with Physician Assistant Aleta Fox for an additional level of care when Horn determined such care was needed. [App. Vol. XV, 3291; 3351].

On October 17, Ellis complained of having a broken back, which he attributed to sleeping on a hard bunk. [App. Vol. XV, 3337]. However, he was mobile and denied having fallen or otherwise being injured. *Id.* Horn advised staff to give Ellis ibuprofen and that she would see him on Monday. *Id.* He was seen on Monday, examined, and diagnosed with a dislocated or broken rib. [App. Vol. XV, 3337-3338]. As that condition has no treatment, Ellis was given more ibuprofen and advised he could see the PA when she made rounds. *Id.* On October 21, Ellis experienced a medical event that appeared to be a seizure, for which an ambulance was called. [App. Vol. V, 1135 (341:22-342:15, 366:24-367:24); Vol. VIII, 1663 (1167:1-5); Vol. XV, 3338]. EMS personnel arrived, took Ellis's vital signs and noted that he was not experiencing an acute medical emergency. *Id.* Although they did not think Ellis's condition was an emergency, they were prepared to transport Ellis to the hospital. [App. Vol. IV, 0832 (pp. 293:18-294:9); Vol. V, 1135 (pp. 341:22-342:15; 366:24-367:24; 404:16-405:3)]. After EMS told Ellis he could not

use their phones to make a phone call, he refused transport and was not taken to the hospital. *Id.*

As instructed, officers, at 4:45p.m. placed Ellis in a holding cell near booking to monitor him for any further symptoms. [App. Vol. XV, 3338]. Several times during the evening and early morning hours, at 8:18p.m., 1:37a.m., and 3:23a.m., jailers observed Ellis walking to and from the bathroom without assistance. [App. Vol. XVI, 3392 (bookmark02:06); 3399 (bookmark12:37); 3400 (bookmark17:12)].

Around 10:00p.m., Ellis told staff he was having a hard time moving, was still in pain, and felt he was going numb from the waist down. Horn was called and she advised staff that EMS had already evaluated Ellis and to tell him he needed to get up, move around and utilize the bathroom himself. She advised that over-the-counter pain relief could be provided and that she would see Ellis the following morning. [App. Vol. XV, 3337-3340]. At 8:30a.m. and again at 8:43a.m., Ellis requested jailers call the E.R. but was told they were not calling the E.R. At about 9:00a.m., Ellis asked for a drink of water but staff did not retrieve the water; instead, believing Ellis could get up and walk, they left his cell door open for him to get the water himself. [App. Vol. XVI, 3412].

At approximately 10:45a.m., Horn got into a heated, profane verbal exchange with Ellis in his cell. He claimed his legs were turning black and he could not move them. Horn refused to look at his legs then profanely yelled that they were not black,

6

there was nothing wrong with him, and she was sick and tired of dealing with him. [App. Vol. XVI, 3413]. At 1:45p.m., staff checked on Ellis, noticed his feet and hands were slightly discolored and his arm was cold to the touch, and immediately requested Horn to come check Ellis, and then called EMS. [App. Vol. XV, 3338-3340]. Horn found Ellis was in respiratory distress but responsive, although she was unable to obtain a blood pressure reading. [App. Vol. XV, 3338-3340]. When EMS arrived, Ellis was awake and talking but at approximately 2:14p.m., suddenly became unresponsive. [App. Vol. XVI, 3414]. EMS attempted life saving measures and transported Ellis to the hospital where he was pronounced dead. [App. Vol. XV, 3341-3346]. His death was determined to be caused by sepsis/septic shock due to acute bronchopneumonia. [App. Vol. XI, 2293 (p. 994:17-22)].

## VI.   SUMMARY OF ARGUMENT

This verdict was not supported by the evidence and additionally was excessive and shocking to the conscience. As Appellee's deliberate indifference claim is a municipal liability claim against Appellant in his official capacity, Appellee was required to prove that Ellis's constitutional right to receive medical care was violated *and* that the violation was caused by the policies, procedures, or customs of the Appellant. In other words, Appellee was required to prove that jail staff were deliberately indifferent to a serious medical need of Ellis of which they were aware, that they failed to act to alleviate that risk, and that such actions were caused by the

policies or customs of the jail. The jury was presented with evidence that staff were not actually aware Ellis was experiencing a serious medical need. The jury was also presented with ample evidence that jail policies required medical care to be provided to inmates. While it was stipulated by the parties that jail policy largely was not followed in this case, there was no evidence that there was a history of constitutional violations related to medical care at the jail such that there was an official custom of deliberate indifference to medical needs.

Additionally, Appellee sought to establish municipal liability under incompatible theories of a systemic failure of the medical care delivery system and a failure to train jail employees. Although 42 U.S.C. § 1983 plaintiffs are free to pursue alternative theories of liability, the systemic failure exception to traditional municipal liability was not applicable to the facts of this case. The very limited exception only applies in situations where the medical care policies of a jail are nonexistent or when they result in no one individual having responsibility for decisions regarding inmate medical care. Furthermore, the law is clear that even in cases where the limited systemic failure exception *does* actually apply, a constitutional violation caused by a systemic failure cannot form the basis of a failure to train claim. Despite the evidence introduced having demonstrated that the limited systemic failure exception was not applicable, the jury was improperly instructed it could find Ellis's constitutional rights were violated as a result of a systemic failure.

The jury was also instructed it could find Appellant liable for failing to train staff, without an adequate explanation that a systemic failure cannot form the basis of a failure to train claim. Moreover, no instruction was given to the jury explaining that use of profane and abusive language toward an inmate is not a constitutional violation. The overall jury instructions did not accurately state or explain the applicable law and Appellant was prejudiced as a result.

Appellant was additionally prejudiced by the District Court's decision to admit testimony regarding state jail standards and standards used by NCCHC when such standards were not applicable to whether Ellis's constitutional rights were violated. Testimony regarding these standards and whether the jail followed them certainly confused and misled the jury about the issues they were to decide; namely whether Ellis's constitutional rights were violated. Such testimony should not have been introduced.

Ultimately, the jury was presented with evidence that Ellis was seen by the nurse multiple times during the twelve days he was in jail. The jury was also presented with evidence that an ambulance was called for Ellis less than twenty-four hours prior to his death. Not only did testimony reveal EMS personnel determined Ellis was not having an acute medical emergency at that time, Ellis refused to be transported by EMS to the hospital for further evaluation. Thus, even if the jury found that staff was deliberately indifferent to Ellis's serious medical needs, the

amount of time the deliberate indifference persisted and the amount of time for which Ellis could have suffered compensable damages can only be measured in hours. Yet the jury awarded a shocking $33 million in compensatory damages. The award was excessive and was the result of improper remarks and conduct by Appellee's counsel during closing arguments. The verdict size alone demonstrates that emotional displays by Appellee's counsel, combined with his statements to the jury that it should use the verdict as deterrence for future conduct even when punitive damages were not available against Appellant, improperly influenced the jury and its verdict. Even assuming the jury was not improperly swayed by Appellee's counsel's conduct, the verdict was still excessive and shocking to the conscience when compared to verdicts in similar cases.

The District Court erred in denying Appellant's Motion for Judgment as a Matter of Law and abused its discretion in denying Appellant's Motion for Remittitur and Motion for New Trial. Additionally, the District Court abused its discretion in the amount of attorney's fees and costs awarded to Appellee. Such decisions should now be reversed.

## VII.    STANDARDS OF REVIEW

Denial of a Rule 50(b) motion for judgment as a matter of law is *de novo*. *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1112 (10th Cir. 2004). The appellate court therefore applies the same legal standard as the district court. *Id.* A

refusal to grant a Rule 50(b) motion will be reversed "'if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position.'" *Id.* at 1112-13. An appellate court's review "is limited to determining whether the record – viewed in the light most favorable to the prevailing party – contains substantial evidence to support the jury's decision." *United Intern. Holdings v. Wharf,* 210 F.3d 1207, 1227 (10th Cir. 2000). When a court determines the evidence presented at trial was legally insufficient to support the verdict, the verdict cannot stand. *Wagner v. Live Nation Motor Sports,* 586 F.3d 1237, 1244 (10th Cir. 2009).

Denial of a motion for a new trial is reviewed for abuse of discretion. *Sanjuan v. IBP,* 160 F.3d 1291, 1296 (10th Cir. 1998). A jury verdict may be set aside when an error in admission of evidence prejudicially affects a substantial right of a party. *Id.* Evidence is prejudicial "'if it can be reasonably concluded that with or without such evidence, there would have been a contrary result.'" *Id.* (quoting *Smith v. Atlantic Richfield,* 814 F.2d 1481 (10th Cir. 1987)).

Evidentiary rulings are generally left to the broad discretion of the trial court and are subject to reversal only when based on an erroneous conclusion of law, erroneous finding of fact, or manifest error in judgment. *Leprino Foods v. Factory Mut. Ins. Co.*, 653 F.3d 1121, 1131 (10th Cir. 2011). When a motion for a new trial is premised on an error concerning the admittance of evidence, the verdict will not

be disturbed unless the court made a "clear error of judgment or "exceeded the bounds of permissible choice in the circumstances." *Weaver v. Blake*, 454 F.3d 1087, 1091 (10th Cir. 2006). Denial of a motion for new trial on the basis that the damages award was excessive, however, is reviewed under a "manifest abuse of discretion" standard, as is the denial of a motion for remittitur. *M.D. Mark, v. Kerr-McGee,* 565 F.3d 753, 766 (10th Cir. 2009). Under that standard the jury's verdict is not disturbed unless it is "so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the jury trial." *Id.*

Challenges to jury instructions are subject to two different standards of review. A district court's decision to give a particular jury instruction is reviewed for abuse of discretion. *Lederman v. Frontier Fire Protection,* 685 F.3d 1151, 1154 (10th Cir. 2012). The appellate court reviews "the record as a whole to determine whether the instructions state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable." *Wollard v. JLG Industries,* 210 F.3d 1158, 1174 (10th Cir. 2000). However, objections that the challenged instruction incorrectly states the governing law is reviewed *de novo*. *Lederman*, 685 F.3d at 1154. If it is determined that the trial court erred in admitting a particular instruction, it must then be determined whether the error was prejudicial to the appellant in light of the record as a whole. *Id.* at 1155.

Finally, an award of attorney's fees is reviewed for abuse of discretion. *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir. 1986). While underlying factual findings are reversible only if clearly erroneous, statutory interpretation that provides the basis for the award is reviewable *de novo*. *Id.*

## VIII.  ARGUMENT AND AUTHORITY

### 1).     DENYING JUDGMENT AS A MATTER OF LAW WAS ERROR

Appellant filed a Rule 50(b) motion in the District Court seeking judgment as a matter of law on the basis that the evidence presented at trial was legally insufficient to support the jury verdict. [App. Vol. XI, 2269-2340]. The District Court denied the Motion, concluding that the evidence at trial was sufficient to support a finding that Ellis's constitutional rights were violated and that the violation was the result of Appellant's policies, procedures, and customs, a failure to train, and/or a systemic failure of the healthcare system at the jail. [App. Vol. XIV, 3088-3133].

Rule 50(a) permits a court to grant judgment as a matter of law when the nonmoving party has been fully heard on an issue at trial and the court finds that there is no legally sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party on that issue. Fed. R. Civ. P. 50(a)(1)-(2). Rule 50(b) permits a party whose Rule 50(a) motion was not granted at trial to file a renewed motion for judgment as a matter of law after judgment has been entered in favor of

the nonmoving party. When presented with such a motion the court may allow judgment on the verdict, order a new trial, or direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b)(1)-(3). "'Judgment as a matter of law under Rule 50 'is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position.'" *Mountain Dudes v. Split Rock Holdings,* 946 F.3d 1122, 1129 (10th Cir. 2019) (quoting *In re: Cox Enters.,* 871 F.3d 1093, 1096 (10th Cir. 2017)). In other words, judgment as a matter of law is granted when "'the evidence conclusively favors one party such that reasonable [people] could not arrive at a contrary verdict.'" *Id.* (quoting *Bill Barrett Corp. v. YMC Royalty,* 918 F.3d 760, 766 (10th Cir. 2019) (per curiam)). When a court determines the evidence presented at trial was legally insufficient to support the jury verdict, the verdict cannot stand. *Wagner, supra,* 586 F.3d at 1244.

Here, Appellant's Rule 50(a) Motion was denied during trial. [App. Vol. VII, 1476 (pp. 1028:1-1035:8)]. Following entry of the judgment, Appellant filed a renewed Motion pursuant to Rule 50(b). [App. Vol. XI, 2269-2340]. The evidence in this case conclusively favors Appellant under the applicable law, such that reasonable persons could not arrive at a different conclusion. *Barrett, supra,* 918 F.3d at 677. The Order denying Judgment as a Matter of Law should be reversed for the reasons discussed in Section 2(A)-(D) below.

14

### 2).    THE VERDICT IS NOT SUPPORTED BY THE EVIDENCE

As indicated in Section 1, Appellant moved for judgment as a matter of law in his favor on the grounds that the evidence at trial was legally insufficient to support the jury verdict. Additionally, as indicated in Section 3 below, Appellant moved for a new trial on the grounds the jury verdict was against the weight of the evidence. Appellant has appealed the denial of both Motions. Because the applicable law and evidence supporting each of these arguments is identical, Appellant has discussed them together in Section 2.

Appellee's §1983 claim against Appellant, in his official capacity, is a claim for municipal liability. Official capacity suits seek to impose liability on the governmental entity which the official represents. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n. 55 (1978). The official capacity claim against Appellant is therefore a claim against Ottawa County itself. Consequently, Appellant cannot be held liable under §1983 based upon the doctrine of *respondeat superior* or vicarious liability. *Id.* at 694-95.

A governmental entity is only liable under §1983 when the constitutional injury can fairly be said to have been caused by that entity's own policies and customs. *Id.* The actions of the governmental entity must be the moving force behind the constitutional violation. *Id.* In other words, municipal defendants may not be held liable simply because they employ a tortfeasor. *Board of County*

*Commissioners of Bryan County v. Brown*, 520 U.S. 397, 403 (1997). Rather, *Monell* requires that Appellee establish Appellant had a policy or custom in place which caused the alleged constitutional violations. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821-22 (1985); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (holding that a plaintiff must show that there is a direct causal link between the policy or custom and the injury alleged).

Although Appellee sought to skirt traditional municipal liability analysis by asserting Ellis's constitutional rights were violated as a result of Appellant's failure to train his employees and as a result of a systemic failure of the healthcare delivery system at the jail, the evidence at trial did not support that there was a failure to train and the very narrow municipal liability exception recognized in *Crowson v. Washington Co.*, 983 F.3d 1166 (10th Cir. 2020) is not applicable to the facts of this case.

### A.    No Underlying Constitutional Violation

The lack of a constitutional violation by the officers of a municipality negates a finding of liability against the municipality itself. *Hinton,* 997 F.2d at 782. In this case, the evidence at trial did not support the jury's finding that Ellis's constitutional rights were violated.

The right of an inmate to receive medical care in a jail is well-established. *Paugh v. Uintah County*, 47 F.4th 1139, 1153 (10th Cir. 2022). That right is violated

when a jail official is deliberately indifferent to the serious needs of a prison inmate or pre-trial detainee. *Id.* (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)); *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Proof of deliberate indifference to a serious medical need is required to succeed on a §1983 claim for denial of medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Mere negligence – even gross negligence – is insufficient to support a deliberate indifference claim. *Berry v. City of Muskogee,* 900 F.2d 1489, 1495 (10th Cir. 1990) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 and n.7 (1989)).

"[D]eliberate indifference is a stringent standard of fault, requiring proof that [an] actor disregarded a known or obvious consequence of his action." *Brown*, *supra*, 520 U.S. at 410. A §1983 claim alleging inadequate or delayed medical care involves "both an objective and subjective component, such that [the Court] must determine both whether the deprivation is sufficiently serious and whether the government official acted with a sufficiently culpable state of mind." *Oxendine v. Kaplan,* 241 F.3d 1272, 1276 (10th Cir. 2001). For the objective component, a medical need is considered sufficiently serious if a physician has diagnosed the condition and mandated treatment, or the condition is so obvious that even a lay person would easily recognize the medical necessity for a doctor's attention. *Id.* at 1276.

Under the subjective component, Appellee had to establish staff knew of a substantial risk of harm to Ellis and failed to take reasonable measures to abate that

risk. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). He had to prove staff were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that they actually drew that inference. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). Jail officials who act "solely…as a gatekeeper to other medical personnel capable of treating the condition" may be held liable if they delay or refuse to fulfill that gatekeeper role. *Id.* The subjective prong of the deliberate indifference test was at issue at this trial. To satisfy that prong, Appellee had to prove staff both knew of a substantial risk of harm to Ellis *and* failed to take reasonable measures to abate that risk of harm. *Hunt, supra,* 199 F.3d at 1224. Notably, "[a]n official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).

Trial testimony established that staff failed to perceive there was a substantial risk of harm to Ellis from the time he was seen by EMS on October 21 until they called EMS again the next afternoon. On October 21, less than 24 hours prior to his death, Ellis experienced a seizure. [App. Vol. V, 1135 (pp. 341:22-342:15)]. When staff became aware of this, EMS was called. [App. Vol. V, 1135 (pp. 341:22-342:15, 366:24-367:24)]. EMTs examined Ellis and determined he had no acute medical concerns. [App. Vol. V, 1135 (pp. 341:22-342:15, 366:24-367:24); Vol. VIII, 1663

(p. 1157:1-5)]. Horn testified that the next morning, October 22, she did not believe Ellis was faking his illness, but believed he was being untruthful about what was actually wrong with him because what he was telling her did not match what she was seeing. [App. Vol. X, 2019 (pp. 726:16-727:10)]. She and other staff clearly failed to perceive the significant risk of harm to Ellis at that time. [App. Vol. III, 0715 (pp. 135:6-16); Vol. IV, 0823 (pp. 263:15-270:25)]. Appellee's own expert agreed staff did not really think Ellis was actually ill. [App. Vol. VII, 1476 (pp.1022:10-2)]. He further testified that since staff had seen Ellis walking around hours earlier, staff could reasonably presume Ellis was not actually as ill or injured as he said and that no ambulance needed to be called. [App. Vol. VII, 1476 (pp. 1015:5-1016:20)]. Once staff *did* draw the inference that Ellis's condition was an emergency, they *did* call EMS.

Even if the risk was obvious and staff were grossly negligent in failing to perceive and appreciate obvious signs of illness, they were not deliberately indifferent to Ellis's medical needs if Ellis did not receive medical attention due to their failure to perceive a substantial risk of serious harm. *Tafoya, supra,* 516 F.3d at 916. Not only did testimony show staff simply did not perceive that risk, Appellee's expert testified that based on what staff knew and witnessed regarding Ellis's physical symptoms, the failure to perceive the severity of his illness was reasonable under the circumstances. Combined with the fact that less than twenty-

four hours earlier EMS had examined Ellis and found no acute illness, the evidence does not support that any staff actually drew the inference Ellis was at a substantial risk of serious harm.

Moreover, Ellis refused to allow EMS to take him to the hospital less than 24 hours prior to his death, even though they were prepared to transport him. [App. Vol. IV, 0832 (pp. 293:18-294:9); Vol. V, 1135 (pp. 341:22-342:15; 366:24-367:24; 404:16-405:3)]. This very crucial evidence was not considered by the District Court when concluding that the weight of the evidence supported the verdict. [App. Vol. XIV, 3088-3133]. The District Court's Order cited testimony that Horn and other staff believed nothing was wrong with Ellis on the morning of his death but ignored the EMS findings and Ellis's refusal to go to the hospital less than 24 hours before.

The jury's finding that Ellis's constitutional rights were violated is not supported by the evidence. Appellant is therefore entitled to Judgment as a Matter of Law. For the same reason, the denial of Appellant's Motion for New Trial was arbitrary, capricious, and outside the bounds of permissible choice given the evidence at trial.

### B.    No Policies, Procedures, or Customs Caused a Violation

Both Appellant and Appellee introduced evidence of the policies which were in place regarding inmate medical care. The parties made numerous stipulations regarding the policies and the jury was advised of those stipulations. [App. Vol. IV,

0948-0952]. The jury was instructed that the following facts regarding policies were not in dispute and required no proof: policies existed which required medical care to be delivered under the direction of a licensed physician, required a schedule for sick call, permitted detention officers to call emergency services if the nurse was not available, required the jail administrator to review statistics on inmate medical care, and required the administrator and nurse to review the medical care's effectiveness and efficiency quarterly. *Id.* While the parties also stipulated some were largely not followed, a violation of internal policy does not equate to or establish a constitutional violation. *Tanberg v. Sholtis*, 401 F.3d 1151, 1163-65 (10th Cir. 2005). Policy also stated that inmates are entitled to health care comparable to that available in the surrounding community and that no jail employee will ever "summarily or arbitrarily" deny a request for medical service. [App. Vol. XV, 3285-3290; 3372-3375]. The jail clearly had policies in place to provide for inmate access to emergency and non-emergency medical care. [App. Vol. XV, 3370-3379].

Appellee argued that language from the jail nurse's job description constituted a policy of deliberate indifference to inmates' medical needs because it advised the nurse to "[n]ever let your guard down" and not to let inmates "gain your trust." [App. Vol. XV, 3352-3364]. But testimony demonstrated that was neither the intent nor the effect of the policy. Then-Jail Administrator Jeff Harding testified the policy meant "trust but verify," meaning staff should verify anything inmates tell them

because sometimes they are untruthful and occasionally fake illnesses. [App. Vol. IV, 0823 (pp. 263:15-25, 292:4-293:5)]. Fox testified that this was a standard policy and practice in correctional medicine as she was trained on that at another correctional facility. [App. Vol. VIII, 1663 (pp. 1223:18-1224:25)]. Appellee's expert agreed, testifying it is important for staff to observe and consider what they are actually seeing, not rely just on what the inmate is telling them. [App. Vol. VII, 1476 (pp. 1015:5-13)].

There were no other deaths in the jail during the jail administrator's tenure. [App. Vol. IV, 0823 (pp. 263:2-5)]. Then-Sheriff Terry Durburow testified he wanted to improve the quality of healthcare for inmates so he contracted with Fox to provide an additional level of healthcare over and above that provided by the nurse. [App. Vol. XVI, 3415; Vol. XI, 2237-2238 (pp. 44:17-45:18; 46:01-25)]. Prior to Ellis's death, Appellant had no reason to believe the healthcare being provided to inmates may possibly violate constitutional rights. He had no prior knowledge of any staff treating or interacting with any inmate in the manner done with Ellis. [App. Vol. XVI, 3415; Vol. XI, 2239-2340 (pp. 175:02-05, 176:9-11)].

The denial Order cites to *Waller v. City and Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019) which held that a single incident of a constitutional violation is insufficient to establish a patter or a custom for municipal liability purposes, and to *Hinkle v. Beckham Co.*, 962 F.3d 1204, 1241 (10th Cir. 2020), which held that the

challenged custom must be "closely related to the violation of the plaintiff's federally protected right." [App. Vol. XIV, 3088-3133]. The Order then points to testimony from a former jail employee which stated that another jailer "encouraged his subordinates to violate a written policy as it related to self-defense" as evidence that disregard for written policy was a custom of the jail. [App. Vol. XIV, 3097; 3104]. A self-defense policy is not closely related to the alleged violation of Ellis's constitutional rights regarding medical care. While the Order also cites to testimony from Fox that she did not have a set day to visit the jail as her contract required, no evidence was presented that there was a history of previous constitutional violations regarding detainee healthcare. The Order additionally mentions the failure of Horn to check the vitals of an inmate who was experiencing chest pain, whom she had diagnosed with an anxiety attack. [App. Vol. XIV, 3104-3106]. Assuming that incident was sufficiently similar, the District Court, and the jury, impermissibly relied on evidence of *one* other potential incident to establish that the jail had an informal custom of deliberate indifference to inmate healthcare. Evidence of only one other prior sufficiently similar incident does not put a defendant on notice that a problem exists and does not establish a custom for municipal liability purposes. *Waller, supra,* 832 F.3d at 1287.

The evidence clearly demonstrated the policies and procedures of the jail required that inmates receive medical care and that there was no established custom

of deliberate indifference to the serious medical needs of inmates. Consequently, under *Monell,* even if Ellis's constitutional rights *were* violated, any such violation cannot fairly have been to be proximately caused by any policy or procedure of Appellant. The jury's finding in favor of Appellee was therefore against the weight of the evidence.

### C.    No Systemic Failure/Inapplicability of *Crowson*

The jury was instructed that it could find municipal liability on the basis of systemic failure of the medical delivery system at the jail. However, *Crowson v. Washington Co.*, 983 F.3d 1166 (10th Cir. 2020) is not applicable to the facts of this case. In *Crowson*, an extremely limited exception to well-established § 1983 law was recognized wherein municipal liability may be established in situations where no one individual employee committed a constitutional violation but where the cumulative effect of multiple employees' actions taken as the result of a systemic lack or failure of policies and procedures results in a constitutional violation. *Id.* at 1191.

The *Crowson* court held that "[d]eliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care" and that even when "the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or

omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Id.* at 1186 (citing *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985)). The court qualified that statement by reiterating this is a limited exception to the general rule that "there must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable. *Id.* at 1191.

> **[S]ometimes the municipal policy devolves responsibility across multiple officers.** In those situations, **the policies may be unconstitutional precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation.** Where the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable. That is, the municipality may not escape liability by acting through twenty hands rather than two.

*Id.* (emphasis added). Thus, a municipality may be held liable under this limited exception when the "sum of actions" of many employees, each of whom have limited responsibility per an entity's policies, violates an individual's constitutional rights even if "no individual action by a single officer rises to a constitutional violation." *Id.* at 1191. But, all other elements of *Monell* liability must still be met and the limited exception does not apply to failure to train claims. *Id.* at 1187.

The systemic failure exemption applies when the evidence shows a "systemic lack of policies and procedures." *Id.* at 1188. Here, there was no evidence of a lack of policies or evidence that responsibility for providing medical care was diluted among numerous employees. Numerous policies were in place to provide for routine

and emergency medical care. [App. Vol. XV, 3283-3290; 3370-3379]. Horn was responsible for evaluating Plaintiff's medical condition and determining whether he needed medical care, emergency or otherwise. [App. Vol. XV, 3362-3364]. Even under *Crowson*, Appellee was still required to prove Ellis's constitutional rights were violated as a result of deliberate indifference to his medical needs, as well as prove that Appellant's policies and procedures were the driving force behind the collective employee conduct. *Id.* at 1190-1191. And he could not rely on a failure to train to meet his burden. *Id.* at 1187.

The Order denying Appellant's Motion for Judgment as a Matter of Law and Motion for New Trial concluded *Crowson* applied, despite the evidence in the case demonstrating otherwise, and despite a failure to train claim being at issue. [App. Vol. XIV, 3100-3102]. Appellant's Motion for Judgment as a Matter of Law should have been granted. Alternatively, the case should be remanded for a new trial, as the Order denying the Motion for New Trial was arbitrary and capricious.

**D.     The Evidence Did Not Support a Failure to Train**

The District Court concluded the evidence supported the jury could find liability based on Appellant's failure to train staff. There are limited circumstances where inadequacy in training can be a basis for §1983 liability. *City of Canton, supra*, 489 U.S. at 387. Inadequacy in training can establish municipal liability "only where the failure to train amounts to deliberate indifference." *Id.* at 388. Under the

law in effect at the time Ellis was detained in the jail, Appellee was required to prove Appellant both knew of and disregarded the substantial risk of inadequate training of his employees. *Id.* at 388. He was required to prove there was a policy or custom of the jail involving deficient training, that the policy or custom caused an injury, and that the policy or custom was adopted with the knowledge it could put citizens at a substantial risk of serious harm. *Waller, supra,* 932 F.3d at 1283-84.

The evidence at trial did not prove those elements. Harding testified jailers were required to complete annual training, that they review policies and procedures when hired, and that they received on-the-job training via shadowing, [App. Vol. IV, 0823 (p. 248:5-19)]. Policy required that staff be trained and Harding followed that policy when training them. [App. Vol. IV, 0823 (pp. 248:20-250:17)]. Durburow testified that new staff received 24 hours of training and all staff, including the jail nurse, received annual training on the jail's policies and procedures and Oklahoma Jail Standards. [App. Vol. XVI, 3415; Vol. XI, 2339-2340 (175:12-176:2, 176:5-177:4, 177:7)]. Durburow was personally aware the training had occurred because he watched the Undersheriff and Jail Administrator conduct the training. [App. Vol. XVI, 3415; Vol. XI, 2340 (177:8-15)].

The District Court determined there was sufficient evidence for the jury to conclude the jail had a policy of not training staff regarding inmate medical care. [App. Vol. XIV, 3101-3102]. The Order points to testimony that, in general, staff

were trained not to trust inmates. [App. Vol. XIV, 3097; 3100-3101]. However, testimony clarified that the policy regarding medical complaints of inmates was to "trust but verify." [App. Vol. IV, 0823 (pp. 292:4-293:5)]. Essentially then, the District Court concluded the testimony of a single officer stating he had never seen the policy book and had received no training on it was sufficient evidence of the jail having a custom or policy of not training staff regarding inmate medical care, that Appellant knew the policy of inadequate training created a serious risk of substantial harm, and that it led to the death of Ellis. [App. Vol. XIV, 3101-3102]. But there is no evidence in the record supporting that Appellant knew a policy of inadequate training created a serious risk of substantial harm and the Order does not identify any. Again, the evidence presented was that Appellant believed staff was being adequately trained. Because the evidence overwhelmingly shows staff was trained and Appellant did not have a policy of deliberate indifference to the need for additional training, the evidence is insufficient to support the verdict.

### 3). DENYING THE MOTION FOR NEW TRIAL WAS ABUSE OF DISCRETION

Appellant additionally filed a Motion for New Trial on the grounds that the jury's verdict was against the weight of the evidence, that the improper arguments and conduct of Appellee's counsel influenced the jury to return a shocking and excessive damages award, that the jury instructions were inadequate and erroneous,

and that admitting state jail standards and that the standards used by the NCCHC was erroneous. [App. Vol. XI, 2341-Vol. XII, 2551].

Rule 59 permits granting a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Parties seeking to set aside jury verdicts "must demonstrate trial errors which constitute prejudicial error, or that the verdict is not based on substantial evidence." *White v. Conoco,* 710 F.2d 1442, 1443 (10th Cir. 1983). A district court abuses its discretion when its decision to deny a motion for new trial is "arbitrary, capricious or whimsical" or falls outside "the bounds of permissible choice in the circumstances." *Dansie v. Union Pacific Railroad,* 42 F.4th 1184, 1198 (10th Cir. 2022).

Here, the District Court's denial of Appellant's Motion for New Trial was outside the bounds of permissible choice under the circumstances. Appellant maintains he is entitled to judgment as a matter of law as explained in Sections 1 and 2 above. Should this Court determine otherwise, the denial of the Motion for New Trial should be reversed and this case remanded for a new trial, as demonstrated below.

### A.    The Jury's Verdict Was Against the Weight of the Evidence

A new trial is proper when the court finds a jury's verdict to be against the weight of the evidence. *Holmes v. Wack*, 464 F.2d 86, 89 (10th Cir. 1972). Here, the

jury verdict was clearly and decidedly against the weight of the evidence as Appellant thoroughly discussed in Section 2 above. Consequently, the verdict should be set aside and the matter remanded for a new trial on that basis.

### B.    Erroneous and Inadequate Jury Instructions

In his Motion for New Trial, Appellant challenged two of the District Court's rulings on jury instructions. [App. Vol. XI, 2341-Vol. XII, 2551]. "Failure to properly instruct the jury requires a new trial if the jury might have based its verdict on the erroneously given instruction." *Henning v. Union Pacific Railroad,* 530 F.3d 1206, 1221 (10th Cir. 2008). A new trial may also be granted when there is "substantial doubt that the jury was fairly guided." *U.S. v. Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994). When ruling on a challenge to jury instructions courts must determine whether the jury was misled by the instructions, taken together as a whole, and whether the instructions as a whole gave the jury an "intelligent, meaningful understanding of the applicable issues and standards." *U.S. v. Winchell*, 129 F.3d 1093, 1096 (10th Cir. 1997). As a whole, the jury instructions in this case did not provide the jury a clear understanding of the issues and the applicable legal standards they were to apply when determining liability. *Martinez v. Caterpillar, Inc.*, 572 F.3d 1129, 1132 (10th Cir. 2009). Specifically, Instruction No. 17 contained an inaccurate statement of law in light of the other jury instructions given, and no instruction was given regarding the use of abusive language.

### 1.    Instruction No. 17 was Erroneous

Instruction 17, which instructed the jury on elements Appellee was required to prove to succeed on his deliberate indifference claim, informed the jury Appellee could satisfy his burden of proof on the third element by establishing that "the deliberate indifference of multiple agents and employees together, as a result of gross deficiencies in policies or staffing, proximately caused injury to Mr. Ellis." [App. Vol. IV, 1001-1002]. This language came from *Crowson,* the inapplicability of which was discussed in Section 1 above. The jury should not have been instructed it could find liability based on "deliberate indifference of multiple agents and employees together, as a result of gross deficiencies in policies or staffing" because the *Crowson* exception was not available in this case and because a failure to train claim was also at issue.

Appellant objected to the *Crowson* language of Instruction 17 multiple times before and during the trial arguing that *Crowson* was not applicable in a case such as this one where there were medical care policies in place and individual acts could be attributed to individual jail employees. [App. Vol. IV, 0934-0942; Vol. X, 2118 (pp. 882:22- 887:15); Vol. VII, 1476 (pp.1031:2-1032:6, 1048:3-1053:15)]. Appellant specifically objected on the grounds that *Crowson* was a limited exception and that including language from *Crowson* in the jury instructions would confuse the legal standards between negligence and deliberate indifference. [App. Vol. X,

2118 (pp. 882:22- 887:15); Vol. VII, 1476 (pp. 1048:3-1053:15)]. The parties briefed their objections to the proposed jury instructions during trial and Appellant objected to Instruction 17 based on the *Crowson* language. [App. Vol. IV, 0934-0942]. The Court seemed to recognize the inherent confusion the *Crowson* language creates, as the judge was initially unsure whether Appellee intended to communicate to the jury that a constitutional violation was or was not required by proposing use of the language. [Vol. X, 2118 (pp. 882:22- 887:15)]. Yet the Court included the language over Appellant's objection.

Appellant further argued Instruction 17 was improper because a failure to train claim was at issue in this case and *Crowson* made very clear that the narrow systemic failure exemption does not and cannot apply in cases where the theory of liability is failure to train. [App. Vol. XI, 2341-2551]. Taking the jury instructions as a whole, the inclusion of the *Crowson* language likely misled the jury as to what Appellee was actually required to prove in his deliberate indifference claim.

The District Court addressed Appellant's argument that Instruction 17 gave the impression that no finding of a constitutional violation was required, stating that Appellant's argument had no merit. [App. Vol. XIV, 3120]. Although the Order acknowledged in footnote 9 that Appellant argued inclusion of language from *Crowson* was improper because it was only applicable in limited situations, the court did not address that argument. *Id.* Rather, it framed the argument only in terms of

whether the instruction made clear that an underlying constitutional violation was required. The Order expressly acknowledged that *Crowson* only applies to claims regarding policies or customs, and not failure to train claims. [App. Vol. XIV, 3100, fn. 4]. The fact is, the jury was instructed that it could find an underlying constitutional violation occurred on the basis of *Crowson* and was also instructed that it could find Appellant liable for a constitutional violation based on a failure to train. [App. Vol. IV, 1004-1005]. The Order did not address Appellant's argument in that regard.

The instructions as a whole therefore did not accurately state the law given that the *Crowson* language was included in Instruction 17 despite Appellee having also made a claim based on failure to train.

### 2.    Abusive Language Instruction Not Given

Compounding the *Crowson* instruction issue is the fact that the jury was not instructed on the applicable law regarding abusive language and constitutional violations. Before trial, Appellant proposed a jury instruction providing that

> mere words alone – no matter how insensitive or reprehensible – are insufficient to establish a constitutional violation. Verbally abusive language, taunts, threats, and deplorable, offensive, or unprofessional language toward an inmate do not amount to a constitutional violation.

[App. Vol. III, 0680-0683]. It was proposed again during trial due to the fact that Appellee had repeatedly shown a video of Horn using abusive language and threats

against Ellis, repeatedly suggesting that the abusive language was the last thing Ellis heard before his death and inferring the use of such language was a constitutional violation. [App. Vol. IV, 0934-0942]. In considering the instruction, the Court agreed with Appellant, noting that "this language has been emphasized again and again and again, and we've heard it a lot and that it's taken a certain prominence here." [App. Vol. VII, 1476 (pp.1070:18-22)].

However, the Court ultimately did not include the instruction, over Appellant's objection. [App. Vol. VII, 1476 (pp.1067:6-1071:15)]. So despite being exposed to the language *ad nauseum* and despite the language being a central theme of Appellee's questioning of witnesses and argument, the jury was left to decide liability without any instruction on whether abusive language is a constitutional violation. Case law is clear that abusive language and threats, on their own, do not violate an inmate's constitutional rights. *McBride v. Deer*, 240 F.3d 1281, 1291, n. 3 (10th Cir. 2001); *Adkins v. Rodriguez*, 59 F.3d 1034, 1037-38 (10th Cir. 1995); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (per curiam).

In denying the Motion for New Trial, the District Court determined Appellant's argument in this regard is meritless because the instruction was unnecessary due to the court explaining to the jury "that for the purposes of finding liability, '[a]n official's actions or inactions falling below the standard of care, as well as a violation of state statute or jail policy may be evidence of deliberate

indifference, but alone are not sufficient to find liability.'" [App. Vol. XIV, 3120-3121]. This general instruction does not tie abusive language to any of those actions, nor does it explain that abusive language is not a constitutional violation but may fall into one of those categories. Nor does the Order indicate how the jury was to know the abusive language, which was prominent feature of Appellee's case, belonged in one of those categories.

Because the jury was left without a meaningful explanation of the applicable law and there is doubt the jury was fairly guided, a new trial is warranted. *See Smith*, *supra*, 13 F.3d at 1424. The denial of the Motion for New Trial was arbitrary, capricious, and outside the bounds of permissible choices. The matter should be remanded for a new trial.

### C.     Admitting Testimony Regarding NCCHC and State Jail Standards Was Error

At trial, counsel for Appellee questioned witnesses at length regarding the jail standards set by the Oklahoma Department of Health and the jail standards used by the NCCHC, whether the care provided to Ellis conformed to those standards, and whether the policies and procedures of the jail conformed to those standards. Appellant objected to testimony regarding those standards in a pre-trial Motion [App. Vol. I, 0099-0101] and again at trial [App. Vol. V, 1012 (pp. 5:2-8:18); Vol. VII, 1476 (pp. 906:7-12, 907:8-17)] due to the risk of confusing the jury. Appellant further objected to testimony regarding NCCHC standards on the grounds they are

35

voluntary standards which are not required to be followed. [App. Vol. V, 1012 (pp. 5:2-8:18)]. The pre-trial ruling on the Motion in Limine acknowledged that "[a]dmission of state and national standards could generate a risk of confusion of the issues and may mislead the jury if the jury believed conduct inconsistent with those national and state standards to be solely dispositive of deliberate indifference" but still denied the Motion, stating the risk of prejudice and confusion did not outweigh the probative value. [App. Vol. II, 0356-0358].

The District Court stated it would issue an instruction to help avoid confusion. [App. Vol. II, 0358-0376]. Instruction Number 21 was given to the jury, which informed them that a violation of State law, regulation or policy may be evidence of, but by itself, would be insufficient, to show deliberate indifference or liability under § 1983." [App. Vol. IV, 1007]. When Appellee's counsel began questioning Jail Administrator Harding regarding the Oklahoma Jail Standards, the District Court instructed the jury that

> [y]ou're going to start hearing about some jail standards, some national and state standards, throughout the trial. You are allowed to consider these, but you should not consider these standards as solely dispositive of whether the sheriff's office acted with deliberate indifference. So you should consider them, but you should not consider them solely dispositive.

[App. Vol. V, 1012 (pp. 61:14-20)]. Still, it was apparent there was confusion present during that questioning in the distinction between state jail standards and jail

policy, and differences in what each requires. [App. Vol. III, 0715 (pp. 159:9-163:25)].

When Appellee's expert Todd Wilcox testified on the NCCHC standards, Appellant made a continuing objection on the basis of relevance, but the Court overruled the objection and did not give a renewed or reminder instruction regarding the standards at that time. [App. Vol. VII, 1476 (pp. 906:7-12, 907:8-17)]. There was additional confusing testimony regarding the NCCHC standards. Wilcox testified that the NCCHC is merely a "not-for-profit organization that advocates for healthcare in correctional facilities," but then also testified that "there have been legal rulings that have mandated NCCHC accreditation of different facilities." [App. Vol. VII, 1476 (pp. 991:1-992:6)]. When asked by defense counsel on cross whether the jail was required to obtain that accreditation, he noncommittally answered that he was "not familiar with that." *Id.* This clearly created a confusing issue for the jurors regarding these inapplicable, irrelevant jail standards and their relationship to a constitutional violation. That confusion ultimately prejudiced Appellant.

In *Estate of Briones v. Ardrey*, the court analyzed whether a report finding that the defendants did not comply with policies and standards regarding medical care provided to an inmate should be excluded under FRE 403 due to its risk of prejudice and confusion of the issues. Discussing *Tanberg v. Sholtis*, 401 F.3d 1151, 1163-65 (10th Cir. 2005), the court stated:

> Were plaintiffs permitted to introduce the internal investigative report, which found that defendant violated Sheriff's office policies, the jury may make a decision based "on an improper basis," that is, that violation of the county's internal policy has some bearing on whether defendant committed a constitutional violation. *U.S. v. Irving*, 665 F.3d 1184, 1213 (10th Cir. 2011) (citation omitted). *Tanberg v. Sholtis*, 401 F.3d 1151, 1163-65 (10th Cir. 2005), is instructive. There . . . the Tenth Circuit determined that explaining internal procedures, and the relevant standards for those procedures, would be confusing and time consuming, particularly where those standards are nearly identical to the constitutional standard. *Id.* at 1164-65.

*Estate of Briones v. Ardrey*, 2021 WL 4170460, *1 (D. Colo. Sept. 14, 2021) [App. Vol. XII, 2550-2551].

The *Briones* court held that the standards should be excluded under FRE 403 whether they were similar to or different from constitutional standards. *Id.* at *2. If the standards were different than the constitutional standards, they were irrelevant because the fact that the defendants did not follow the standards would not make it more or less likely that they also violated the inmate's constitutional rights. *Id.* If, on the other hand, the standards were similar to the constitutional standards, it would confuse the jury and tempt them to conclude that if defendants failed to comply with standards similar to actual law, they must also have violated constitutional requirements. *Id.* Allowing the evidence at trial would thus have "a substantial risk of leading the jury to resolve the constitutional question here based on an improper purpose, and could confuse the jury into thinking that the violation of the policy is somehow relevant to the constitutional claim." *Id.* Appellant relied on *Tanberg* in its

Motion in Limine [App. Vol. I, 0098-0233] but the court determined that *Tanberg* was not applicable. [App. Vol. II, 0351-0378]. However, *Briones* makes clear that *Tanberg* was entirely applicable here and that questioning witnesses on state and "national" jail standards should have been excluded under Rule 403 due to the resulting confusion and prejudice to Appellant.

The District Court's Order states that under *U.S. v. Murry*, 31 F.4th 1274, 1291 (10th Cir. 2022) it would have been appropriate to exclude the testimony "if the risk of prejudice and confusion substantially outweigh the relevance, where probative value is given its maximum force and prejudice its minimum value." [App. Vol. XIV, 3121-3123]. The District Court held that the standards had significant probative value and could establish circumstantial evidence of deliberate indifference. *Id.* It further found that any prejudicial effect was mitigated by the instruction given by the jury on the standards not being "solely dispositive." *Id.* But the Order did not address the large amounts of confusion created by the testimony regarding which standards required which actions and whether the jail was required to follow those standards.

Evidentiary rulings may be overturned and a new trial granted when a district makes a "clear error of judgment" or it "exceeded the bounds of permissible choice in the circumstances." *Weaver, supra,* 454 F.3d at 1091. A new trial is proper when there is "grave doubt" as to whether the error had a "substantial influence" on the

verdict. *U.S. v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). Here, there is grave doubt as to whether the jury understood and appreciated the distinction between constitutional standards and whether the confusion admitting the testimony created substantially influenced the verdict. The matter should be remanded for a new trial.

### D. Improper Arguments and Conduct of Appellee's Counsel

Appellant additionally sought a new trial on the grounds that the closing arguments and conduct of Appellee's counsel were improper and impermissibly influenced the jury's verdict, resulting in a grossly excessive damages award that is shocking to the conscience. [App. Vol. XI, 2341-Vol.XII, 2551]. The District Court rejected these arguments, finding that the conduct of Appellee's counsel was not pervasive, that the court took adequate curative action, and that the size of the verdict was neither shocking nor excessive. [App. Vol. XIV, 3110-3118]. It specifically found the improper closing remarks "were made in rebuttal to the Defendant's arguments that the jury should not 'punish the county' and focus on compensating Mr. Ellis for his injuries and internalizing those costs." *Id.* The denial of the Motion for New Trial was arbitrary and capricious and should be reversed.

A new trial may be ordered due to the misconduct of counsel when the moving party demonstrates it was prejudiced as a result of that conduct. *Abuan v. Level 3 Comm.,* 353 F.3d 1158, 1175 (10th Cir. 2003). Whether misconduct was harmful enough to require a retrial is at the discretion of the Court. *Angelo v. Armstrong*

*World Indus,* 11 F.3d 957, 962 (10th Cir. 1993). Likewise, improper arguments by counsel warrant a new trial when it "clearly appears that the challenged remarks influenced the verdict." *Id.* at 1168 (10th Cir. 2017). Here, Appellee's counsel took improper actions, including crying while questioning a witness and while making his closing argument, and made improper remarks which clearly influenced the jury verdict. In *Whittenburg v. Werner Ent.,* 561 F.3d 1122 (10th Cir. 2009), the Tenth Circuit explained that courts should weigh three factors when determining whether a new trial is warranted. *Id.* at 1133. Those factors include the extensiveness of the improper statements or conduct, the absence of any meaningful action, and the size of the verdict. *Id.* When weighing the factors indicates that misconduct influenced the verdict, the trial court may order a new trial. *Osterhout v. Bd. of Cty. Comm'rs*, 10 F.4th 978, 992 (10th Cir. 2021).

### 1.    Pervasiveness

The misconduct of counsel and improper remarks were present beginning on the first day of trial but were even more extensive during closing arguments. While questioning Harding, Appellee's counsel began to cry in front of the jury. [App. Vol. V, 0715 (pp.148:7-150:2)]. Defense counsel objected to the emotional display. *Id.* Prior to closing arguments, the Court issued a preemptive warning to Appellee's counsel regarding getting emotional in front of the jury. [App. Vol. VIII, 1663 (pp.1087:6-1088:14)]. Yet, during closing, he again apparently began to cry, but

denied he was crying, despite the fact that defense counsel observed him doing so and objected, and the judge confirmed she heard him sniffling. [App. Vol. IX, 1822 (pp.1453:2-24)].

Appellant recognizes that "closing arguments need not, nor should, be a sterile exercise devoid of passion," that parties are "entitled to have someone speak with eloquence and compassion for their cause," and that closing arguments may be dramatic without constituting error. *Whittenburg*, 561 F.3d at 1133. However, there are limitations on passion and blatant appeals to prejudice. *Id.* at 1128. Decisions from New Jersey and Illinois have stated that it is highly improper for counsel to cry during closing arguments, as that action inflames the emotions of the jury. *See People v. Brown*, 2015 Ill. App. 4th. 130412 (Ill. App. Ct. 2015); *People v. Dukes*, 12 Ill.2d 334, 146 N.E.2d 14, 17 (1957); *Carey v. Lovett*, 622 A.2d 1279 (N.J. 1993). The jury was exposed to Appellee's counsel purportedly crying at the outset and during closing, despite Appellant's objections and the Court's preemptive warnings. When the jury's verdict is the product of counsel inflaming their passions, the proper remedy is a new trial. *Moody v. Ford Motor Co.*, 506 F.Supp.2d 823, 847 (N.D. Okla. 2007).

The same day the District Court entered its Order denying Appellant's post-trial Motions, the court in *Young v. Correctional Healthcare Companies, Inc.*, ___ F. Supp. 3d ____, 2024 WL 866286 (N.D. Okla. Feb. 29, 2024) (attached as Exhibit

1) issued a remittitur order which addressed crying by the plaintiff's counsel, who is Appellee's counsel in the present matter. The defendant in *Young* identified three instances of the plaintiff's counsel crying or nearly crying, including crying during examination of a witness and almost crying during closing arguments. *Id.* at *12. Per *Young,* "[d]uring closing arguments, after already warning Plaintiff's counsel about controlling his emotions so as to not cry, on its own, the Court attempted to intercede so that the jury would not be exposed to Plaintiff's counsel's tears." *Id.* Although counsel denied crying during closing and the court did not see him crying, it noted that he "conveyed the same emotionally charged message to the jury by his actions" when he placed a box of tissues in front of him. *Id.* Finding that counsel had cried on at least one occasion and "expressed the same emotions to the jury" on another occasion, the *Young* court held that "crying inflames the jury's passions instead of focusing the jury on the law and evidence." *Id.*

Although Appellee's counsel did not cry while questioning his own client in this matter, as he did in *Young*, Appellee's counsel cried on at least one occasion and appeared to cry, expressing the same emotions to the jury on another, after being warned by the court to control his emotions. [App. Vol. III, 0715 (pp.148:7-150:2); Vol. VIII, 1663 (pp.1087:6-1088:14); Vol. XI, 1822 (pp.1453:2-24)]. The *Young* court noted that on its own, shedding a tear one time would not constitute

43

misconduct, but that the conduct needed to be considered along with other misconduct by counsel. *Young* at *12.

Here, during his closing argument, Appellee's counsel blatantly asked the jury to render a verdict based on deterrence, which was wholly improper as Appellant is a governmental entity and punitive damages were not available. *Burke v. Regalado*, 935 F.3d 960, 1028 (10th Cir. 2019). Over Appellant's objections, Appellee's counsel argued that

> **[t]hey talk about this idea of "you can't punish us," but the point of constitution law, the point of a 1983 case, which is the area that we practice, is the idea of a deterrent effect**… The idea of deterrence, the idea that you eight people are getting to make this decision, and you can deter this from happening in our community through your verdict.

[App. Vol. IX, 1822 (pp. 1454:6-1456:2)]. He further argued:

> this has to be an incredibly significant verdict; otherwise, these gentlemen are going to walk out of here, and they're going to high-five because they'll say, "We can – we can run a cheap medical system. We don't have to even have a doctor. We can go 18 years with an LPN and no one following the policies, no one even knowing what the medical policies were, no one following the contracts. We can run a very, very cheap medical system because that jury just came back with a very small verdict. They listened to us. The just awarded the family 3 million dollars. Business as usual. That worked out from a financial standpoint.
>
> That's what it's about to them. That's why we're here, is because they think, like them, who devalue a human life for a person who is in a jail setting, that you will as well… [w]e've had people die for our country to make sure that we have these rights. And you are the eight people who can uphold those rights, and you can award a verdict that actually compensates, truly compensates, for what Terry went through, and also has the ability to deter it from happening in the future.

[App. Vol. IX, 1822 (pp.1456:25-1458)]. The jury therefore improperly heard that punishing Appellant to deter future similar behavior is the *very point* of a §1983 claim.

Such arguments are *only* appropriate "when the law and evidence place the issue of punitive damages before the jury." *Racher v. Westlake Nursing Home,* 871 F.3d 1152, 1169 (10th Cir. 2017). There is no question that punitive damages were not available against Appellant. It is clear that these remarks were purposely intended to, and actually did, influence the jury verdict in this case and that Appellant was prejudiced as a result. When a large verdict is accompanied by improper arguments by counsel, it indicates the jury was swayed by the improper statements and acted upon them. *Whitehead v. Food Max*, 163 F.3d 265, 278 (5th Cir. 1998); *Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 759 (6th Cir. 1980); *Burke v. Deere & Co.*, 6 F.3d 497, 513 (8th Cir. 1993); *Dougal v. State Farm,* 2006 WL 1141621, *2 (N.D.Okla. April 26, 2006) (unpublished decision attached as Exhibit 2).

Citing to *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) and *Burke, supra*, 935 F.3d at 1029, the District Court recognized that arguments which specifically urge deterrence against a governmental entity are improper. [App. Vol. XIV, 3111-3112, fn. 6]. However, the District Court dismissed the significance of the remarks made by Appellee's counsel as being essentially an off-the-cuff rebuttal made in response

to defense counsel stating the jury's verdict cannot be punitive. [App. Vol. XIV, 3112-3126]. The *Young* ruling makes clear that the rebuttal closing arguments in this case were scripted in advance and intended to improperly sway the jury. In *Young*, the same counsel told the jury, as he did in the present case, that "[t]hey'll be high-fiving if you walk out of here giving a verdict of $10 or $20 million, I promise you, because that just means business as usual." *Young* at *27, fn. 15. The *Young* court found it to be "particularly egregious" that jurors were told in his rebuttal argument that it was their duty as members of the Tulsa community to return an astronomical verdict. *Id.* This is nearly identical to the argument Plaintiff's counsel made to the jury in closing rebuttal in this case. But punitive damages *were* available in the *Young* case, whereas only compensatory damages were available in the present matter.

Taking the above issues into consideration together, the extent of the impropriety is substantial enough to undermine any faith that the verdict in this case was fairly obtained. *See Burke, supra,* 935 F.3d at 1026. The first *Whittenburg* factor thus weighs in favor of granting a new trial.

## 2.    Ineffective Curative Action

The second factor to consider when determining whether a new trial is warranted is whether any meaningful curative action was taken during trial. *Whittenburg*, 561 F.3d at 1133. Here, the District Court's attempt to remedy the

prejudice Appellant suffered early on in the trial by Appellee's counsel crying was unsuccessful in preventing the same thing from later happening again. While the Court technically sustained Appellant's objections regarding crying and issued a preliminary warning to Appellee's counsel before closing arguments, there were no curative remarks or instructions made to the jury after either incident once they occurred. The jury therefore went to deliberate with that second emotional display fresh in their minds.

In terms of the improper comments regarding deterrence, Appellant lodged an ongoing objection on this issue after filing a Motion in Limine to exclude such improper remarks. Prior to trial, Appellant filed an omnibus Motion in Limine to prevent Appellee's counsel from asking the jury to use its verdict to "send a message" to Appellant as punishment or deterrence. [App. Vol. I, 0098, No. 25]. Appellant cited to *Moody, supra,* in support of that request. In denying the Motion, the Court relied on opinions from the Second and Ninth Circuits which state that deterrence is a goal of §1983 actions. But Tenth Circuit precedent clearly states deterrence arguments are improper when punitive damages are not at stake. *Burke, supra,* 935 F.3d at 1029. Appellant also raised a running objection at trial regarding asking the jury to render a verdict as a deterrence or punishment. [App. Vol. IX, 1822 (pp.1454:6-22)]. The objection was sustained as to punishment, but overruled

47

with respect to deterrence so no curative action was taken in that regard and the improper arguments proceeded. *Id.*

The District Court concluded that it had taken adequate curative action because it had issued a general instruction to the jury regarding the challenged actions. [App. Vol. XIV, 3115-3116]. Although a general instruction was given to the jury reminding them that argument from counsel is not evidence, *Whittenburg* made clear that such instructions are not always curative. *Whittenburg, supra,* 561 F.3d at 1132. "[T]he more improper the argument and the more prejudicial the circumstances, the more specific and timely must be the curative instruction." *Id.* When a trial court overrules a contemporaneous objection to an improper closing argument, such a general instruction given later is not sufficient to undo the harm. *Id.* In *Whittenburg*, "[t]he district court's decision to overrule the objection to counsel's argument and deem it appropriate was never undone and remained the most specific and timely guidance from the court to the jury with respect to the propriety of counsel's closing remarks." *Id.* Here, the last impression the jury received from the trial court is that the arguments of Appellee's counsel were proper and that the jury was free to use its verdict as a deterrent for future behavior rather than as compensation for injuries suffered by Ellis. The only curative action available to remedy the prejudice suffered by Appellant at this juncture is granting a new trial.

### 3.    The Size of the Verdict was Shocking and Excessive

The third *Whittenburg* factor which courts must consider is the size of the jury verdict. "[T]he size of a verdict – whether it is large or excessive – is a **significant** factor suggesting prejudice sufficient to require a new trial." *Whittenburg, supra,* 561 F.3d at 1132 (emphasis added). When a jury returns a high damages award after conduct from counsel which is clearly intended to increase the amount of damages, it is apparent that the purpose of the improper conduct was accomplished. *Id.* at 1132-1133 (citing *Chicago & N.W. Ry. Co. v. Kelly*, 84 F.2d 569, 576 (8th Cir. 1936)).Here, the compensatory damages award was shocking and excessive, as is thoroughly discussed in Section 4 below[2].

Taken together, the combination of the three *Whittenburg* factors indicates this case should be retried. The extent and severity of the improper conduct, the lack of any meaningful curative actions at the time, and the size of the verdict all indicate that passion and prejudice impacted both the jury's finding of liability and the damages award.

---

[2] Appellant also sought Remittitur on the grounds that the award was excessive and shocking to the conscience. To avoid duplicative briefing, that issue is discussed in Section 4 below.

### 4).    THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING REMITTITUR

Remittitur of a compensatory damages award is appropriate "when the jury award is so excessive…as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." *Fresquez v. BNSF,* 52 F.4th 1280, 1315 (10th Cir. 2022). "[M]ere excessiveness in the amount of an award may be cured by a remittitur, whereas excessiveness which results from jury passion and prejudice may not be so cured. In that case, a new trial is required." *Mason v. Texaco,* 948 F.2d 1546, 1561 (10th Cir. 1991).

Appellant sought remittitur of the $33 million compensatory damages award (and a new trial) in this case on the grounds that the award was grossly excessive and shocks the conscience, that the damages award was impermissibly intended to be punitive, and that the award drastically exceeds awards in comparable cases. [App. Vol. XII, 2552-2667]. In denying the Motion for Remittitur, the District Court found the award was neither excessive nor shocking to the conscience, was not intended to be punitive, and did not exceed awards in comparable cases. [App. Vol. XIV, 3088-3133]. A district court's denial of a motion for remittitur on the grounds the damages were excessive is reviewed for a manifest abuse of discretion. *M.D. Mark, supra,* 565 F.3d at 766. The totality of the circumstances must be considered

when determining whether remittitur is proper. *Smith v. Nw. Fin. Acceptance,* 129 F.3d 1408, 1416-17 (10th Cir. 1997).

Here, the District Court manifestly abused its discretion in denying Appellant's Motion for Remittitur, as the $33 million compensatory damages award was so excessive that it is shocking to the conscience and raises the inference that passion, prejudice, or other improper cause invaded the trial.

## A. Awards in Comparable Cases

Appellant demonstrated the excessiveness of the award through a comparison to verdicts in similar §1983 cases concerning the denial of medical care in Oklahoma jails. [App. Vol. XII, 2552-2667]. Comparison to jury awards in other similar cases is an appropriate measure of excessiveness. *Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir. 1989); *Blangsted v. Snowmass Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1258 (D. Colo. 2009); *Evans v. Fogarty*, 241 Fed. App'x 542, 561 (10th Cir. 2007). In both his Motion for New Trial and Motion for Remittitur, Appellant pointed to the compensatory damages awards in *Burke, supra,* 935 F.3d at 1033 and *Young, supra,* Like the present case, those cases were tried in the Northern District of Oklahoma and concerned allegations of deliberate indifference to the needs of inmates or pre-trial detainees. Appellant provided a thorough analysis of the similarities of those cases to the District Court. [App. Vol. XI, 2341-Vol. XII, 2551].

In *Burke*, the jury returned a $10 million damages award for the plaintiff against the defendant sheriff. *Burke*, 935 F.3d at 989. In examining whether the verdict was excessive, the Tenth Circuit found it was "on par with cases involving similar conduct." *Id.* at 1033. The court noted that in *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 567 (1st Cir. 1989), the jury awarded $4.5 million in compensatory damages for a jailer's supervisory role in violating an inmate's constitutional rights and that in *Glover v. Vest*, No. CIV-14-936-F, 2015 WL 13344116 at *2 (W.D.Okla. Dec. 23, 2015), the jury awarded $6.5 million in compensatory damages against a jail supervisor in his official capacity. As is the case here, the $10-million-dollar award in *Burke* was comprised of purely noneconomic damages. *Id.* at 1036. The *Burke* court found the award to be appropriate in light of the fact that "Mr. Williams endured considerable pain and suffering during his five days at the jail." *Id.* Although the court acknowledged the $10 million verdict was large, it held that it was not shocking to the judicial conscience given that the decedent's injury and paralysis were untreated for five days, he was left unattended for days at a time, he was unable to eat or drink, jail staff dragged him from one cell to another, and that he was naked when he suffocated to death on the jail floor. *Id.*

The $33 million compensatory damages award in this case is *more than three times* that of the compensatory damages award in *Burke*, which the Tenth Circuit

admitted was large but not shocking given the evidence. Appellant also pointed to the $14 million compensatory damages award in *Young,* as well as numerous other jail death cases around the country which evidenced the excessiveness and shocking nature of the verdict in this case. [App. Vol. XI 2341-Vol. XII, 2667]. In denying remittitur and a new trial, the District Court found that while the $33 million verdict was large, it was neither shocking to the conscience nor excessive. [App. Vol. XIV, 3116-3135].

Again, on the very same day the District Court issued its Order, the *Young* decision was also issued. While the *Young* order reduced the punitive damages award in that case, $14 million compensatory damages were also awarded. *Young* specifically stated the compensatory damages amount was "high" and a "large amount" but was "not unreasonable" in light of the evidence and the $10 million compensatory damages award in *Burke,* a case which the court described as being "strikingly similar" to the *Young* case. *Id.* at *27.

Again, Appellant cited to both *Young* and *Burke* in his Motion for Remittitur and Motion for New Trial as being similar to the present case, as they are both recent 42 U.S.C. §1983 medical deliberate indifference cases involving the death of inmates or pre-trial detainees in county jails located within the Northern District of Oklahoma. [App. Vol. XI, 2341-Vol. XII, 2667]. In fact, the *Young* case was tried in the Northern District just a few months before the present case was tried. The

53

resulting compensatory damages award which *Young* described as being "high" and a "large amount" was less than half of the amount awarded in the present case. *Young* at \*27. Although the District Court relied very heavily on law from *Burke* in its denial Order, it did not at all consider the compensatory damages award in *Burke* or *Young* or the similarities between those cases and the present case in terms of whether the award was excessive or conscience shocking.

Citing to *Stokes v. U.S.*, 967 F.3d 1034, 1044 (10th Cir. 2020), the District Court stated that "[a]s a preliminary matter the Court need not compare awards if the 'noneconomic damage awards do not shock the judicial conscience." [App. Vol. XIV, 3132-3133]. But the *Young* order demonstrates that the $33 million award does and *should* shock the conscience. The *Young* court determined:

> The verdict size weighs in favor of finding that it is reasonably probable that Plaintiff's misconduct influenced the jury's verdict. The jury's award of $14 million for compensatory damages was high, but not unreasonable. The jury in Mr. Williams' trial awarded $10 million in compensatory damages. Again, that is a large amount. But it is not unreasonable. The compensatory award in this case being greater than that in Mr. Williams' case could easily be viewed as evidence of the increase in post-pandemic verdicts. *See* Aleeza Furman, *With High-Value Verdicts on the Rise, Some Attorneys Say Post-COVID Jurors Demand Accountability*, Legal Intelligencer Online (Sept. 28, 2022). Regardless, $14 million is still a very large verdict, even under these facts.

*Young* at \*27.

Without rehashing the facts of the *Young* case, which Appellant recapped in his Motion for Remittitur [App. Vol. XII, 2552-2667], the *Young* court noted that

the facts in that case were quite damning to the defendant. That Order states that the defendant's "deliberate indifference killed people in its care" and referred to the defendant's conduct in that regard as "reprehensible." *Young* at *1. It further states that "there was an "avalanche of evidence" presented to the jury that the defendant's deliberate indifference caused pain, suffering, and a constitutional violation. *Id.* The decision also declares that "the weight of the evidence supporting the jury's verdict on liability was overwhelming," even when viewed neutrally rather than in the light most favorable to the plaintiff. *Id.* at *27. Although the *Young* decision determined that the $14 million compensatory damages award in that case was "a very large verdict, **even under these facts**," the court declined to grant remittitur because the award was consistent with the "strikingly similar" *Burke* case. *Id.* at *3 (emphasis added).

If a $14 million compensatory damages verdict is very large in the Northern District of Oklahoma, even in the face of reprehensible facts and an avalanche of evidence against the defendant, a $33 million compensatory damages verdict is excessive and completely unprecedented. The award is certainly not in line with the $10 million verdict in *Burke* or the $14 million compensatory damages award in *Young*. A damages award 230% higher than the award in *Burke* cannot simply be attributed to an overall rise in post-pandemic verdicts, as the 40% increase from the verdicts in *Burke* to *Young*, which were years not months apart, could be.

In *Gasperini v. Center for Humanities,* 518 U.S. 415 (1996) the Supreme Court reiterated that "'[i]f it should clearly appear that the jury have committed a gross error, or have acted from improper motives, or have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case.'" *Id.* at 433. It further reiterated that trial judges have discretion to grant a new trial if the verdict appears to be against the weight of the evidence, which includes "overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Id.* The *Gasperini* court additionally held that "'every circuit has said that there are circumstances in which it can reverse the denial of a new trial if the size of the verdict seems to be too far out of line.'" *Id.* at 435. Every indication is that the $33 million compensatory damages award in this case is too far out of line to stand, that it is shocking to the conscience, and that it raises the inference that passion, prejudice, or some other improper cause invaded the trial.

In rejecting that the size of the verdict was excessive and shocking to the conscience, the District Court ignored timely, relevant jury verdicts from the very same district and instead relied on decisions from other circuits and district courts outside of Oklahoma. The Order relied on the $63 million dollar compensatory damages verdict in *Gilliam v. Allen*, 62 F.4th 829 (4th Cir. 2023), a Fourth Circuit

case arising in North Carolina, to support that the $33 million dollar award does not shock the judicial conscience. But *Gilliam* did not involve allegations of deliberate indifference or denial of medical care in a correctional setting. Rather, it concerned law enforcement officers forcing confessions of rape and murder from two "severely intellectually disabled" youth and claims of false arrest, due process violations, and malicious prosecution against multiple defendants. *Id.* at 835-838. Nothing about the *Gilliam* case is remotely similar to the present case. While The District Court stated that *Gilliam* demonstrates the $33 million compensatory damages award in this case is "large" but "not unprecedented," *Gilliam* demonstrates nothing of the sort as it lacks any commonality with the present case.

Two of the other cases to which the Order cites as the basis for its finding the award is not excessive or shocking are also wrongful murder conviction cases and are thus equally dissimilar to the present case. *Jiminez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) and *Fields v. City of Chicago*, 981 F.3d 534 (7th Cir. 2020) are both cases arising from wrongful murder convictions in Illinois. The *Jiminez* case involved § 1983 due process and conspiracy claims, as well as a state law malicious prosecution claim, against the city and a former detective. *Jiminez*, 732 F.3d at 712. The jury awarded him $25 million in compensatory damages from those defendants following 16 years in prison after a wrongful conviction. *Id.* In *Fields*, the plaintiff was sentenced to death on a murder charge but was later acquitted on a retrial. *Fields*,

981 F.3d at 542. The plaintiff sued the city and two police officers under § 1983 and Illinois state law alleging due process violations, malicious prosecution, civil conspiracy, and intentional infliction of emotional distress, as a result of the defendants allegedly fabricating evidence and withholding exculpatory evidence. *Id.* at 542-543. The jury awarded a total of $22 million on the claims against those defendants. *Id.* at 543. Nothing about the *Jiminez* or *Fields* cases are similar to the present case.

The District Court then cites to an excessive force case from the Northern District of Georgia, *Edwards for Blasingame v. Grubbs*, 2022 WL 4363631 (N.D. Ga. Sept. 14, 2022) (unpublished decision attached as Exhibit 3). That Fourth Amendment case arose from the alleged use of excessive force by an Atlanta police officer who tazed him and was brought against the officer and the City of Atlanta. *Id.* at *1-2. That case also bears no relationship whatsoever to the facts or claims in this case. Notably, the $20 million compensatory damages verdict was against an individual officer, not the municipality, and was still far less than the $33 million compensatory damages award in the present matter.

The only case cited by the District Court which actually involves a county jail is *Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005), but that case too involves an excessive force claim, arising from events which occurred in an Indiana county jail, and not a claim for deliberate indifference to medical needs. *Moreland*

is therefore equally dissimilar and inapplicable to the case at bar. The jury in that case awarded $29 million in compensatory damages from the two individual-capacity defendants but the award has nothing in common with the facts or claims in the present case.

This Court's determination that the $33 million dollar verdict was neither excessive nor shocking to the judicial conscience is not supported by the similar *Young* and *Burke* cases, or any of the dissimilar § 1983 cases cited by the District Court. Nor is it supported by the facts of this case. Here, the denial Order cites to evidence and testimony in the record which this District Court states supports the jury's $33 million dollar compensatory damages award and indicates the award was not based on juror passion, prejudice, or any improper motive. While Appellant does not dispute that the jury was presented with the cited evidence, the critical question is not whether the weight of the evidence supports the liability of Appellant, it is whether the weight of the evidence supports the amount of the compensatory damages award. In that regard, the Court does not appear to have considered key pieces of evidence when determining that the verdict amount was not excessive given the facts in this case.

For instance, the Order states multiple times that the jury heard evidence that jailers were instructed that they were not permitted to call an ambulance for inmates without going through the jail nurse, regardless of medical need. [App. Vol. XIV,

3098; 3101]. But the Order does not acknowledge that jurors were also presented with evidence that an ambulance was called for Ellis less than 24 hours prior to his death, that Ellis was examined by paramedics, and that Ellis refused transport to the hospital for further evaluation. [App. Vol. IV, 0823 (pp. 293:18-294:9); Vol. V, 1135 (pp.341:22-342:15; 366:24-367:24; 404:16-405:3)]. Remittitur is appropriately granted when the amount of a damages award is not supported by sufficient evidence. *Therrien v. Target Corp.*, 617 F.3d 1242, 1258 (10th Cir. 2010). In this case, there is not sufficient evidence to support a $33 million dollar compensatory damages verdict; it is clearly excessive given that the jury was presented with evidence that an ambulance was called for Ellis and that he refused to let EMS take him to the hospital for further evaluation the day before his death.

The $33 million dollar verdict is excessive and shocking to the conscience. Remittitur should be granted or a new trial should be ordered.

### B.    The Damages Award Was Impermissibly Punitive

Appellant notes that the compensatory damages award was comprised entirely of non-economic damages. During the eight-day trial, Appellee *only* sought non-economic damages; he did not introduce any evidence regarding the Decedent's burial costs, future earning capacity, or any other form of actual damages on which the jury's verdict is or could be based. As a result, the $33 million dollar award appears to be punitive in nature rather than compensatory. Appellant, sued in his

official capacity, is a governmental entity and only compensatory damages, not punitive damages, are available from a governmental entity under 42 U.S.C. § 1983. *Kentucky v. Graham*, 473 U.S. 159, 167, n. 13 (1985). Such damages are not intended to punish defendants. *Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001). Courts have granted motions for remittitur when excessive compensatory damages awards appear to have been based on a desire to punish the defendant rather than merely to compensate the plaintiff for actual losses. In *Moody, supra,* 506 F.Supp.2d, at 847 the court held that a jury verdict of $15 million supported the defendant's theory that the jury was motivated by a desire to punish it with its verdict when verdicts in similar cases rarely exceeded $2 million. However, even without a review of comparable cases, the appearance that the amount awarded to Appellee was intended to punish Appellant is overwhelming.

The Tenth Circuit has recognized "the potential prejudice posed by arguments that invite the jury to award damages based on punishment or deterrence when only compensatory damages are at issue." *Racher, supra,* 871 F.3d 1152, 1169 (10th Cir. 2017). It has specifically found that arguments urging deterrence against a governmental entity which is immune from punitive damages are improper. *Burke, supra,* 935 F.3d at 1029. As Appellant discussed in Section 3(D)(1), above, Appellee's closing argument blatantly asked the jury to punish Appellant, casting the amount of any award in Appellee's favor as a deterrent to prevent future similar

incidents from occurring. Such arguments are *only* appropriate "when the law and evidence place the issue of punitive damages before the jury." *Racher,* 871 F.3d at 1169. There is no question that punitive damages were not available in this case. Improper argument will not generally warrant disturbing a damages award "unless it clearly appears that the challenged remarks influenced the verdict." *Id.* at 1168. Here, it "clearly appears" that these remarks were purposely intended to, and actually did, influence the damages award. As noted in Section 3(D)(1) above, and the cases cited therein, a large verdict accompanied by improper arguments by counsel tends to indicate that the was swayed by the improper statements and acted upon them. *Whitehead v. Food Max*, *supra*,

Given the statements of Appellee's counsel, it is abundantly clear the jury verdict was impermissibly intended to punish Appellant for the actions of Horn and other jailers which lacked sympathy or compassion for Ellis, but which certainly had nothing to do with the municipal liability of Appellant. Because the award was impermissibly intended to punish rather than merely compensate Ellis's estate for any harm Ellis suffered, the District Court abused its discretion in denying Appellant's Motion for Remittitur and the award should be reduced to an amount which reflects damages that are solely compensatory in nature.

## 5).    ATTORNEY FEE AWARD WAS AN ABUSE OF DISCRETION

Appellee was awarded $970,402.00 in attorney's fees and expenses, which represented 2,579.5 hours of attorney time. [App. Vol. XIV, 3134-3164]. When awarding attorney's fees to the prevailing party, the fee itself must be reasonable. *Phelps v. Hamilton*, 120 F.3d 1126, 1129 (10h Cir. 1997) (quoting 42 U.S.C. § 1988(b)). The lodestar amount (which equals the number of hours multiplied by the hourly rate) is presumptively reasonable, but may be adjusted upward or downward when other factors warrant the adjustment. *Metz v. Merrill Lynch, Pierce, Fenner & Smith*, 39 F.3d 1482, 1493 (10th Cir. 1994). These factors include the time and labor required, the novelty of the questions presented, the skill required, preclusion of other employment, customary fee, the results obtained, and awards in similar cases. *Gottlieb v. Barry*, 43 F.3d 474, 484 n.4 (10th Cir. 1994). When determining the reasonableness of the overall award, the total number of hours billed by each lawyer should be examined. *Ramos*, v. *Lamm*, 713 F.2d 546, 553 (10th Cir. 1983). The prevailing party bears the burden of establishing the reasonableness of every hour spent on the case. *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995). Fees for large amounts of time spent on straightforward, unnecessary, irrelevant, and duplicative tasks may be disallowed. *Praseuth v. Rubbermaid*, 406 F.3d 1245, 1258 (10th Cir. 2005).

The District Court reduced the requested hourly rate of Appellee's attorneys but awarded fees for an unreasonable number of hours spent on straightforward, unnecessary, and duplicative tasks. While the District Court found that Appellee did not demonstrate proper billing judgment, the fee reduced the number of billed hours only by 163.4, from 2,742.9 down to 2579.5 hours. [App. Vol. XIV, 3134-3164]. Notably, Appellee was awarded fees for an unreasonable 343.4 hours spent reviewing video surveillance footage, which was the result of Appellee's own litigation strategy of making an unnecessarily broad discovery request for *all* footage from *all* cameras for the *entire* duration of Ellis's detention. *Id.* Ellis's detention lasted approximately twelve days, approximately 288 hours or less. Presumably Ellis was asleep during approximately one-third of those hours. In its Order, the District Court discussed the importance of the footage, but the evidence at trial demonstrated only the last 24 hours of events were genuinely in dispute. Awarding 343.4 hours of time for reviewing the footage was therefore an abuse of discretion.

Additionally, Appellee was awarded attorney's fees for hours spent on dismissed claims and claims made against other former co-defendants. [App. Vol. XIV, 3134-3164]. The District Court recognized that the billing records showed Appellee included 216.8 hours spent on claims against other parties and on pursuing a state constitutional claim which did not exist, but awarded Appellee those hours on the grounds that the claims were related. These hours should also have been

disallowed by the District Court. Consequently, the number of hours for which Appellee was awarded attorney's fees was unreasonable and should be further reduced. *See Ramos*, 713 F.2d at 553.

## IX.    CONCLUSION

The District Court erred in denying the Appellant's Motion for Judgment as a Matter of Law and abused its discretion in denying the Appellant's Motion for New Trial and Motion for Remittitur. Numerous issues were present during trial which ultimately prejudiced Appellant and improperly influenced the verdict, as evidenced by the size of the verdict itself. It is clear that the evidence presented at trial does not support that Appellant could possibly be liable in his official capacity for any violation of Ellis's constitutional rights. Had testimony which confused state jail standards and inapplicable voluntary standards not been introduced at trial, had the jury been properly instructed on the applicable law, and had the conduct and remarks of Appellee's counsel not improperly swayed the jury, the outcome of the trial would have been different. In the absence of a different outcome, the amount of the compensatory damages award against Appellant certainly would have been different. Moreover, the amount of attorney's fees awarded constituted an abuse of discretion. These issues should now be corrected by this appeal.

## X.    ORAL ARGUMENT REQUESTED

While the facts and legal arguments are adequately addressed herein, the decisional process will be significantly aided by oral argument. The issues in this matter are of important public interest as the claim is against a governmental entity and the $33 million dollar award will be paid from taxpayer funds. Oral argument may help clarify the numerous issues in question in this matter.

Respectfully submitted,

s/ Alison B. Levine
Wellon B. Poe, OBA No. 12440
Jamison C. Whitson, OBA No. 18490
Alison B. Levine, OBA No. 33021
Justin P. Ashlock, OBA No. 33459
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105
Telephone:  (405) 524-2070
Emails:      wbp@czwlaw.com
             jcw@czwlaw.com
             abl@czwlaw.com
             jpa@czwlaw.com

ATTORNEYS FOR DEFENDANT/
APPELLANT SHERIFF OF
OTTAWA COUNTY

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This Opening Brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 15,965 (in accordance with the Court's Order entered on June 6, 2024), excluding portions of the Brief that are exempt by Fed. R. App. P. 32(f).

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font.

s/ Alison B. Levine
Alison B. Levine

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 10th Cir. R. 32, Appellant certifies that on June 12, 2024, Appellant's Opening Brief is being filed using the Court's CM/ECF system, which will then send notification of such filing to the Parties identified on the Certificate of Service, below. Additionally, Appellant certifies that (a) all required privacy redactions have been made, (b) that the hard copies to be submitted to the Court are exact copies of the version submitted electronically, and (c) that the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning software program, and is free of viruses.

s/ Alison B. Levine
Alison B. Levine

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Fed. R. App. P. 25(d)(2), I hereby certify that on June 12, 2024, the foregoing Appellant's Opening Brief was filed electronically via the CM/ECF system with the Court and caused the following parties or counsel in this matter to be served by electronic means as more fully reflected on the Notice of Electronic Filing:

Daniel E. Smolen, via danielsmolen@ssrok.com
Robert M. Blakemore, via bobblakemore@ssrok.com
Bryon D. Helm, via bryonhelm@ssrok.com

I further certify that the requisite number of true and correct copies of the foregoing Opening Brief will be forwarded by U.S. First Class Mail to the Court within five business days of the Court issuing notice that the electronic Opening Brief has been accepted:

        Clerk of the Court
        United States Court of Appeals for the Tenth Circuit
        Byron White U.S. Courthouse
        1823 Stout Street
        Denver, CO 80257

                        s/ Alison B. Levine
                        Alison B. Levine