**Nos. 24-5035 & 24-5080**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

AUSTIN P. BOND, as Personal Representative of
the Estate of Terral Ellis, II, deceased,
*Plaintiff/Appellee*

vs.

THE SHERIFF OF OTTAWA COUNTY, in his official capacity,
*Defendant/Appellant*

**PLAINTIFF/APPELLEE'S CORRECTED RESPONSE TO**
**APPELLANT'S SUPPLEMENTAL OPENING BRIEF**

_____

APPEALED FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
D.C. No. 4:17-CV-325-CRK-CDL
The Honorable Claire R. Kelly
*United States District Judge*

> Daniel Smolen, OBA #19943
> Robert M. Blakemore, OBA #18656
> SMOLEN & ROYTMAN
> 701 South Cincinnati Avenue
> Tulsa, Oklahoma 74119
> Telephone (918) 585-2667
> Facsimile (918) 585-2669
> *Plaintiff/Appellee*

September 30, 2024

*SCANNED PDF ATTACHMENTS INCLUDED*
*DIGITAL SUBMISSIONS SENT VIA EMAIL*
*ORAL ARGUMENT REQUESTED*

# TABLE OF CONTENTS

|                                                                                      | *Page* |
|--------------------------------------------------------------------------------------|:------:|
| Table of Contents                                                                    | *i* |
| Table of Authorities                                                                  | *iv* |
| I.    Statement of Related Cases                                                      | *1* |
| II.   Plaintiff's Jurisdictional Statement                                            | *1* |
| III.  Statement of Issues on Appeal                                                   | *1* |
| IV.   Statement of the Case / Statement of Facts                                      | *1* |
| A.  The Sheriff's Appendix is Deficient                                               | *1* |
| B.  The Sheriff's Statement of Facts is Inadequate                                    | *2* |
| C.  Factual Summary                                                                   | *3* |
| 1.  Evidence Specific to Ellis                                                        | *3* |
| 2.  The Jail's Medical Delivery System (Policies and Customs)                         | *19* |
| D.  Procedural History                                                                | *24* |
| V.   Summary of the Argument                                                          | *25* |
| VI.  Argument                                                                         | *28* |
| A.  This Court Should Summarily Affirm Based on the Sheriff's Deficient Appendix      | *28* |
| B.  The District Court Did *Not* Err in Denying the Sheriff's Motion for Judgment as a Matter of Law Based on "Overwhelming Evidence" | *29* |

1. Plaintiff Presented Substantial Evidence of "Underlying" Violations of Ellis's Constitutional Right to Adequate Medical Care ............................................. 29

2. Plaintiff Established the Sheriff's Liability Under a *Monell* Theory ............................................. 37

3. The Evidence Also Supports the Sheriff's Liability Based on a Systemic Failure of Medical Policies and Procedures ............................................. 45

C. The District Court Did *Not* Abuse Its Discretion In Denying Defendant's Motion For New Trial ............................................. 46

1. The Sheriff's Appendix is Insufficient to Support Reversal of the Motion for New Trial ............................................. 48

2. The Jury's Verdict is Supported by Overwhelming Evidence ............................................. 48

3. Plaintiff's Counsel's Arguments and Conduct Were Not Inappropriate, and, in any Event, Provide no Basis For a New Trial. ............................................. 48

a. There Was No Attorney Misconduct, Let Alone "Pervasive" Misconduct ............................................. 50

i. Plaintiff's Counsel Did *Not* "Cry" During Trial ............................................. 50

ii. Plaintiff's Counsel's Remarks Regarding Damages Were Appropriately Focused on Fully Compensating the Estate For Ellis's Extraordinary Suffering and Substantial Injuries ............................................. 53

b. To the Extent Any Curative Action was Required, the Curative Action Provided by the Court Was Sufficient ............................................. 57

      c.    Considering the Strength of the Evidence, the Size of the Verdict Was Reasonable and Not the Product of Prejudicial Remarks ......................... *58*

    4.  The Court's Instructions to the Jury Were Adequate and Accurately Reflected Governing Law ......................... *60*

    5.  The Court Did Not Err in Admitting Evidence of NCCHC Standards or Oklahoma Jail Standards ......................... *65*

D.   The District Court Did *Not* Abuse Its Discretion In Denying Defendant's Motion For Remittitur ......................... *67*

    1.  The Jury Was Within its Wide Discretion in Awarding Compensatory Damages in this Case; Remittitur is Not Warranted ......................... *69*

    2.  The Jury's Compensatory Damages Award Appropriately Reflects the Pain and Suffering Ellis Suffered as He Was Tortured to Death ......................... *70*

    3.  Comparisons to Damages Awarded in Other Cases Are Inappropriate, Particularly Given the Uniquely Horrific Circumstances of Ellis's Lingering and Tortuous Death ......................... *72*

E.   The District Court Did Not Abuse Its Discretion In Awarding Attorney Fees ......................... *74*

F.   The District Court Properly Denied Defendant's Motion to Reconsider ......................... *75*

Conclusion ......................... *76*

Certificate of Digital Submission ......................... *77*

Statement Regarding Oral Argument ......................... *77*

Certificate of Service ......................... *77*

# TABLE OF AUTHORITIES

| *Case* | *Page(s)* |
|---|---|
| *Adams v. City of Chicago*, 798 F.3d 539 (7th Cir. 2015) | *73* |
| *Barney v. Pulsipher,* 143 F.3d 1299, n. 5 (10th Cir. 1998) | *44* |
| *Bell v. Wolfish*, 441 U.S. 520 (1979) | *30* |
| *Bill Barrett Corp*, 918 F.3d 760 (10th Cir. 2019) | *29, 36* |
| *Blangsted v. Snowmass Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250 (D. Colo. 2009) | *74* |
| *Blevins v. Cessna Aircraft Co.,* 728 F.2d 1576 (10th Cir. 1984) | *49* |
| *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397 (1997) | *37* |
| *Breen v. Pruter,* 679 F. App'x 713 (10th Cir. 2017) | *46* |
| *Bryson v. City of Oklahoma City,* 627 F.3d 784 (10th Cir. 2010) | *39* |
| *Burke v. Regalado,* 935 F.3d 960 (10th Cir. 2019) | *31, 33, 38, 39, 41, 44, 46, 47, 48, 50, 51, 52, 53, 57, 58, 59, 65, 66, 68, 69, 70, 71, 72, 73, 74, 75* |
| *Chalmers v. City of Los Angeles,* 762 F.2d 753 (9th Cir. 1985) | *56* |
| *Collins v. Cundy,* 603 F.2d 825 (10th Cir.1979) | *65* |

*Crowson v. Washington Cty. Utah*, 983 F.3d 1166 (10th Cir. 2020)  *38, 41, 44, 45, 46, 61, 62, 63*

*DeSpain v. Uphoff*, 264 F.3d 965 (10th Cir. 2001)  *31*

*Dobson v. Camden*, 705 F.2d 759 (5th Cir. 1983)  *55*

*Estelle v. Gamble*, 429 U.S. 97 (1976)  *30, 34*

*Farmer v. Brennan*, 511 U.S. 825 (1994)  *31, 32, 33*

*Foelker v. Outagamie Cnty.*, 394 F.3d 510 (7th Cir. 2005)  *35*

*Garcia v. Salt Lake City*, 768 F.2d 303 (10th Cir. 1985)  *39, 45, 46, 62*

*Greene v. Safeway Stores, Inc.*, 98 F.3d 554 (10th Cir. 1996)  *29*

*Hendrickson v. Cooper*, 589 F.3d 887 (7th Cir. 2009)  *69*

*Henry v. Storey*, 658 F.3d 1235 (10th Cir. 2011)  *47*

*Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651 (10th Cir. 2016)  *28, 47, 53*

*Hinkle v. Beckham Cty. Bd. of Cty. Commissioners*, 962 F.3d 1204 (10th Cir. 2020)  *38, 40*

*Hoskie v. United States*, 666 F.2d 1353 n. 4 (10th Cir. 1981)  *73*

*Lance v. Morris*, 985 F.3d 787 (10th Cir. 2021)  *38*

*Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151 (10th Cir. 2012)  *61*

*Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999)  *67*

*Martinez v. Beggs*, 563 F.3d 1082 (10th Cir. 2009)  *27*

*Martin v. Bd. of County Com'rs of County of Pueblo*, 909 F.2d 402 (10th Cir. 1990)  *27*

*Mason v. Texaco, Inc.*, 948 F.2d 1546 (10th Cir. 1991) .......... *69*

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) .......... *31, 33, 34, 41, 65*

*McBride v. Deer*, 240 F.3d 1287, n. 3 (10th Cir. 2001) .......... *65*

*Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1977) .......... *37, 38, 39, 41, 45, 46, 62*

*Nevor v. Moneypenny Holdings, LLC*, 842 F.3d 113 (1st Cir. 2016) .......... *69*

*N. Am. Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc.*, 579 F.3d 1106 (10th Cir. 2009) .......... *47*

*Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002) .......... *30, 31*

*Osterhout v. Bd. of Cnty. Commissioners of LeFlore Cnty., Oklahoma*, 10 F.4th 978 (10th Cir. 2021) .......... *48, 49, 50, 51, 58, 66, 71*

*Owen v. City of Indep., Mo.*, 445 U.S. 622 (1980) .......... *56*

*Palmer v. City of Monticello*, 31 F.3d 1499 (10th Cir.1994) .......... *69*

*Porro v. Barnes*, 624 F.3d 1322 (10th Cir. 2010) .......... *37*

*Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033 (10th Cir. 2022) .......... *31, 35, 39*

*Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152 (10th Cir. 2017) .......... *57, 60, 69*

*Ramirez v. N.Y. City Off-Track Betting Corp.*, 112 F.3d 38 (2d Cir. 1997) .......... *56*

*Restivo v. Hessemann*, 846 F.3d 547 (2nd Cir. 2017) .......... *55*

*Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637 (10th Cir. 2017) ........................................................... <u>30, 31</u>

*Robertson v. Wegmann,* 436 U.S. 584, 590-91 (1978) ........................................................... <u>55</u>

*Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000) ........................................................... <u>31, 34</u>

*Spahr v. Ferber Resorts, LLC,* 419 F. App'x 796 (10th Cir. 2011) ........................................................... <u>68</u>

*Tafoya v. Salazar,* 516 F.3d 912 (10th Cir. 2008) ........................................................... <u>36, 41, 44</u>

*Therrien v. Target Corp.,* 617 F.3d 1242 (10th Cir. 2010) ........................................................... <u>68</u>

*United States v. Kelley,* 929 F.2d 582, 586 (10th Cir. 1991) ........................................................... <u>46</u>

*United States v. Roberts,* 185 F.3d 1125 (10th Cir. 1999) ........................................................... <u>58</u>

*Wagner,* 586 F.3d at 1244 ........................................................... <u>29</u>

*Ware v. Jackson County, Mo.,* 150 F.3d 873 (8th Cir. 1998) ........................................................... <u>41</u>

*Whittenburg v. Werner Enters. Inc.,* 561 F.3d 1122 (10th Cir. 2009) ........................................................... <u>48, 49, 50</u>

*Youren v. Tintic Sch. Dist.,* 343 F.3d 1296 (10th Cir. 2003) ........................................................... <u>29</u>

## I.      STATEMENT OF RELATED CASES

Since Defendant/Appellant Sheriff of Ottawa County, in his official capacity (hereinafter "Sheriff" or "Defendant"), filed his Opening Brief in this appeal, he initiated another related appeal, 24-5080. In 24-5080, the Sheriff appeals the District Court's denial of his Motion to Reconsider filed below.[1] The appeals have now been consolidated.

## II.      PLAINTIFF'S JURISDICTIONAL STATEMENT

Plaintiff/Appellee Austin Bond ("Plaintiff"), as the Personal Representative of the Estate of Terral Ellis ("Ellis"), deceased, agrees this Court has jurisdiction under 28 U.S.C. § 1291.

## III.      STATEMENT OF ISSUES ON APPEAL

Plaintiff asserts this Court should consider the following additional issue: Whether the Sheriff's appeal should be dismissed, or limited, for failure to file an adequate appendix. *See* FRAP 10(b)(2) and 30(a)(1); 10th Cir. Rule 10.3.

## IV.      STATEMENT OF THE CASE / STATEMENT OF FACTS

## A.      The Sheriff's Appendix is Deficient

As an initial matter, Plaintiff notes that the Appendix provided by the Sheriff is utterly insufficient, particularly because the Sheriff claims the verdict and judgment

---

[1]     The Sheriff correctly notes that two previous related appeals, filed by former individual defendants Horn, Bray and Shoemaker (22-5101 and 22-5103), were voluntarily dismissed.

are not supported by the weight of the evidence. *See, e.g., Lincoln v. BNSF Ry. Co.,* 900 F.3d 1166, 1189–91 (10th Cir. 2018). Notably, though the Sheriff argues the verdict was excessive and not supported by sufficient evidence, his Appendix does not include vital video surveillance evidence, admitted as Plaintiff's Exhibits ("PX") 50-60, 62-64, 66, 68-69 and 71. *See* Pl's Supp. Appx. 5-6. Further, while the Sheriff's Appendix purports to include PX 61, 65 and 67 (Aplt. Appx. 3412-3414), the Sheriff did not include PX 61, 65 and 67 in the captioned form as admitted and played for the jury. Plaintiff's video Exhibits were, obviously, crucial to the jury's verdict and the District Court's analysis of the Sheriff's post-trial motions. *See, e.g.,* Aplt. Appx. 3109-3110. Additionally, the Sheriff's Appendix does not include the video deposition testimony of witnesses Michael Harrington and Johnny Bray, which were played to the jury. *See* Aplt. Appx. 1141 & 1211. Without all the trial testimony and the relevant video exhibits, this Court cannot "determine whether the evidence presented to the jury was sufficient to support its verdict or whether the district court erred in denying his motion for a new trial." *Lavielle v. Acosta,* 748 F. App'x 196, 197 (10th Cir. 2019).[2] This Court should summarily affirm due to the Sheriff's deficient Appendix.

### B.    The Sheriff's Statement of Facts is Inadequate

---

[2]     While Plaintiff has provided the pertinent video Exhibits and video depositions in a Supplemental Appendix, the Court and Plaintiff "are under no obligation to assist [Defendant] in overcoming the deficiencies in his appendix." *Lavielle,* 748 F. App'x at 198 (citing *Burnett v. Sw. Bell Tel., L.P.,* 555 F.3d 906, 910 (10th Cir. 2009)).

Rule 28(a)(6) of the Federal Rules of Appellate Procedure provides that an appellant's opening brief must contain "a concise statement of the case setting out the facts relevant to the issues submitted for review… with appropriate references to the record…." One of the primary issues raised by the Sheriff is whether the jury's verdict was "against the weight of the evidence." Op. Brief at 3.  Yet, the Sheriff's "Statement of Facts" subsection consists of fewer than ***three (3) pages*** of a 65-page Brief. *Id.* at 4-7. Considering the issues on appeal, and the evidentiary record generated during an 8-day trial, this is inadequate.

## C.    Factual Summary

### 1.    Evidence Specific to Ellis

### •    Booking and the Early Days in D-Pod

On October 10, 2015, Ellis voluntarily turned himself in to the Ottawa County Jail. *See, e.g.,* Aplt. Appx. 948, 1048, 1087. As the Jail's surveillance video shows, Ellis was cooperative and courteous when he arrived at the Jail. *See* Pl's Supp. Appx. 270 (PX71). As part of the booking process, the booking officer filled out a Medical Treatment/Injuries questionnaire, which indicated Ellis suffered from asthma, had previously been treated at Saint Francis hospital, and was prescribed Albuterol. *See* Pl's Supp. Appx. 21.

After book-in, Ellis was placed in "D-Pod" – a general housing unit at the Jail. *See, e.g.,* Aplt. Appx. 1090.  An inmate named Michael Harrington was housed in the D-Pod with him. *See* Pl's Supp. Appx. 272 at 10:08 – 11:07, 29:20 – 37:10.

- **October 17-October 20, 2015**

After initially meeting Ellis in D-Pod, Harrington was moved to "F-Pod" for a period of days. *See* Pl's Supp. Appx. 272 at 36:10 – 38:17. When Harrington was returned to D-Pod, he "observed that ***something was extremely wrong*** with" Ellis. *Id.* Ellis stopped eating and was in severe pain. *Id.* at 41:24 – 42:4, 46:17 – 47:10. Ellis told Harrington he felt like he was "going to die…." *Id.* at 46:17 – 47:10.

On October 17th, 2015, Ellis complained of back pain, reporting he believed his back was broken. *See* Aplt. Appx. 2588. Theresa Horn, LPN ("Nurse Horn"), the Jail's nurse, was notified of Ellis' complaint via telephone. *See, e.g., id.* at 3337. However, Nurse Horn was not present at the Jail and did not physically examine Ellis on October 17. *Id.* at 616.

Nurse Horn saw Ellis on October 19, 2015. *See* Aplt. Appx. 617.  She did not take Ellis's vital signs. *Id.* at 617; 3337-38. Rather, without gathering any objective data, Nurse Horn, who is only a Licensed Practical Nurse, "diagnosed" Ellis with a "broken rib". *Id.* at 3337-38.

After Ellis's visit with Nurse Horn on October 19, when Inmate Harrington was physically assisting Ellis to the "rec yard", he saw one of the Jail's detention

officers, Johnny Bray. Pl's Supp. Appx. 272 at 44:14 – 46:11. Harrington pressed Officer Bray, "aren't you [going to] help him? He needs help. There's something wrong with him." *Id.* In reply, Bray became irritated, indicated there was nothing he could do, and accused Ellis of faking his illness to get released from the Jail. *Id.* Ellis prophetically inquired of Officer Bray: ***"What are you going to tell my 2-year-old son whenever I die?"*** *Id.* Unmoved, Officer Bray simply told Ellis to lie back down. *Id.* Hours later, Ellis earnestly stated to Harrington: "They're not going to help me, are they? ***I think I'm going to die."*** *Id.* at 46:17 – 47:16. Ellis said that he was experiencing the "worst pain of [his] life." *Id.* He appeared dehydrated and malnourished. *Id.*

- **October 21, 2015**

On the afternoon of October 21, Ellis began having what appeared to be a seizure, which he reported to Jail staff. *See, e.g.,* Pl's Supp. Appx. 122; Aplt. Appx. 617. Officers Lawson and Bray went to D-Pod in response to Ellis' complaint. *See, generally,* Pl's Appx. 250 (PX51). As was common, Nurse Horn was offsite, but was contacted by the dispatcher. *See* Pl's Supp. Appx. 271 at 67:3 – 68:6. Nurse Horn advised the officers to call "EMS to come and check on the inmate." *Id.* Officer Bray knew that the ***medical care provided at the Jail was "subpar"*** and that Ellis was complaining of a ***"serious medical condition."*** Pl's Supp. Appx. 271 at 29:10 – 33:21. Nevertheless, at approximately 4:33PM, while awaiting the arrival of

paramedics, Officers Bray and Lawson are heard sarcastically mocking Ellis and commenting on the poor quality of medical care at the Jail: "[I]t's awesome how a guy with no history of seizures suddenly has seizures." "Yeah, I think I feel one coming on Bray." "I feel one coming on too. ***I hear the medical around here is excellent… (laughs)***." Pl's Supp. Appx. 250 (PX51) at 2:56-3:12. *See also* Aplt. Appx. 1921.

At 4:39PM, Integris EMS arrived at the scene. *See* Aplt. Appx. 3344. Ellis purportedly informed Integris EMS that he: (A) had flank pain which grew worse upon palpitation; (B) had "two seizures"; (C) was "severely dehydrated"; and (D) had been urinating in a cup because he could not get up to go to the bathroom. *Id.* 3345-3349; 1149:5-19; 857:16-19. Nonetheless, Integris EMS did not to transport Ellis to the hospital. *See, e.g.,* Aplt. Appx. 3344-3345. Ellis was disappointed that he wasn't being taken to the hospital. *Id.* at 1282:5-9. Ellis did not refuse transport to the emergency room. *Id.* at 1161:5-7. Before EMS left, Jail staff committed to calling EMS immediately if Ellis's condition changed. *Id.* at 3343 (PX5); 1606:18 − 1607:1; 1108:14-20; 1109:6-9; 1421:24 − 1422:6.

After EMS left, Ellis was moved to a segregated cell, H-1. *See, e.g.,* Aplt. Appx. 1103:23 − 1104:23; 862:11-13. Officer Lawson, who walked Ellis to H1, testified that Ellis appeared to be in pain. *Id.* at 476:15 − 478:17. He could not bend over to get

his own shoe, needed help carrying his mat, and had difficulty walking to the cell –
"he seemed in pain every step." *Id.*

H-1 did not have a toilet or a sink. *Id.* Ellis was forced to lay on a urine-soaked
mat. *See, e.g.,* Aplt. Appx. 2002:2-7; 901:3-7. H-1 *was* equipped with the "D-Ring,"
a metal restraint device affixed to the cell floor. *See, e.g.,* Aplt. Appx. at 1105:5 –
1106:7; 1258:5 – 1259:20. The Sheriff's Office used the D-Ring to "control inmates
who were causing a problem or being destructive…." *Id.* at 1105:13-17. When the
D-Ring was in use, the restrained inmate would literally be chained to the floor. *Id.*
at 1105:18-20. This would keep the inmate from standing up. *Id.* at 1258:5-19. The
restrained inmate's entire upper body and torso were confined to the cell floor. *Id.* at
1259:3-12.

Around 9:34PM on October 21, Ellis reported to Officers Bray and Lawson
he could not feel his legs. *See, e.g.,* Pl's Supp. Appx. 251 (PX52); & Pl's Supp. Appx.
271 at 154:17-22. In reply to Ellis's complaint, Lawson sarcastically commented:
"He can't feel his legs now, Bray, he can't feel his legs." Pl's Supp. Appx. 251. Despite
his lack of any medical training, Officer Bray told Ellis he had no injuries. *See* Pl's
Supp. Appx. 271 at 202:12 – 204:9. At approximately 9:56 PM, Officer Bray can be
heard mocking Ellis again, referring to him as ***"the zombie…."*** Pl's Supp. Appx.
253 (PX54). *See also* Aplt. Appx. 1294:9-17, 1294:24 – 1295:7. Still, Bray admits
Ellis's conditions, as reported to him, were ***getting worse.*** Pl' Supp. Appx. 271 at

201:25 − 202:8. Ellis continued to complain of numbness and pain in his legs on the night of October 21. *See, e.g.,* Aplt. Appx. 1295:8-12. Shoemaker, the Jail's Assistant Jail Administrator, admits that Ellis had been ***begging*** for help on October 21 and that he needed to go to the ER. *See* Aplt. Appx. 1967:10 − 1968:7.

Though Officer Bray was "uncertain" whether he believed Ellis's complaints, he was concerned enough to called Nurse Horn. *See* Pl's Supp. Appx. 271 at 157:14-21. Despite being told by the Integris EMS paramedics to call them if Ellis's condition changed, it was Bray's understanding that as a detention officer he was forbidden from calling the paramedics, but was required to call Nurse Horn instead. *Id.* at 156:10-19. During the call, Bray told Nurse Horn about Ellis's condition. *Id.* at 156:20-23, 199:13-23. Nurse Horn told Bray she would be in the next day, which was consistent with her normal practice. *Id.* at 154:23 − 156:9. Despite Ellis's concerning change in condition, Nurse Horn did not call Integris EMS, apparently because "EMS had already been to the jail earlier in the day and checked on the inmate." *Id.* at 155:11 − 156:6.

At around 10:11PM, Officer Bray is heard taunting Ellis yet again: "Oh, you're paralyzed now? … Uh Huh, Ok … I ain't laughing at you…." Pl's Supp. Appx. 254 (PX55).  Ellis then asks Bray to call an ambulance, to which Bray sarcastically responds, "I'm gonna call … right now." *Id.* Lawson, admits however,

8

Ellis never actually said he was "paralyzed". Aplt. Appx. 1301:3-8.[3]  Rather, Ellis complained that his legs were "numb". *Id.*

On the night of October 21, Ellis was ***"crying for his child and wanted to see his child…."*** Aplt. Appx. 1332:24 – 1333:8 (emphasis added).

- **October 22, 2015**

From about 12:42 to 12:47AM on October 22, there was an exchange between Ellis and Officer Mike Wiford, in which Ellis was apparently complaining that he felt as though he was bleeding internally and asked for help getting water. *See* Pl's Supp. Appx. 256 (PX57). Wiford coldly responds, "No. … They're saying that ***there's nothing wrong with you***… This is the third thing that you've said you have that they're saying 'No' … So if you want to get a drink of water, get up…." *Id.*

From around 8:18AM to 8:40AM on October 22, Ellis can be heard continually screaming, whimpering in pain and begging for help. *See* Pl's Supp. Appx. 257 (PX58). His whimpers turned to blood curdling screams and desperate cries for "Help!" *Id.* The officers in the area, AJA Shoemaker and Officer Travis Eads ("Eads"), and even the Jail's "lunch lady", Brenda Pierce ("Pierce"), vacillate between completely ignoring Ellis to verbally refusing his cries for help to openly and

---

[3]     That Ellis was able to walk from cell H-1 to the bathroom at 8:18PM on October 21 is irrelevant.  As Plaintiff's medical expert, Todd Wilcox, M.D. ("Dr. Wilcox") testified, a patient can feel weakness in his legs and still walk. *See* Aplt. Appx. 2297:22 – 2298:5.

cruelly mocking him. *Id.* Following is a summary and transcription of some of the video/audio:

> Eads: "What? You fell?"
> Ellis: "[moaning]" …
> Ellis: "Oh, my God! Help! My legs! It's my legs! … **Please.** Don't go anywhere! Ahhh!"
> Shoemaker: "We did this yesterday. **You're not selling me.**"
> Ellis: "Don't leave me here! Don't leave. I just fell..."
> Shoemaker: "We're not calling the ER" [Shoemaker closes door]
> Ellis: "Please, dude, wait. Dude, **I can't believe y'all are doing this! Help! Help! Help! Help! Somebody Help! Help! Help!"**
> **\*\*\***
> Ellis: "Help! I can't breathe, help."
> Pierce: "If you can't breathe, how can you talk?!"
> Eads: "It's a miracle!"
> Ellis: "Help! Help! Help!"

Pl's Supp. Appx. 257 (PX58) at 8:28 − 8:40. No help was ever provided. At trial, Shoemaker testified that while Ellis was clearly pleading for help, he did not see any "immediate" danger to his health, so he did not call for an ambulance. Aplt. Appx. 1963:21 − 1964:15. This was consistent with the Jail's practices. *Id.*

Instead of calling "911", Shoemaker claims that at around 8:33 AM, he called Nurse Horn (who was offsite) and informed her that Ellis was "screaming for help" and "cannot get up or walk." Aplt. Appx. 1970:5-20. *See also* Pl's Supp. Appx. 124. Nurse Horn seemed unconcerned and merely replied that she would "look at" Ellis when she got to the Jail. Aplt. Appx. 1970:5 − 1971:7. This was consistent with her behavior in the past. *Id.* Despite being informed that Ellis was screaming for help and could not walk, Nurse Horn would not arrive at the Jail until nearly two (2) hours

later, with sunglasses on and "Big Gulp" in hand. *See* Pl's Supp. Appx. 263 (PX64). *See also* Aplt. Appx. 764:20-23, 790:8 − 791:4.

At around 8:47AM on October 22, Officer Eads can be heard stating to another officer: "This guy's been ***yelling help for about 30 minutes***. This guy in H-1. …[H]e got up, tried to stand up, and fell down." Pl's Supp. Appx. 258 (PX59). *See also* Aplt. Appx. 749:8-23. Neither officer provided any assistance to Ellis. *Id.* At approximately 8:49 AM, there was an exchange between an inmate and Officer Eads: Inmate: ***"I think [Ellis] died, dude."*** Eads: ***"You think he died?"*** Inmate: "That'd be pretty bad" Eads: "Yeah, that would be" Inmate: ***"He sounded so bad."*** Pl's Appx. 259 (PX60). Yet again, Officer Eads did nothing to assist Ellis. *Id.*

After Shoemaker directed Officer Eads *not* to retrieve any water for Ellis (at around 9:00AM on October 22) he added, ***"Don't let [Ellis] try to fool you."*** Pl's Supp. Appx. 260 (PX61). Paradoxically, Shoemaker testified he did not think Ellis was faking his condition. *See* Aplt. Appx. 1964:6-8. Shoemaker agrees there is no "penological purpose" in forcing a person who is in excruciating pain to get up to get his own water. *Id.* at 1968:13-17. Nonetheless, Shoemaker forbade Eads from giving Ellis water because he was instructed by Nurse Horn to make Ellis walk and get his own water. *Id.* at 1972:20 − 1973:9. As Jail Administrator Jeff Harding admits, no one ever brought any water to Ellis. *See* Aplt. Appx. 758:15 − 759:6.

11

At around 9:02AM, Ellis again politely requested assistance from Officers Shoemaker and Eads; they provided none. *See* Pl's Supp. Appx. 260 (PX61). At 9:08AM, Shoemaker shuts Ellis's cell door without saying anything or doing anything to help him. *Id.* At no time is Ellis seen leaving the cell to get water and none was provided to him. *Id.*

Nurse Horn later charted in her Progress Notes that she checked on Ellis at 9:45AM on October 22, found him "lying on the mat in H1" and that Ellis "voiced no" complaint. Aplt. Appx. 3338-39.  She additionally notes that Ellis stated he ate breakfast and requested to "go back to the pod…." *Id.*  She did not mention her 8:33AM call with Shoemaker. *Id. See also* Aplt. Appx. 1356:9-16. **The 9:45 AM Progress Note is a complete fabrication.**  The video evidence shows Nurse Horn did not even arrive at the Jail until around **10:25AM**. *See* Pl's Supp. Appx. 263 (PX64). *See also* Aplt. Appx. 764:20-23, 790:8 – 791:4. Contrary to the false impression Nurse Horn attempted to create with her fictitious Progress Note, the evidence shows Ellis consistently complained of a worsening condition and continually pleaded for help on the morning of October 22, 2015.

At approximately 10:00AM on October 22, Ellis again began calling out to Shoemaker (who was sitting at the desk): "Asthma, **asthma attack!...** D.O.!" Pl's Supp. Appx. 261 (PX62). Shoemaker ignored his cries for help. *Id.* At 10:01AM, Ellis again pleaded with the detention staff: "D.O.! My asthma! D.O.! D.O.! D.O.! I'm

having an ***asthma attack! Help! Help!"*** *Id.* Around two minutes later, Officer

Eads went to Ellis's cell and asked, "What do you need?" *Id.* Ellis replied, "My

asthma!" *Id.* Eads asked whether Ellis had an inhaler to which Ellis responded that

he did not. *Id.* The Officers failed to provide any assistance. *Id.*

At approximately 10:05AM, Ellis can be heard moaning in pain and

screaming, "Help!" Pl's Supp. Appx. 261 (PX62). In response to Ellis's screams for

help, Shoemaker yells, ***"Dude, shut up!"*** *Id*; *See also* Aplt. Appx. 761:5-7. Neither

Shoemaker, nor Eads, nor anyone else at the Jail, did anything to help Ellis. *See* Pl's

Supp. Appx. 261 (PX62).

At 10:12AM on October 22, Ellis again calls out, "DO!" *See* Pl's Supp. Appx.

262 (PX63). Shoemaker cynically calls back, "Inmate!" *Id.* Ellis inquires, "Please, sir

can I get albuterol or not? … ***I think I'm dying.***" *Id.* The Jail Administrator admits

Jail staff should have immediately responded to Ellis' pleas. *See* Aplt. Appx. 762:6-

24. Instead, they did nothing. *Id.*

◊     **The "Tirade"**

There is no dispute that what happened next constitutes "reprehensible

conduct towards an inmate." Aplt. Appx. 1885 (Defendant's Closing Argument).

The parties have stipulated that "[i]nstead of referring Ellis for medical treatment,

[Nurse] Horn mocked and threatened him for reporting his symptoms, implied he

13

was faking his illness, and told him she was tired of dealing with him." Aplt. Appx. 617. This is putting it mildly.

At around 10:43AM, Ellis began begging the staff to look at his legs, complaining they were turning "black and purple". Pl's Supp. Appx. 264 (PX65). As Plaintiff's medical expert, Dr. Wilcox, testified, discoloration of the legs -- or "mottling" -- is "one of those really ominous signs that the patient's in real trouble…." Aplt. Appx. 1535:23 – 1536:22. Yet, rather than treating Ellis with compassion or care, Nurse Horn became enraged and went on a tirade:

> Nurse Horn: "***Listen to me and shut up!*** We've had EMS come over and check you out. ***Ain't a damn thing fucking wrong with you.***"
> Ellis: "Look at my legs."
> Nurse Horn: "Your legs are fine. …"
> Ellis: "Call them again."
> Nurse Horn: "No! No!... I looked at you fucking legs, and they are not black."
> Ellis: "Yes."
> Nurse Horn: "… ***[Y]ou're fucking colorblind!***"

Pl's Supp. Appx. 264 (PX65).

In obvious pain, Ellis then politely appealed to Officer Shoemaker: ***"Ooh, ooh, I can't feel my legs sir."*** Pl's Supp. Appx. 264 (PX65). Shoemaker responded by closing the cell door. *Id.* Nurse Horn then went on another rampage: "I just seen [*sic*] you move your legs … you moved your feet ... ***I'm tired of dealing with your dumb ass, you hear me?*** *Id.*

14

Next, Nurse Horn furiously screamed at Ellis and threatened him with the "D-Ring" if he continued to complain about his medical condition:

> "If we put you back in the pod and you start pissing in a cup again ***you're gonna  go on the fucking D-Ring because there ain't [sic] a damn thing wrong with you*** … the very first time you [complain] 'oh I can't get up, I need help … oh I'm having seizures' you're going on that D-Ring and that's where you're going stay the whole time that you are here because ***I'm sick and tired of fucking dealing with your ass! Ain't a damn thing wrong with you!"***

Pl's Supp. Appx. 264 (PX65). Nurse Horn believes "[s]ometimes you have to threaten the inmates…." Aplt. Appx. 2102:4-7. The Jail Administrator agrees that chaining an inmate -- who had been complaining about medical symptoms -- to the D-ring would deter that inmate from continuing to complain about his medical symptoms. *See* Aplt. Appx. 772:20-24.

The parties have stipulated that Nurse Horn did not refer Ellis for medical treatment. *See* Aplt. Appx. 617. Nurse Horn admits she did not even take Ellis's vital signs. *See id.* 2097:15 − 2098:22. She did nothing to assist this man. And while Nurse Horn claimed Ellis's legs were not discolored as he complained, when Ellis was found unresponsive in his cell hours later, mottling to his body and extremities was noted. *See, e.g.,* Aplt. Appx. 3339; 3324; 1351:1-7.

After threatening Ellis and providing no medical assessment or care whatsoever, Nurse Horn angrily walked away, leaving Ellis alone to die in H-1. *See* Pl's Supp. Appx. 264 (PX65).

◊    **The Death of Terral Ellis**

At around 1:03PM on October 22, an inmate trustee is seen on video going to Ellis's cell door. *See* Pl's Supp. Appx. 265 (PX66). About a minute later, the Jail's "lunch lady", Brenda Pierce, comes into view and starts a conversation with the trustee: Pierce: "I've never even looked in there [i.e., Ellis's cell]. I don't want to look in there. That shit is crazy…Ok I'll look" Trustee: ***"Looks like he's dying…."*** *Id.* Ms. Pierce then briefly looked into Ellis's cell, only to leave the booking area without providing any assistance. *Id.*

At approximately 1:38PM on October 22, Shoemaker went to Ellis's cell and attempted to rouse him, but Ellis was not responding. *See, e.g.,* Aplt. Appx. 2001:2-3; Pl's Supp. Appx. 266 (PX67). As Shoemaker observed, Ellis's feet and hands were ***"discolored*** to a blue with red spots" and he was "cold to the touch." Pl's Supp. Appx. 143; Aplt. Appx. 2007:15-17. At about 1:39PM, Shoemaker left to retrieve Nurse Horn. *See* Pl's Supp. Appx. 266 (PX67). At around 1:40PM, Shoemaker returned from Nurse Horn's office, followed by a very slowly moving Nurse Horn. *Id.* At 1:41PM, Ellis is heard moaning in pain. *Id.* At approximately 1:42PM, Nurse Horn left Ellis's cell, and, without any sense of urgency, walked back to her office, grabbed a blood pressure cuff, and slowly walked back. *Id.*  According to Nurse Horn, when she entered Ellis's cell, she observed that Ellis: (A) was in respiratory distress, (B) had "garbled" speech, (C) was "cool to touch", (D) "responded in pain

16

when touched on any part of body" and (D) had "mottled" extremities. Aplt. Appx. 3339-40. Nurse Horn called for Quapaw EMS, who were dispatched at 1:49PM. *See* Pl's Supp. Appx. 133-137.

From about 1:49 to 1:55PM, before Quapaw EMS arrived, and in the middle of a medical emergency, inmate trustees were deployed to remove and clean the urine-soaked mat (crudely referred to as a "piss mat") that Ellis had been sleeping on. *See* Pl's Supp. Appx. 266 (PX67) (13:49 – 13:55). *See also* Aplt. Appx. 901:10-21.

Ellis was unresponsive at the ER and later pronounced dead. *See* Pl's Supp. Appx. 139.  He was just 26 years old. *See, e.g.,* Pl's Supp. Appx. 146.  The Medical Examiner determined that Ellis's cause of death was sepsis/septic shock due to acute bronchopneumonia, and that "toxicology [was] noncontributory." *Id.* at 146-47.  As Dr. Wilcox has explained, sepsis occurs when "bacteria or an infectious agent is circulating in the bloodstream and going throughout the body" and ultimately causes organs systems to "start shutting down." Aplt. Appx. 1511:23 – 1512:19.

Dr. Wilcox opines that had Ellis been transported to the hospital earlier, even by 10:42AM on October 22, he likely would have survived. *See* Aplt. Appx. 1545:5-16. Dr. Wilcox believes Nurse Horn's treatment of Ellis was "really unforgivable in a healthcare encounter", particularly because there was a change in his presentation. *Id.* at 1547:4-15. She failed to do the "basics", including obtaining a set of vital signs,

and paying attention to Ellis's complaints and condition. *Id.* at 1546:5-24. Overall, the Jail did not have a functioning healthcare system. *Id.* at 1556:10 – 1559:17.

The Medical Examiner further noted that Ellis was allegedly found with "a bed sheet tied loosely around his neck." *Id.* at 148. The jury heard substantial evidence that – after consistently denying Ellis care as he slowly died in front of them – ***Nurse Horn and Assistant Jail Administrator Shoemaker attempted to stage his death as a "suicide."*** *See, e.g.*, Aplt. Appx. 1368:21-24; 1332:17 – 1333:1. After Ellis was finally placed in an ambulance, video shows Nurse Horn telling Shoemaker what to write in a report he was drafting. *Id.* at 1361:12-16. Horn instructed Shoemaker to write "possible suicide." *Id.* at 1368:21-24. In his report, Shoemaker wrote that there "was a blanket with a towel tied on the blanket that was sitting on [Ellis's] chest…." Pl's Supp. Appx. at 143 (PX 15). In her Progress Notes, Nurse Horn likewise claimed to have observed that Ellis's head and neck were "hyperextended" and that there were red marks on his neck which "may have been ligature marks." Aplt. Appx. at 3339. Nurse Horn later reported to Quapaw EMS that "[a]t last checking patient was found with blanket wrapped around his neck but not tightly…." Pl's Supp. Appx. at 136 (PX 13, withheld from Defendant's appendix). The Medical Examiner found no "ligature marks" on Ellis's neck. Pl's Supp. Appx. at 150 (PX19, withheld from Defendant's appendix).

The jury also saw surveillance video showing that while Ellis was dying in an ambulance in the Jail's sallyport, Nurse Horn and Shoemaker shared a "chuckle" because they were unable to spell that Ellis had experienced pain "systemically" in Shoemaker's report. Aplt. Appx. at 1369:19 − 1370:17.

## 2.    The Jail's Medical Delivery System (**Policies and Customs**)

The evidence at trial established the County's total abdication of its duty to provide minimally sufficient healthcare to inmates. The Jail Administrator admitted he had ***"fail[ed] to implement any kind of medical care system"*** at the Jail. Aplt. Appx. 1127:11-19. *See also id.* at 1111:4 − 1112:23. As Dr. Wilcox opined, the Jail did not have a functioning healthcare system. *See* Aplt. Appx. 1556:10 − 1559:17.

First, as a matter of routine and established practice, the Jail's medical policies, with one dubious exception (discussed *infra*), were disregarded. As Jail Administrator Harding acknowledged, "you can have the very best written policies, but if they're not followed, it doesn't matter." Aplt. Appx. 1085:24 − 1086:2. As Assistant Jail Administrator Charles Shoemaker trenchantly expressed when discussing the jail's policy book with his subordinate: ***"Fuck that policy book. It doesn't matter."*** *Id.* at 1219:13 − 1220:11. Consistent with that ethos, Officer Lawson testified he had never even seen the policy book and had received no training on it. *Id.* at 1220:10-15.

While OCSO had a written policy that required "[a]ll county jail inmates shall be entitled to healthcare comparable to that available to citizens of the surrounding community," the policy was not implemented, complied with, nor enforced. *See, e.g.,* Aplt. Appx. 784:9-21; 2012:14 – 2013:12. For example, despite a contractual requirement that the Jail would set a specific day of the week for Physician's Assistant Aleta Fox to come to the jail, Jail Administrator Harding never implemented that requirement. *See* Aplt. Appx. 796:11 – 797:24, 799:1-7. Indeed, he never even reviewed the contract, nor did he ever even speak with Ms. Fox. *Id*. In fact, the Sheriff ***stipulates*** that "[a]lthough the sheriff's office contracted with a physician's assistant to visit the jail once a week for inmate medical exams, visits were not regularly scheduled, and the physician's assistant only visited the jail when and if Horn called her." Aplt. Appx. 618.

In addition, detention officers were trained and instructed that – irrespective of the Jail's *written* policies – they could not call an ambulance for an inmate in distress, no matter how obvious the inmate's medical need, without Nurse Horn's approval. *See, e.g.,* Aplt. Appx. 1276:7-17, 1930:1-10. After Shoemaker watched video of himself refusing to provide care or call for an ambulance for Ellis as he lay dying, he testified that his conduct was consistent with the way he had been trained, and that he "didn't see anything on the video that [he] felt like was beyond or outside of the way that [he] had been trained." Aplt. Appx. 1956:21 – 1958:1.

The Sheriff further **stipulates**: (1) "[t]here was no physician directly providing care at the jail even though the jail's Medical Services Policy required medical care to be delivered under the direction of a licensed physician"; (2) "[t]he Medical Services Policy also required a schedule for sick call, but the jail did not maintain scheduled sick call or a sick call list"; and (3) while "[t]he jail's Medical Services Policy required the jail administrator to review annually statistics on inmate medical care and also required the jail administrator and nurse to review at least quarterly the medical care's effectiveness and efficiency[,] … formal audits were never done." Aplt. Appx. 618.

The one medical policy that *was* followed at the Jail was the "Jail Nurse" Policy. *See* Aplt. Appx. 3362-3364. The Jail Nurse Policy arbitrarily, and perilously, draws distinctions in how a nurse would treat patients in the community and how a nurse must treat inmates at the Jail: **"[D]on't ever let [the inmates] gain your trust."** *Id.* at 3363 (emphasis added). This policy came from the Sheriff. *See* Aplt. Appx. 783:3-11. The Jail Administrator agrees that Nurse Horn followed the policy in her dealings with Ellis. *Id.* at 781:11 − 782:3, 783:3-11. This policy of distrust infected the entire Jail.  As Officer Lawson testified, Jail staff members **were trained not to trust inmates − "even in a situation where you have an inmate begging for help" − and that this training "came from the top down . . .**

21

***Sheriff, undersheriff, jail administrator."*** Aplt. Appx. 1317:20 – 1318:5 (emphasis added).

Dr. Wilcox gave unrebutted testimony that the Jail's administration set up a system of medical "care" under which inmates' lives were entrusted to a single LPN, Nurse Horn, who was not trained or qualified to medically assess patients or render a diagnosis. *See* Aplt. Appx. 1588:13 – 1589:5, 1555:10 – 1559:17. Nurse Horn "really had established herself as the entire medical department, which, really makes no sense legally or medically because she's an LPN." *Id.* Making matters worse, Nurse Horn was then routinely relying on even *less* trained individuals – EMTs – to make decisions regarding inmates' medical care. *See, e.g.,* Aplt. Appx. 1417:21 – 1418:13. *See also id.* at 1591:12-18. Nurse Horn testified that "[n]o one, including the sheriff or undersheriff, ever raised any issues with [her] using lesser trained EMTs to make the medical decisions for the inmates." *Id.* at 1418:10-13. The Sheriff was fully aware that Nurse Horn was directing the healthcare of inmates, despite her total lack of qualifications to do so. *Id.* at 1415:13-25.

Not only did the Sheriff create a healthcare system that entrusted the care of inmates to an unqualified and unsupervised LPN, both he and the Jail Administrator also implemented a policy or practice that allowed Nurse Horn to come to the Jail whenever she wanted, without any expectation of when she would be at the Jail or how many hours she would work in a week. *See* Aplt. Appx. 1354:23 – 1355:2,

1425:19-21; 920:8-15. Unsurprisingly, Nurse Horn was often absent from the Jail. *See, e.g.,* Aplt. Appx. 890:22 − 892:4, 893:5 − 894:16. In her frequent absence, Horn would attempt to medically assess and even diagnose patients over the phone. *See, e.g., id.* at 1382:16 − 1386:21. She was literally phoning it in.

Nurse Horn herself explained that OCSO created this policy of allowing her to work whenever she wanted in order to save money. The Sheriff stated, "I can't give you as much money as you was making with [a different employer], but you can set your own hours." Aplt. Appx. 1424:25 − 1425:21. Nurse Horn further admitted that the Sheriff was "concerned about the costs of sending inmates to outside medical" (Aplt. Appx. 1418:10-13) and that she and Jail Administrator Harding discussed "different ways to keep the costs down, including keeping the costs down for the emergency room bills." Aplt. Appx. 1397:23 − 1398:3.

And the mistreatment of Ellis was not an isolated occurrence. When asked if he had observed Nurse Horn refusing to provide any kind of care to inmates on a frequent basis, Officer Larson responded ***"absolutely frequent. More common than not, I would say."*** Aplt. Appx. 1245:9-15. The Jail Administrator concurred with this assessment:

> Q. This wasn't happening just to Terry Ellis, sir, it was happening to every inmate in that entire facility. This is a ten-day snapshot and I've showed you five inmates; correct?
>
> A. Yes.

Q. And every single one of them are getting treated the same as Terry Ellis; agreed?

A. Yes.

Aplt. Appx. 808:8-19. The Jail Administrator further admits that – far from being an unfortunate, isolated incident – Ellis's death was the product of a total systemic failure involving every single staff member who interacted with him. *Id.* at 771:3-17.

## D. Procedural History

The original administrator of Ellis's Estate, along with two co-Plaintiffs, filed the Complaint in this matter on June 9, 2017. *See* Aplt. Appx. 44-62. Over the long course of this case, numerous named Defendants were voluntarily dismissed. *See id.* at 73-76, 87-97, 690-692, 2266-68. By the time trial of this matter began, only two parties remained, Plaintiff and the Sheriff. *See, e.g.,* Aplt. Appx. 981. "Plaintiff … brought a claim against the Sheriff of Ottawa County, in his official capacity pursuant to 42 U.S.C. § 1983 alleging a violation of Ellis's Fourteenth Amendment right to adequate medical care." *Id.*

This matter was tried over eight days in August of 2023. On August 23, 2023, after deliberating, the jury entered a verdict in favor of Plaintiff and against Sheriff, awarding Plaintiff $33 million in compensatory damages. *See* Aplt. Appx. 1011. On September 8, 2023, the District Court entered its final Judgment in accordance with the jury's verdict. *Id.* at 1821.

The Sheriff subsequently filed three post-trial motions, a Motion for Judgment as a Matter of Law, Motion for New Trial and Motion for Remittitur. *See* Aplt. Appx. 2269-2667. Plaintiff filed comprehensive responses to each of these motions. *Id.* at 2790-2851.

On October 13, 2023, Plaintiff filed his Motion for Attorney's Fees, pursuant to 42 U.S.C. § 1988. *See* Aplt. Appx. 2701-2789.

On February 29, 2024, the District Court entered its Opinion and Order ("Order" or "District Court's Order") denying the Sheriff's Motion for Judgment as a Matter of Law, Motion for New Trial and Motion for Remittitur. *See* Aplt. Appx. 3088-3133. Also on February 29, the Court filed an order granting, in part, Plaintiff's Motion for Attorney's Fees and Bill of Costs, awarding $970,402 in attorney's fees and expenses and $19,480.54 in costs. *See* Aplt. Appx. 3131-3164.

On March 27, 2024, the Sheriff filed a Motion to Reconsider the Order denying his post-trial motions. *See* Applt. Appx. 3165-3243.

On March 28, 2024, the Sheriff initiated Appeal No. 24-5035. *See* Applt. Appx. 3244. On June 5, 2024, the District Court denied the Sheriff's Motion to Reconsider. *See* Aplt. Appx. 3268-3281. The Sheriff then appealed the denial of reconsideration and this Court consolidated Appeals Nos. 24-5035 and 24-5080 for all procedural purposes.

## V.    SUMMARY OF THE ARGUMENT

On October 10, 2015, Ellis voluntarily turned himself into the Ottawa County Jail on a pending charge. When Ellis arrived at the Jail, he was a healthy 26-year-old man and young father. Twelve days later, he would be dead.  In those twelve days, Ellis encountered unspeakable mistreatment -- and nightmarish conditions of confinement -- tantamount to torture. Ellis's suffering and death were entirely preventable. The Jail staff's reckless -- and at times, depraved -- indifference to his serious medical needs is shocking, shameful and indefensible.

When Ellis started to develop symptoms of pneumonia and began asking the detention staff for help, his pleas were met with ridicule and scorn.  As time went on and his condition grew worse, he was branded as a malingerer and treated with utter contempt by the Jail staff. On the night of October 21, Ellis was heard crying out for his son, complaining that his legs were numb and pleading for help. By the morning of October 22, Ellis was in the throes of septic shock.  His legs were numb, and his extremities mottled.  Beginning at around 8:18AM and continuing to about 8:40AM, Ellis can be heard -- on audio from the Jail's video surveillance system -- continually screaming, whimpering in pain and begging for help. *See* Pl's Supp. Appx. 257 (PX58). A one point, his legs gave out and he fell. He was in respiratory distress. He was suffering in unspeakable pain. His screams are blood curdling: ***"Oh, my God! Help! My legs! It's my legs! … Help! Help! Help! Somebody Help! Help! Help! … Help! I can't breathe, help"*** *Id.* Ellis's frantic cries echoed hauntingly

through the Jail. *Id.* When there were officers in the area, they vacillated between completely ignoring him -- to verbally refusing his cries for help -- to openly and cruelly mocking him. *Id.* No one was coming to save Terral Ellis. They couldn't be bothered.

By 10:45AM on October 22, when the Jail's lone nurse, Theresa Horn, LPN, showed up, Ellis must have had a fleeting glimmer of hope that she would assess his serious condition and get him to the ER.  Hope quickly turned to despair as Nurse Horn sadistically threatened to chain this gravely ill young man to a barbaric restraint device known as the "D-Ring" if he continued to complain about his medical condition:

> "If we put you back in the pod and you start pissing in a cup again you're gonna  go on ***the fucking D-Ring because there ain't [sic] a damn thing wrong with you*** … the very first time you [complain] 'oh I cant get up, I need help … oh I'm having seizures' you're going on that D-Ring and that's where you're going stay the whole time that you are here because ***I'm sick and tired of fucking dealing with your ass! Ain't  a damn thing wrong with you!***"

Pl's Supp. Appx. 264 (PX65). After threatening Ellis and providing no medical assessment or care whatsoever, Nurse Horn left him in his cell to die. Her threats were some of the last words Ellis heard as he laid alone on a urine-soaked mat, his organs shutting down and death approaching.  By around 2:00PM, Ellis had succumbed to septic shock, having never received the medical attention he so

desperately and obviously needed. This is part of the overwhelming evidence presented to the jury.

On appeal, the Sheriff argues the verdict is excessive, not supported by the weight of the evidence and/or the result of attorney misconduct. These arguments lack merit. "The jury ha[s] wide latitude to choose an award based on the evidence." *Hill v. J.B. Hunt Transp., Inc.,* 815 F.3d 651, 668 (10th Cir. 2016). As the District Court thoughtfully held and reasoned:

> Without guidance from Congress, it is for a jury rather than the Court to say what those hours of physical and mental pain cost Mr. Ellis. It is unclear how one might monetize the pain of a slow septic death, or how that process and prospect of dying felt to a young man who must have questioned why he turned himself in; who begged for others to help him; who cried for his child; and who was then forced to weigh the risk of being chained to the floor against the hope of asking for help. … It is unclear the precise monetary values the jury assigned to the variables of pain, despair, disbelief, and helplessness endured by Mr. Ellis. The variables for such a computation are, thankfully, not often needed. However, after reviewing the evidence heard by the jury, the Court cannot say the amount rendered by the jury—in compensation for pain and suffering, death and loss of familial relationships—shocks the conscience.

Aplt. Appx. 3128. This Court should affirm.

## VI.    ARGUMENT

### A.    This Court Should Summarily Affirm Based on the Sheriff's Deficient Appendix

Plaintiff adopts and incorporates §IV(A), *supra*, as if fully stated herein.

### B.    The District Court Did *Not* Err in Denying the Sheriff's Motion for Judgment as a Matter Of Law Based on "Overwhelming Evidence"

Assuming the Court does not summarily affirm based on the Sheriff's deficient Appendix, the denial of Rule 50(b) relief should be affirmed on the merits. "Judgment as a matter of law is cautiously and sparingly granted ...." *Bill Barrett Corp*, 918 F.3d 760, 766 (10th Cir. 2019) (cleaned up)). In deciding a motion for judgment as a matter of law, the Court must "construe the evidence and inferences in the light most favorable to the nonmoving party without weighing the evidence, passing on the credibility of witnesses, or substituting [its] judgment for that of the jury." *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996). Under Rule 50, a party is entitled judgment as a matter of law "only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law." *Bill Barrett Corp*, 918 F.3d at 766 (quoting *Wagner*, 586 F.3d at 1244). "A directed verdict is only appropriate if the evidence, viewed in the light most favorable to the nonmoving party, points but one way and is susceptible to no reasonable inferences supporting the non-moving party." *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1302 (10th Cir. 2003) (cleaned up).

Because Appellants' Rule 50(b) Motion did not even begin to meet this exceedingly high threshold for relief, the District Court did not err in denying it.

## 1. Plaintiff Presented Substantial Evidence of "Underlying" Violations of Ellis's Constitutional Right to Adequate Medical Care

Courts typically will not hold a governmental entity, like the Sheriff, liable without proof of an "underlying constitutional violation by [one] of its officers." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317−18 (10th Cir. 2002). In the case at bar, several employees or agents of the Ottawa County Sheriff's Office − including Nurse Horn, Shoemaker, Bray, Lawson and Pierce − violated Ellis's constitutional right to adequate medical care. Plaintiffs' evidence of underlying Constitutional violations is comprehensive, overwhelming, and unassailable. Indeed, the evidence establishes that the continual refusal to address Ellis's serious medical needs produced "physical torture" and a "lingering death", "the evils of most immediate concern to the drafters of the [Eighth] Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). This was not a close case.

Under the Eighth Amendment, prisoners possess a constitutional right to medical care. That right is violated when doctors or officials are deliberately indifferent to a prisoner's serious medical needs. *See Estelle*, 429 U.S. at 103-04. Pretrial detainees, like Ellis, who have not been convicted of a crime, have a constitutional right to medical and psychiatric care under the Due Process Clause of the Fourteenth Amendment, with the standard for deliberate indifference *at least* as protective as the standard for convicted prisoners under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017).

"Deliberate indifference involves both an objective and subjective component." *Olsen*, 312 F.3d at 1315 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)) (cleaned up). "The objective component examines whether the medical condition or harm claimed by the inmate was 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022) (internal citation omitted). Defendant offers no argument that Ellis's medical condition was not sufficiently serious to satisfy the objective component.

"To satisfy the subjective component, the plaintiff must show the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). *See also Mata v. Saiz,* 427 F.3d 745, 753 (10th Cir. 2005).

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001). For instance, "the existence of an obvious risk to health or safety may indicate awareness of the risk." *Rife,* 854 F.3d at 647 (citing *Farmer,* 511 U.S. at 842). The Sheriff attempts to turn this standard on its head by arguing the "[t]rial testimony established that staff failed to perceive there was a substantial risk of harm to Ellis." Op. Brief at 18.

Defendant's argument fails for two primary reasons. *First*, there was abundant testimony at trial, from multiple witnesses, showing Jail staff did in fact perceive the risks to Ellis's health and safety. *See, e.g.*, Aplt. Appx. 1128:13-24, 1278:10 − 1279:4, 1930:1-4, 1958:2-5, 1964:3-15, 1966:24 − 1968:7, 1970:12 − 1971:20, 1972:24 − 1973:9, 1979:5-14, 1985:1-13, 1997:9 − 1998:16, 1350:20-25; Pl's Supp. Appx. 271 at 156:10-12, 154:17 − 156:1, 201:25 − 202:8 (played at Aplt. Appx. 1211:10). *Second*, in light of the *obviousness* of the risks to Ellis's safety and health, the jury was not required to accept Nurse Horn's "and other jail staff['s]" self-serving testimony concerning what they did, or did not, "perceive."[4] *See, e.g., Farmer,* 511 U.S. at 842. The surveillance video and audio evidence alone plainly and decisively establishes the patent obviousness of substantial risks to this man's health and safety. *See, e.g.,* Pl's Supp. Appx. 257 (PX58); Pl's Supp. Appx. 264 (PX65). It is *painfully* obvious.

Fundamentally, Defendant has *stipulated* to facts establishing that Nurse Horn and other Jail staff were deliberately indifferent to Ellis's serious medical needs.  As summarized above, the parties stipulated that: (1) "[a]round 10:45 a.m. on October 22, 2015, Ellis complained of being unable to walk, that his legs were black and blue,

---

[4]    Appellant also attempts to twist Plaintiff's expert's testimony to support its argument that there is a lack of any underlying deliberate indifference.  But Dr. Wilcox testified that Ellis exhibited "serious and ominous clinical changes in an otherwise previously-healthy patient" that warranted "a trip to the emergency department." Trial Tr. at 953:4-21. Dr. Wilcox further described Nurse Horn's disregard of Ellis's "change in presentation" as "unforgivable." *Id.* at 966:4-24.

and that he was in pain"; (2) "Shoemaker was near the cell Ellis was in when Horn arrived to examine him on the morning of October 22"; (3) "[i]nstead of referring Ellis for medical treatment, Horn mocked and threatened him for reporting his symptoms, implied he was faking his illness, and told him she was tired of dealing with him"; and (4) "[o]ther than summoning Horn, Shoemaker did nothing to assist Ellis." Aplt. Appx. 617-18. These *stipulated facts* <u>*alone*</u> show Nurse Horn and Shoemaker disregarded obvious and substantial risks to Ellis's health and safety. This is deliberate indifference under any formulation of the standard. *See, e.g., Burke,* 935 F.3d at 992; *Farmer,* 511 U.S. at 837; *Mata,* 427 F.3d at 753.

Beyond these stipulated facts, in its Order the District Court noted "the jury was presented **overwhelming evidence** from which it could conclude that the jail staff not only knew about Ellis' condition but were also indifferent to it." Aplt. Appx. 3093 (emphasis added).

Beginning with Nurse Horn, her entire interaction with Ellis -- on the morning of October 22 -- is a stunning and vile display of cruel and inhumane abuse. *See* § IV(C), *supra.* The Sheriff's own counsel told the jury Nurse Horn exhibited "reprehensible conduct towards an inmate." Aplt. Appx. 1885. "A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition. Even a brief delay may be unconstitutional." *Mata,* 427 F.3d at 755. Certainly Nurse

33

Horn's conduct on the morning of October 22 satisfies and exceeds this standard. She not only disregarded Ellis's complaints of severe pain, inability to walk, numbness in his legs and mottling of his extremities, she threatened him with a barbaric punishment if he continued to complain about his emergent and life-threatening condition. This is one of those rare "worst cases" described by the Court in *Estelle*. 429 U.S. at 103. The evidence establishes that Nurse Horn's treatment of Ellis -- and her failure to meet his serious and obvious medical needs -- produced "physical torture" and a "lingering death…." *Id.* This is as sure a case of deliberate indifference as this Court is likely to ever see.

Further, even before the morning of October 22, there is evidence that Nurse Horn "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety"; failed to "treat a serious medical condition properly"; "den[ied] [Ellis] access to medical personnel capable of evaluating the need for treatment"; and "delay[ed] [the] provi[sion of] medical treatment [which] caused …. unnecessary pain [and] a worsening of [Ellis's] condition." *Sealock*, 218 F.3d at 1211; *Mata*, 427 F.3d at 753, 755. Without ever conducting even a basic medical assessment, Nurse Horn baselessly labeled Ellis a malinger,[5] even as his condition worsened. Adding insult to

---

[5]     "Diagnosing" Ellis as a malinger, without any medical assessment, is, in and of itself, deliberate indifference. *See, e.g., Burke,* 935 F.3d at 994 (finding evidence of deliberate indifference where, "[d]espite his obvious need", jail nurses and detention staff "either dismissed Mr. Williams as a malingerer without undertaking any investigation into his condition or abdicated their gatekeeping roles by failing to relay

injury, Nurse Horn instructed the detention staff to do the same. This stigma that Ellis was "faking", despite his obvious and emergent needs (and rapidly changing and deteriorating condition), was passed to the entire Jail staff with disastrous consequences. This, too, constitutes deliberate indifference. *See* fn. 6 *infra*.

As for the detention staff, Shoemaker, Bray, Lawson, Pierce, and others were all deliberately indifferent to Ellis's serious medical needs. The evidence, set out herein, is amply summarized in the District Court's Order. *See, e.g.,* Aplt. Appx. 3093-94. By way of example:

- "[O]n the evening of October 21, 2015, Ellis asked D.O. Lawson 'do you mind giving me some meds and my inhaler?' to which D.O. Lawson replied 'no, that's a nurse thing. The nurse has to okay [inaudible] we'll call her tomorrow.'" Aplt. Appx. 3093.[6]

- "Later that evening, Ellis told D.O. Lawson and D.O. Bray that he could not move his legs and asked them to call an ambulance, to which D.O. Bray responded, 'you're paralyzed now?' and reiterated that he would call the nurse." Aplt. Appx. 3093-94.[7]

- "On the morning of October 22, 2015, after screaming to get the attention of … Shoemaker, Ellis again expressed that there was something wrong with his legs; however, … Shoemaker refused to call emergency services. In the middle

---

the problem to medical staff."); *Prince,* 28 F.4th at 1048, n. 11 (assumption that a detainee is faking or maligning can be evidence of deliberate indifference) (citing *Foelker v. Outagamie Cnty.,* 394 F.3d 510 (7th Cir. 2005)).

[6]     The District Court cites PX68, a video surveillance clip, which it notes was admitted at trial – along with the rest of Plaintiff's video exhibits (PX50-71) "without objection." Aplt. Appx. 3093, n. 2.  PX68 is not included in the Sheriff's Appendix.

[7]     Citing PX55, another of the video exhibits withheld from the Sheriff's Appendix.

35

of an exchange with D.O. Bray, Brenda Pierce, the jail's lunch lady, can be heard saying 'that poor guy needs help' before ultimately mocking and dismissing him, by asking, 'if you can't breathe how can you talk?'" Aplt. Appx. at 3094 (internal citation omitted).[8]

- "At one point, Ellis begged A.J.A. Shoemaker to look at his legs, but A.J.A. Shoemaker stated 'I'm not looking at your legs. Why would I look at your legs man? I'm not medical.'" Aplt. Appx. 3094. (citing PX 65, Aplt. Appx. at 3413).

To prevail on the Rule 50 Motion, the Sheriff bore the burden of establishing that – viewing the facts in the light most favorable to Plaintiff – there was a **complete absence** of evidence supporting liability. *See Bill Barrett Corp*, 918 F.3d at 766. Precisely the opposite is true. As the District Court concluded, the jury heard "overwhelming evidence" that Jail staff "not only knew about Ellis' condition but were also indifferent to it." Aplt. Appx. 3093. As the District Court correctly held, there was "eight days' worth of testimony from which a jury could have easily inferred knowledge..." *Id.* at 3094-95 (citing *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008)).[9] The District Court did not err. There is ample, varied and truly overwhelming evidence of "underlying" constitutional violations.

---

[8]    Citing PX58, another video exhibit, admitted at trial, and omitted from the Sheriff's Appendix.

[9]    In addition, this Court has held deliberate indifference may be found where an inmate is prevented "from receiving treatment" or is denied "access to medical personnel capable of evaluating the need for treatment." *Burke,* 935 F.3d at 993 (cleaned up).  If the official delays or refuses to fulfill that gatekeeper role, then he "may be liable for deliberate indifference." *Id.* Here, there is abundant evidence that every Jail staff member who came into contact with Ellis, from the night of October

### 2. **Plaintiff Established the Sheriff's Liability Under a *Monell* Theory**

In denying relief under Rule 50(b), the District Court held Plaintiff presented

***"abundant evidence"*** that policies or customs maintained by the Sheriff were

"closely related" to the violation of Ellis's Constitutional rights.  Aplt. Appx. 3097

(emphasis added). The District Court's holding is well-supported. Plaintiff's evidence

of "*Monell*" or municipal liability is substantial.

Plaintiffs' claims were brought against the Sheriff in his official capacity. A

claim against a state actor in his official capacity, such as the Sheriff, "is essentially

another way of pleading an action against the county or municipality" he represents

and is considered under the standard applicable to § 1983 claims against

municipalities or counties. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).

In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1977) and

subsequent cases, the Supreme Court has "required a plaintiff seeking to impose

liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom'

that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520

U.S. 397, 403 (1997). As the Tenth Circuit has succinctly stated, to establish *Monell*

liability the plaintiff "must prove (1) official policy or custom[,] (2) causation, and (3)

---

21 through the afternoon of October 22, failed in their gatekeeper role. *See, generally*,
§IV(C), *supra*. The is another, independent ground, to affirm.

state of mind." *Hinkle v. Beckham Cty. Bd. of Cty. Commissioners,* 962 F.3d 1204, 1239 (10th Cir. 2020).

Policies or customs meeting this standard may arise from "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Hinkle,* 962 F.3d at 1239–40 (10th Cir. 2020) (cleaned up). A failure to train or supervise are specific grounds for *Monell* liability. *See, e.g., Lance v. Morris,* 985 F.3d 787, 800-02 (10th Cir. 2021). Inadequate staffing is also a recognized basis for municipal liability. *See, e.g., Burke,* 935 F.3d at 999-1001.

County sheriffs may be held liable for the maintenance of an unconstitutional health care delivery system. In *Burke,* the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff based on evidence that he maintained a policy or custom of insufficient medical staffing, resources, and training, of chronic delays in care and of indifference toward medical needs at the Tulsa County Jail. *Burke,* 935 F.3d at 999-1001. As the Tenth Circuit reiterated in *Crowson,* a county may face liability premised on a "theory [of the] ***systemic failure of medical policies and procedures.***" 983 F.3d at 1192 (emphasis added). "Deliberate indifference to serious medical needs may be shown by proving that there are such gross deficiencies

in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake City,* 768 F.2d 303, 308 (10th Cir. 1985). More recently, the Circuit held that a county sheriff may face *Monell* liability for his failure to adequately staff a jail's medical unit with qualified professionals, failure to provide access to a physician and failure to supervise a jail's medical delivery system. *Prince,* 28 F.4th at 1049-51 (citing *Burke,* 935 F.3d at 1001).

As summarized herein (§IV(C)), there is substantial evidence that the Sheriff/OCSO maintained such a system (or lack thereof) at the Jail. The evidence established a "systemic failure of medical policies and procedures" at the Jail. The trial record is replete with "gross deficiencies in staffing [and] procedures." It is clear the Sheriff utterly failed to staff the Jail with qualified personnel, failed to provide access to a physician, and failed to supervise the Jail's medical delivery system. Indeed, there was ___**no functioning medical delivery system**___ at all at the Jail. The District Court correctly denied Rule 50(b) relief on Plaintiffs' *Monell* theory of liability.

___**First**___, and fundamentally, OCSO's written Jail Nurse Policy is unconstitutional in both concept and execution and is causally linked to Ellis's suffering and death. It is well-established that a *Monell* plaintiff may prove the necessary policy or custom through evidence of a "formal regulation or policy statement…." *Bryson v. City of Oklahoma City,* 627 F.3d 784, 788 (10th Cir. 2010). It

is rare, however, to find a written policy statement that causes a Constitutional deprivation.[10]  This is one of those rare instances. The Jail Nurse Policy arbitrarily, and perilously, draws distinctions in how a nurse would treat patients in the community and how a nurse must treat inmates at the Jail: ***"[D]on't ever let [the inmates] gain your trust."*** Aplt. Appx. at 3363 (emphasis added). This is a written policy statement that, in no uncertain terms, admonishes the Jail Nurse to always distrust her inmate patients.  The evidence showed this was the *only* medical policy that was followed at the Jail.  It would appear Nurse Horn adopted this policy statement as her overarching philosophy.  From early on, Nurse Horn refused to believe Ellis's complaints of a serious medical need, labeling him a malinger without any medical assessment even as his condition obviously worsened. Making matters worse, Nurse Horn instructed the detention officers to do the same.  This policy infected the entire Jail staff with disastrous consequences.  As Officer Lawson testified, Jail staff members ***were trained not to trust inmates*** − ***"even in a situation where you have an inmate begging for help"*** − ***and that this training "came from the top down . . . Sheriff, undersheriff, jail administrator."*** Aplt. Appx. 1317:20 − 1318:5[11] (emphasis added).

---

[10]    With respect to causation, this Court has explained that "the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Hinkle*, 962 F.3d at 1241.

[11]    As correctly identified by the District Court, this is also independent evidence of an unconstitutional failure to train. *See* Aplt. Appx. 3100-3101.

**<u>Second</u>**, there was a "systemic failure of medical policies and procedures". *Crowson*, 983 F.3d at 1192. The Sheriff was responsible for unconstitutional policies or customs of inadequate medical staffing and a "lack of urgency surrounding jail medical care." *Burke*, 935 F.3d at 1001. **<u>Third</u>**, the Sheriff utterly, and with deliberate indifference, failed to train and supervise its staff with respect to the medical policies and procedures.

The Sheriff's primary argument on appeal is a familiar one. The Sheriff avers that the mere existence of written policies – purportedly governing medical care at the Jail – shields the County from *Monell* liability. *See, e.g.*, Op. Brief at 20-24. This is a superficial argument that cannot withstand minimal scrutiny.

"[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced." *Ware v. Jackson County, Mo.*, 150 F.3d 873, 882 (8th Cir. 1998). It is well established that "[t]he knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." *Tafoya*, 516 F.3d at 919 (citations omitted). *See also Mata*, 427 F.3d at 758 (finding a "DOC protocol mandating that [defendant] treat severe chest pain as a cardiac symptom constitutes circumstantial evidence of her knowledge of the seriousness of such pain").

Consistent with this authority, the District Court held that "[t]he mere existence of a written policy which required jail staff to provide adequate medical

care does not negate the fact that the jury was presented with sufficient evidence to conclude that despite those written policies there was a prevalent custom of denying adequate medical care, that the custom was so widespread as to be known to Defendant, and that the custom and practice of denying medical care caused Ellis' death." Aplt. Appx. 3098. This holding should be upheld on appeal.

Here, the evidence at trial established that, as a matter of routine Jail operations, ***none*** of the written medical policies – aside from the patently unconstitutional Jail Nurse Policy – were followed or enforced.   The Jail Administrator acknowledged: "you can have the very best written policies, but if they're not followed, it doesn't matter." Aplt. Appx. 1085:25 – 1086:2. As the Assistant Jail Administrator forcefully expressed when discussing the Jail's policy book with his subordinate: ***"Fuck that policy book. It doesn't matter.***"  *Id.* at 1221:17-21. Consistent with that attitude, Officer Lawson testified he had never even seen the policy book and had received no training on it. *Id.* at 1220:12-21. OCSO actually trained its officers to violate the written policies.  *Id.* 919:3-17.

Plainly there was evidence of a reckless and utter failure to train Jail staff with respect to the medical policies. *See* Aplt. Appx. 1317:20 – 1319:11. This is yet another basis for the Sheriff's liability. *See, e.g., Lance,* F.3d at 800-02.

While Ottawa County had a written policy requiring that "[a]ll county jail inmates shall be entitled to healthcare comparable to that available to citizens of the

surrounding community," the Jail Administrator himself admitted this policy was not enforced. Aplt. Appx. 784:9-21. For example, despite a contractual requirement that the Jail would set a specific day of the week for Physician's Assistant Aleta Fox to come to the jail, Jail Administrator Harding never implemented that requirement. *Id.* at 796:11 − 797:2; 799:1-5. *See also id. at* 618. Indeed, he never even reviewed the contract, nor did he ever even speak with Ms. Fox. *Id.*

In addition, jailers were trained and instructed that − irrespective of the jail's *written* policies − they could not call an ambulance for an inmate in distress, no matter how dire the inmate's medical need was. Aplt. Appx. 1276:7-17, 1930:1-10. *See also id.* at Aplt. Appx. 1957:15 − 1958:1. The Sheriff further ***stipulated*** that: (1) "[t]here was no physician directly providing care at the jail even though the jail's Medical Services Policy required medical care to be delivered under the direction of a licensed physician"; (2) "[t]he Medical Services Policy also required a schedule for sick call, but the jail did not maintain scheduled sick call or a sick call list"; and (3) while "[t]he jail's Medical Services Policy required the jail administrator to review annually statistics on inmate medical care and also required the jail administrator and nurse to review at least quarterly the medical care's effectiveness and efficiency[,] … formal audits were never done." *Id.* at 618.

The evidence at trial established the County's total abdication of its duty to provide minimally sufficient healthcare to inmates. The Jail Administrator admitted

he had ***"fail[ed] to implement any kind of medical care system"*** at the Jail. Aplt. Appx. 187:17-19.

**Fourth**, while the Sheriff does not mount much of an argument concerning the "state of mind" element, the evidence of deliberate indifference at the County level is ample. Concerning the alleged failure to train, the Sheriff *does* argue that "there is no evidence in the record supporting that Appellant knew a policy of inadequate training created a serious risk of substantial harm and the Order does not identify any." Op. Brief at 28. But, at a minimum, the evidence showed the risks in maintaining its dangerously deficient medical delivery system, including the utter failure to train with respect to the medical policies, were "so obvious that the [the Sheriff] *should have known* of it." *Barney v. Pulsipher*, 143 F.3d 1299, 1308, n. 5 (10th Cir. 1998) (citing *Farmer*, 511 U.S. at 840–42) (emphasis added). And, again, the Sheriff's "knowing failure to enforce policies necessary to the safety of inmates" as summarized herein "may rise to the level of deliberate indifference." *Tafoya*, 516 F.3d at 919.

In sum, the District Court correctly concluded there is ample evidence to support the jury's verdict. The Sheriff was responsible for unconstitutional policies or customs of inadequate resources, training, supervision and a "lack of urgency surrounding jail medical care." *Burke*, 935 F.3d at 1001. There was a pervasive and "systemic failure of medical policies and procedures." *Crowson*, 983 F.3d at 1192.

These "systemic failure[s] of medical policies and procedures" were causally linked to Ellis's suffering and death.[12] As with the evidence of underlying Constitutional violations, the evidence supporting *Monell* liability is truly overwhelming.[13] For these reasons, the District Court properly denied the Sheriff's 50(b) motion.

### 3. The Evidence Also Supports the Sheriff's Liability Based on a Systemic Failure of Medical Policies and Procedures

Under *Crowson*, 983 F.3d 1166 and *Garcia*, 768 F.2d 303, where a municipal liability defendant's "policy, or lack of policies, evinces deliberate indifference, the [defendant] can be liable even in the absence of individual liability by any [employee] actor." *Crowson*, 983 F.3d at 1185 (citing *Garcia*). As the *Crowson* Court clarified, a defendant may face municipal liability premised on a "theory [of the] systemic failure of medical policies and procedures." 983 F.3d at 1192 (emphasis added). "Deliberate indifference to serious medical needs may be shown by proving that there are such gross deficiencies in staffing, facilities, equipment, or procedures

---

[12]     Furthermore, as detailed in the Statement of the Case/Statement of Facts §IV(C), *supra*), Ellis's suffering and death was *not* merely an unfortunate, isolated incident, as the Sheriff avers. The facially unconstitutional medical delivery system was destined to fail. *See, e.g.,* Aplt. Appx. 1245:9-15; 808:8-19; 771:3-17.

[13]     Additional grounds for *Monell* liability discussed in the Statement of the Case/Statement of Facts §IV(C), *supra*), include the complete failure to supervise Nurse Horn, the failure to staff the Jail with qualified medical personnel and the reliance on EMTs to medically "assess" inmates and detainees. *See, e.g.,* Aplt. Appx. 1588:13 – 1589:5; 1417:21 – 1418:13; 1415:13-25; 1354:23 -1355:2; 1425:29-21.

that the inmate is effectively denied access to adequate medical care." *Garcia*, 768 F.2d at 308.

Here, as shown *supra*, there is substantial evidence that numerous employees or agents of the Sheriff committed "underlying" violations of Ellis's constitutional rights. Nonetheless, irrespective of any individual liability, the evidence at trial also established a systemic failure of medical policies and procedures, as well as gross deficiencies in procedures, that effectively denied Ellis access to adequate medical care. The Sheriff did not have the capacity to safely care for a patient like Ellis in the Jail's medical unit. Rather, Ellis fell victim to "a policy or custom of providing deficient medical care" and "numerous deficiencies [with the medical delivery system that had been] unaddressed for years." *Burke*, 935 F.3d at 999-1000. Whether under a traditional *Monell* analysis or under *Crowson* and *Garcia*, the evidence was more than sufficient to survive scrutiny under Rule 50.

## C.  The District Court Did *Not* Abuse Its Discretion In Denying Defendant's Motion For New Trial

Motions for new trial are "'not regarded with favor and should be granted only with great caution.'" *Breen v. Pruter*, 679 F. App'x 713, 729 (10th Cir. 2017) (quoting *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991)). This Court reviews the denial of motion for new trial for abuse of discretion. *See, e.g., Burke*, 935 F.3d at 1026. "A district court abuses its discretion if it made a clear error of judgment or

exceeded the bounds of permissible choice in the circumstances." *Hill*, 815 F.3d at 657 (cleaned up).

"When a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is ***clearly, decidedly, or overwhelmingly against the weight of the evidence.***" *Burke*, 935 F.3d at 991 (cleaned up) (emphasis added). A court reviewing a motion for a new trial must "***draw all inferences from the evidence in favor of the non-moving party***, and do[es] not weigh the evidence or judge witness credibility." *Id.* at 991 (quoting *Henry v. Storey*, 658 F.3d 1235, 1238 (10th Cir. 2011) (emphasis added)).

In the context of a motion for new trial, "courts must exercise great caution in setting aside a jury's verdict due to an improper argument." *Burke*, 935 F.3d at 1026 (cleaned up). "'[E]ven if some statements exceeded the bounds of permissible argument, a judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict.'" *Id.*; *see also N. Am. Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc.,* 579 F.3d 1106, 1112−13 (10th Cir. 2009) (internal citation omitted). "In deciding whether the court abused its discretion, [this Court] assume[s] that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial." *Burke*, 935 F.3d at 1020 (cleaned up).

Applying these standards of review, the District Court's denial of the Sheriff's Motion for New Trial should be upheld.

### 1. The Sheriff's Appendix is Insufficient to Support Reversal of the Motion for New Trial

Plaintiff adopts and incorporates §IV(A), *supra*, as if fully stated herein.

### 2. The Jury's Verdict is Supported by Overwhelming Evidence

Even if this Court does not affirm on the basis of an insufficient Appendix, denial of the Sheriff's Motion for New Trial should be upheld. The Sheriff's assertion that the jury's verdict is against the weight of the evidence is virtually identical to the arguments challenging the denial of the Motion for Judgment as a Matter of Law. As described in detail above, the District Court correctly concluded the jury's verdict was supported by "overwhelming evidence." Aplt. Appx. 3093, 3110. Certainly, the Sheriff has not met his burden of showing that the verdict is "clearly, decidedly, or overwhelmingly against the weight of the evidence." *Burke*, 935 F.3d at 991.

### 3. Plaintiff's Counsel's Arguments and Conduct Were Not Inappropriate, and, in any Event, Provide no Basis for a New Trial

Faced with "overwhelming evidence," the Sheriff sought a new trial based on accusations of "misconduct" by Plaintiff's counsel. On appeal, the Sheriff claims two instances of alleged attorney misconduct provide grounds for a new trial: (1) purportedly crying during the trial; and (2) allegedly encouraging the jury to punish the Defendant. The Sheriff is wrong on both counts. Applying the *Whittenburg-Osterhout* factors, the District Court appropriately denied a new trial. *See* Aplt. Appx. 3110-3118. This Court should affirm.

It is exceedingly uncommon for a new trial to be granted based on attorney "misconduct." The primary authority relied upon by Defendant is this Court's decision in *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122 (10th Cir. 2009). However, *Whittenburg* is readily distinguishable. Emphasizing the extreme nature of the relief sought, the *Whittenburg* Court described itself as "reluctant" to order a new trial based on an improper closing argument. *Whittenburg*, 561 F.3d at 1133. Nevertheless, considering the entirely improper nature of the argument at issue in the case, the *Whittenburg* Court determined that it could not "sit this one out." *Id.* More specifically, the closing argument in *Whittenburg* was composed mostly of ***"fictitious admissions never uttered by defendants"*** and ***"vituperative and unprovoked attacks on defendants and their counsel,"*** made with unusual "volume and volubility…." *Id.* at 1124 (emphasis added). Here, as detailed below, there is no credible *allegation* that Plaintiff's counsel engaged in similar misconduct – let alone actual support in the record for such a claim.

Whether the alleged conduct occurs during trial or closing argument, "[t]he ultimate question is whether the alleged misconduct would have been prejudicial or harmless." *Osterhout v. Bd. of Cnty. Commissioners of LeFlore Cnty., Oklahoma*, 10 F.4th 978, 989 (10th Cir. 2021) (citing Fed. R. Civ. P. 61; *Blevins v. Cessna Aircraft Co.*, 728 F.2d 1576, 1578−79 (10th Cir. 1984)). While there are slight variations in the test,

depending the type of alleged misconduct,[14] "[f]our factors bear on whether attorney misconduct merited a new trial: (1) the pervasiveness of the misconduct, (2) the taking of curative action, (3) the size of the verdict, and (4) the weight of the evidence." *Osterhout,* 10 F.4th at 991–92 (citing *Whittenburg,* 561 F.3d at 1127 (first three factors); and *Burke,* 935 F.3d at 1027 (balancing the weight of the evidence)). All four factors weigh heavily in Plaintiff's favor. The Sheriff has provided this Court with no basis for finding the District Court abused its discretion in denying the extreme remedy of vacating the jury's award and ordering a new trial.

### a.    There Was No Attorney Misconduct, Let Alone "Pervasive" Misconduct

### i.    Plaintiff's Counsel Did *Not* "Cry" During Trial

The Sheriff argues "Plaintiff's counsel took improper actions, including crying while questioning a witness and while making his closing argument." Op. Brief at 41.[15] Despite the seriousness of accusing counsel of "misconduct" in a pleading, the Sheriff offers no meaningful support for this claim – it is simply a bald allegation.

---

[14]    In *Osterhout,* for instance, the Circuit used slightly different tests when looking at alleged misconduct during questioning of witnesses versus purported misconduct during argument. *See Osterhout,* 10 F.4th at 989 & 991-92.

[15]    Notably, when arguing its Motion for New Trial – which was directed to the Judge who observed counsel's conduct firsthand – the Sheriff only claimed Plaintiff's counsel had "purportedly" or "apparently" cried. In submitting its appeal to this Court, however, the Sheriff now alleges counsel in fact cried during trial. *Compare* Aplt. Appx. 2356 *with* Appellant's Opening Brief at 43; *compare* Aplt. Appx. 2356 *with* Appellant's Opening Brief at 9. The Sheriff does not explain why it is more confident

First, though the Sheriff claims Mr. Smolen cried while questioning a witness, the record does not support this. While questioning Jail Administrator Harding, Mr. Smolen played a video clip of Ellis screaming for help as he lay dying in excruciating pain. *See* Aplt. Appx. 739:13 – 741:5. *See* Pl's Supp. Appx. 257 (PX58). At the moment that Mr. Smolen may have been on the *verge* of shedding a tear, the District Court wisely called for a sidebar. The Court acknowledged the emotional nature of the video footage of Ellis's suffering and asked Mr. Smolen if he needed to take a break. Mr. Smolen responded that he was fine, and the questioning proceeded without incident. There is simply no evidence that Mr. Smolen cried during the inquiry of Harding.

Moreover, although the Sheriff now claims "Defense counsel objected to the emotional display," the record shows otherwise. While counsel for Defendant commented, "[y]our Honor, Mr. Smolen, this was an issue at the last trial, the same thing, crying and tearing up" (Aplt. Appx. 740:3 – 741:1), he did not object or request a mistrial. "The failure to object resulted in forfeiture." *Osterhout*, 10 F.4th at 991 (citing *Burke*, 935 F.3d at 1014).

Second, during closing argument, Mr. Smolen described the pain Ellis suffered as he lay dying in his cell. As soon at the District Court perceived Mr.

---

about these allegations now, more than a year later, than it was immediately after the trial.

Smolen becoming emotional, she again called a sidebar.  During the sidebar, the

Court told Mr. Smolen, "if you get emotional, let's take a minute, and we'll just do

something." Aplt. Appx. 1902:2-24. Mr. Smolen told the Court he had paused to

avoid crying and assured the Court that he was composed. He then continued his

closing argument without issue. *See* Aplt. Appx. 1902:25 – 1907:4. In his Brief, the

Sheriff again falsely claims defense counsel objected.  Op. Brief at 42.  In fact,

Defendant's counsel did not lodge any objection regarding any purported crying

during Mr. Smolen's closing argument, thereby forfeiting the issue.  Aplt. Appx.

1902:2-24.  A failure to contemporaneously object to statements in a closing

argument may constitute a forfeiture and ordinarily means the court reviews for

plain error.  *See Burke*, 935 F.3d at 1031-32 (internal citation omitted).  The Sheriff

did not assert plain error in its Motion for New Trial.  Thus, the issue was forfeited.

Even if the Sheriff had not forfeited its objection, there is no basis for a new

trial. The transcript of Plaintiff's counsel's closing argument shows it was

appropriately focused on the overwhelming evidence of deliberate indifference to

Ms. Ellis's serious medical needs, Ellis' pain and suffering and Defendant's reckless

maintenance of a dangerously deficient and deadly medical delivery system. *See* Aplt.

Appx. 1847:21 – 1859:17, 1860:20 – 1868:23, 1896:14 – 1903:9, 1904:23 – 1907:4.

The closing argument was entirely proper.

The Sheriff cites a New Jersey Supreme Court decision, *Carey v. Lovett*, 132

N.J. 44 (N.J. 1993). *See* Aplt. Appx. 2357.   But as the District Court correctly concluded, these pertinent facts in *Carey* bear no resemblance to Defendant's allegations or to the trial proceedings in this case, rendering the *Carey* opinion inapposite. *See* Aplt. Appx. 3113–14.

"In deciding whether the court abused its discretion, [the Tenth Circuit] assume[s] that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial." *Burke*, 935 F.3d at 1020 (cleaned up).  In this case the District Court concluded, "[t]he trial in the instant case lasted for 8 days, during which Defendant cites two possible times Plaintiff's counsel began to cry, and on both occasions the Court responded promptly with a sidebar."  Aplt. Appx. 3114. The District Court did not find Plaintiff's counsel committed any misconduct during the trial.  The Sheriff offers nothing to suggest the District Court's decision reflects "a clear error of judgment" or "exceeded the bounds of permissible choice in the circumstances." *Hill*, 815 F.3d at 657 (quoting *ClearOne Commc'ns, Inc.,* 653 F.3d at 1178).  Accordingly, counsel's purported "crying" provides no basis for a new trial.

### ii.    Plaintiff's Counsel's Remarks Regarding Damages Were Appropriately Focused on Fully Compensating the Estate For Ellis's Extraordinary Suffering and Substantial Injuries

The Sheriff also contends Plaintiff's counsel improperly encouraged the jury to award punitive damages. This argument is likewise unsupported by the record. As the District Court noted in its Order, it was *Defendant's* counsel who first introduced

the theme of punishment, admonishing the jury "not to punish the county." Aplt. Appx. at 3129. *See also id.* at 1892:22-25, 1894:16-24. As the District Court found, Plaintiff's closing properly focused on "the basis of the compensation owed to Mr. Ellis and the importance of internalizing the cost of the harm." Aplt. Appx. at 3129. Mr. Smolen's remarks emphasized the importance of appropriately valuing Ellis's life and his incredible pain and suffering, to ensure that the County bore the true cost of its willful decision to prioritize saving money over protecting inmates' lives and health:

> I think that the case is worth 50 million dollars or more **based on the pain and suffering that Terry went through**.
>
> …[W]hen you really sit down, and you **look at the jury instruction on compensatory damage, and you think about what he was suffering, what his suffering was like both from a physical standpoint and from a mental standpoint** and the idea that even in those moments of suffering, he just wants, "… what are you going to tell my kid? …
>
> …**[W]hen you look at how young he was, the idea that he had checked himself in, that the pain from an emotional standpoint and from a physical standpoint was so great, that this has to be an incredibly significant verdict**; otherwise, these gentlemen are going to walk out of here, and they're going to high-five because they'll say, "We can – we can run a cheap medical system…."

Aplt. Appx. at 1905:6 – 1906:15 (emphasis added). *See also id.* at 1854:18 – 1855:16, 1856:23 – 1857:12, 1858:15 – 1859:15, 1897:5 – 1990:3, 1900:19 – 1902:4.

In his final remarks, Mr. Smolen again emphasized the importance of fully compensating Plaintiff for the pain, suffering, and needless death of Ellis, stating:

"And you are the eight people who can uphold those rights, and you can award a verdict that actually compensates, truly compensates, for what Terry went through, and also has the ability to deter it from happening in the future." Aplt. Appx. at 1906:22 – 1907:1.

It was not improper for Plaintiff's counsel to mention deterrence when urging the jury to award compensatory damages sufficient to compensate the Estate for the torture and death of Ellis.  It is well established that the primary objectives of § 1983 are "**compensation** of persons injured by deprivation of federal rights **and prevention of abuses of power** by those acting under color of state law." *Robertson v. Wegmann,* 436 U.S. 584, 590-91 (1978) (emphasis added).  *See also Restivo v. Hessemann,* 846 F.3d 547, 585-86 (2nd Cir. 2017); *Dobson v. Camden,* 705 F.2d 759, 765 (5th Cir. 1983).  And as the District Court observed in its Order (Aplt. Appx. 3129-3130, n. 10), the Supreme Court has expressly emphasized the nexus between these two goals, noting that § 1983 is *designed* to use compensatory damages as a method of deterring violations of constitutional rights:

> [Section] 1983 was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well.  The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights.  Furthermore, the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on

constitutional rights. Such procedures are particularly beneficial in
preventing those "systemic" injuries….

*Owen v. City of Indep., Mo.*, 445 U.S. 622, 651–52 (1980) (cleaned up).  As Plaintiff's

counsel correctly stated in his closing, this goal of deterrence is only achieved if

government actors are required to pay the full cost of the harms caused by their

violations.

This precise issue was addressed in *Chalmers v. City of Los Angeles*, 762 F.2d

753, 761 (9th Cir. 1985), where the Ninth Circuit stated:

> [T]he City claims that in discussing the deterrent effects of damages
> under section 1983, plaintiff's counsel was effectively requesting an
> award of punitive damages. … **Deterrence, however, is an
> acknowledged goal of that section, and an argument which
> emphasizes deterrence is not necessarily equivalent to an
> argument for punitive damages.** …The City has not established
> an abuse of discretion by the trial court in denying a new trial motion
> on the ground of attorney misconduct.

(emphasis added, internal citation omitted).  *See also Ramirez v. N.Y. City Off-Track*

*Betting Corp.*, 112 F.3d 38, 40 (2d Cir. 1997).  It is not "misconduct" to urge the jury

to hold the County accountable for the full cost of its willful decision to provide

grossly inadequate medical care to the people in its custody.

Moreover, "even if some of the comments exceeded permissible bounds, these

statements . . . do not merit reversal." *Burke*, 935 F.3d at 1032. While the Sheriff

relies on *Burke* to support its claim that referencing deterrence was "wholly improper"

(Op. Brief at 44), the *Burke* decision actually shows why a new trial was properly

denied. Rather than deciding that discussing deterrence against a government entity was improper, the Tenth Circuit "assume[d] without deciding" that such remarks were improper and nevertheless concluded that such statements – even when combined with others that the Court assumed *arguendo* were improper – did not warrant reversal. *See Burke*, 935 F.3d at 1027-33. There is even less basis for overturning the jury's verdict in this case than in the Burke case, in which counsel's remarks regarding deterrence were just one of numerous statements that the Tenth Circuit assumed arguendo were improper. *Id.* Mr. Smolen's rebuttal arguments were consistent with the evidence and relevant to Plaintiff's request for damages sufficient to fully compensate Plaintiff for Ellis's horrific torture and death.

### b.    To the Extent Any Curative Action was Required, the Curative Action Provided by the Court Was Sufficient

The "curative action" factor also weighs against the grant of a new trial. Because there was no misconduct, no curative action was required. Nevertheless, in *Burke*, the Tenth Circuit held that even if the remarks of Plaintiff's counsel regarding deterrence had been improper, the court's jury instructions "helped dispel any prejudicial effect of improper comments." *Burke*, 935 F.3d at 1033 (citing *Racher*, 871 F.3d at 1171). The *Burke* Court explained:

> The instructions clarified that compensatory damages should "fairly and justly compensate for any injury you believe that Elliott Williams actually sustained as a direct consequence of the Defendant's conduct." They further explained that "[c]ompensatory damages must not be based on speculation or sympathy," and that "[a]rguments and

statements by lawyers are not evidence[.]" ***We generally presume that juries follow the instructions given to them notwithstanding what has been said in court.***

*Id.* (emphasis added, internal citations omitted). *See also Osterhout,* 10 F.4th at 992.

Similarly, the District Court in this case instructed the jury that if it found the Sheriff liable, it should only award compensatory damages "that you think will justly and fairly compensate for any injury you find was caused by Defendant's violation of Ellis' constitutional right to adequate medical care." Aplt. Appx. 1009. The Jury Instructions further explained that "[a]n award of compensatory damages must be based on evidence and not on sympathy, speculation, or guesswork," (*id.*), and that "[a]rguments and statements by lawyers are not evidence." *Id.* at 987. Presumably, the jury followed these instructions. *See Burke,* 935 F.3d at 1033; *Osterhout,* 10 F.4th at 992. The "curative action" factor weighs in favor of Plaintiff.

### c.    Considering the Strength of the Evidence, the Size of the Verdict Was Reasonable and Not the Product of Prejudicial Remarks

While the Sheriff argues "the compensatory damages award was shocking and excessive," he offers no support for that claim. Op. Brief at 49. Any assessment of whether a verdict is "excessive" must consider not merely the size of the verdict, but the nature of the plaintiff's damages and the weight of the evidence. *See, e.g., Burke,* 935 F.3d at 1027 (internal citation omitted); *United States v. Roberts,* 185 F.3d 1125, 1144 (10th Cir. 1999). Without undertaking that analysis, there is no basis to

conclude the damages were the product of "passion and prejudice" rather than an appropriate measure of "Ellis' physical and mental pain before death, loss of life, and loss of familial relationships." Aplt. Appx. 1009; *see also Burke*, 935 F.3d at 1034.

Below, the District Court painstakingly considered the size of the verdict in light of the nature of the Ellis's damages and the weight of the evidence. *See, e.g.,* 3116-3118. The District Court's analysis is thoughtful, well-articulated and eminently reasonable. *Id.* Ultimately, the District Court determined that "[a]lthough the size of the verdict is large, the Court cannot say that it shocks the conscience given the evidence heard by the jury." Aplt. Appx. 3116. In particular, the District Court noted, *inter alia*, that the jury heard evidence that: (1) "on the evening of October 21, 2015, Ellis complained to the jail staff that his legs were numb"; (2) "on the morning of October 22, 2015, Ellis' verbal distress and suffering was met with neglect by the jail staff"; (3) "[w]hen Ellis begged for water, a member of the staff prevented another from giving him water…"; (4) "Ellis laid on a urine-soaked mattress"; (5) ***"Ellis cried out for his son while suffering throughout the night"***; (6) "by 10:42 am on October 22, 2015, Ellis was complaining that he was in pain and that his legs were black and purple"; (7) "jail staff, guards, and even the lunch lady, not only ignoring Ellis' pleas, but mocking him"; and (8) "when the nurse arrived, ***she not only ignored Ellis' pleas for help, but also threatened him***

*if he continued asking for medical assistance."* *Id.* at 3116-3118 (emphasis added).

Juries have "wide discretion" to "fix the amount of noneconomic compensatory damages." *Racher*, 871 F.3d at 1172. The District Court held and reasoned that "[b]ased on the evidence presented to the jury over an eight-day trial, the Court cannot say that the size of the verdict was unreasonable or the result of inappropriate remarks." Aplt. Appx. 3118.

In asking this Court to reverse the District Court's conclusion, the Sheriff bears the burden of establishing that the trial court abused its discretion by "[making] a clear error of judgment or exceed[ing] the bounds of permissible choice in the circumstances." *Hill*, 815 F.3d at 657 (quoting *ClearOne Commc'ns, Inc.*, 653 F.3d at 1178). The Sheriff has not come close to meeting this burden. Not only has Defendant entirely failed to engage with the District Court's reasoning, it did not even provide this Court with crucial video surveillance evidence the District Court relied on in reaching its conclusion.

### 4. The Court's Instructions to the Jury Were Adequate and Accurately Reflected Governing Law

The Tenth Circuit "review[s] a district court's decision to give a particular jury instruction for abuse of discretion, but . . . review[s] *de novo* legal objections to the jury instructions." *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1154 (10th

Cir. 2012) (quotations omitted). Here, the Court appropriately instructed the jury. Once again, the Sheriff has provided no basis for a new trial.

The Sheriff argues the Court's instructions to the jury were erroneous in two respects. <u>First</u>, the Sheriff claims Jury Instruction No. 17 (Aplt. Appx. 1001) "contained an inaccurate statement of law," because "[t]he jury was instructed that it could find municipal liability on the basis of systemic failure of the medical delivery system at the jail" under *Crowson*. The Sheriff argues "*Crowson* was not applicable in a case such as this one where there were medical care policies in place and individual acts could be attributed to individual jail employees." Op. Brief at 31.

Notably, this argument flatly contradicts this Sheriff's insistence that no individual violated Ellis's constitutional rights. *See* Op. Brief at 16-20. In that portion of the Brief, Defendant argues that although Ellis was slowly dying in front of multiple Jail staff members' eyes, no individual Jail staff member "perceived" this, so no individual acted with deliberate indifference.[16] Yet in arguing that *Crowson* does not apply in this case, Defendant appears to concede that the jury could have attributed underlying constitutional violations to individual Jail employees.

More fundamentally, the idea that a plaintiff cannot establish a systemic violation of constitutional rights when "individual acts could be attributed to

---

[16]    As described *infra*, this claim is both contrary to law and contradicted by the record.

individual jail employees" is both incoherent and inconsistent with *Crowson*. A municipality can only act through its agents, so *every* case involving a municipal liability theory will inherently include acts by individual employees or agents of a governmental entity. The same was true in *Crowson*, in which this Court held that "even if . . . Nurse Johnson and Dr. LaRowe 'did not violate the Constitution individually, ... their *combined* acts may be sufficient for *Monell* liability' such that Mr. Crowson still has a claim for municipal liability irrespective of whether Nurse Johnson violated his rights." *Crowson*, 983 F.3d at 1192. In addition, it is well established that, even in the absence of individual liability, "[d]eliberate indifference to serious medical needs may be shown by proving that there are such *gross deficiencies* in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia*, 768 F.2d at 308 (emphasis added).

In *this* case, Plaintiff presented ample evidence of gross deficiencies in, and the systemic failure of, medical policies and staffing such that Ellis was effectively denied access to adequate medical care. These gross deficiencies included systematic violation of written medical policies, failing to adequately staff the Jail with qualified medical professionals, failing to provide access to a physician, failing to supervise the Jail's medical delivery system, and prohibiting Jail staff from calling an ambulance in response to emergency medical conditions. The jury was properly instructed on

underlying deliberate indifference and municipal liability.[17] *See* Aplt. Appx. 1001-1005. And with the evidence presented in this case, the jury could have reasonably, and easily, found liability on any and all of Plaintiff's theories.

Defendant also insists that "*Crowson* made very clear that the narrow systemic failure exemption does not and cannot apply in cases where the theory of liability is failure to train." Op. Brief at 32. In *Crowson*, the Court held the plaintiff's claim for failure to train could not succeed because he had failed to show that an individual jail staff member had violated his constitutional rights. Nevertheless, the Court found Crowson could still hold the municipality liable under a "systemic failure of medical policies" theory of liability. *Crowson,* 983 F.3d at 1192.   In the instant case, there is truly overwhelming evidence that *multiple individual County employees violated Ellis's constitutional rights*, and that the County's failure to train its employees was closely related to these violations. Again, based on the mountain of evidence, the jury could have reasonably and easily found liability on *any and every* theory alleged by Plaintiff. Defendant cites no authority for the claim that a plaintiff cannot advance individual violations and systemic *Crowson* liability as alternative theories of liability.

---

[17]    Defendant also argues the District Court "seemed to recognize the inherent confusion the *Crowson* language creates, as the judge was initially unsure whether Appellee intended to communicate to the jury that a constitutional violation was or was not required by proposing use of the language…."  Op. Brief at 32. In fact, however, the transcript shows it was *Defendant's counsel*, not the District Court, who was confused. *See* Aplt. Appx. 2120:22 – 2125:15.

Second, the Sheriff asserts the District Court erred by failing to instruct the jury that "mere words alone – no matter how insensitive or reprehensible – are insufficient to establish a constitutional violation." Op. Brief at 33. The Sheriff claims that because the District Court declined to give this instruction, "the jury was left to decide liability without any instruction on whether abusive language is a constitutional violation." *Id*. at 34. This argument likewise lacks merit.

At no time did the jury hear a single suggestion that words alone are sufficient to establish a constitutional violation. Defendant cites nothing in the record that would have left the jury with that impression. And the Court accurately instructed the jury as to the definition of deliberate indifference. *See* Aplt. Appx. 1001-1002. The Court's instructions further emphasized that "[a]n official's actions or inactions falling below the standard of care, as well as a violation of state statute or jail policy may be evidence of deliberate indifference, but alone are not sufficient to find liability." *Id*.

Because the jury was properly instructed on the applicable law, the proposed "abusive language" instruction was unnecessary. It is a stipulated fact in this case that at "[a]round 10:45 a.m. on October 22, 2015, Ellis complained of being unable to walk, that his legs were black and blue, and that he was in pain." Aplt. Appx. 617. Yet, as **the Sheriff admits**, "[i]nstead of referring Ellis for medical treatment, Horn mocked and threatened him for reporting his symptoms, implied he was faking his

illness, and told him she was tired of dealing with him." *Id.* This is deliberate indifference to a serious medical need. *See, e.g., Burke*, 935 F.3d at 992; *Mata*, 427 F.3d at 753. Nurse Horn's words were uttered in the context of an unconstitutional refusal of necessary medical assistance. In the lead case cited by the Sheriff in support of its proposed jury instruction, the Tenth Circuit held that "acts or omissions resulting in an inmate being subjected to ***nothing more* than threats and verbal taunts** do not violate the Eighth Amendment." *McBride v. Deer*, 240 F.3d 1287, 1291, n. 3 (10th Cir. 2001) (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir.1979)) (emphasis added). If Plaintiff's allegations and evidence amounted to "nothing more than" Nurse Horn's "threats and verbal taunts," then perhaps the Sheriff's Proposed Jury Instruction would have been warranted. Clearly, that was not the case here. The Court did not err in instructing the jury.

### 5. The Court Did Not Err in Admitting Evidence of NCCHC Standards or Oklahoma Jail Standards

Defendant next claims the District Court erred in admitting testimony regarding "the jail standards set by the Oklahoma Department of Health and the jail standards used by the NCCHC."[18]   Op. Brief at 35.   This Court "review[s]

---

[18]     In his Motion for New Trial, the Sheriff insisted the District Court had also erred in allowing testimony regarding jail standards used by the American Correctional Association ("ACA"). Yet the transcript reveals the Plaintiff's counsel did not ask any questions regarding the ACA's standards. On the contrary, the only inquiries about ACA standards at trial were by Mr. Poe, counsel for Defendant. *See* Aplt. Appx. 1571:22-25, 1573:7-18. Defendant offers no explanation regarding why

evidentiary decisions for abuse of discretion." *Burke*, 935 F.3d at 1011. "A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id*. (quotations omitted). This standard is clearly not met in this case.

Defendant identifies no ***testimony*** regarding Oklahoma Jail Standards that it claims was improperly admitted. *See* Op. Brief at 36-37 (citing "App. Vol. III, 0715 (pp. 159:9 – 163:25)"). Instead, Defendant cites to a sidebar discussion between the District Court and counsel, which the jury did not hear. As for NCCHC standards, Defendant cites to testimony that ***Defendant's counsel elicited*** from Dr. Wilcox. *Id*. at 37 (citing "App. Vol. VII, 1476 (pp. 991:1-992:6)"). Moreover, counsel for Defendant forfeited this issue by failing to contemporaneously object. *See* Aplt. Appx. at 1572:1 – 1573:13. *See also Osterhout*, 10 F.4th at 991 (internal citation omitted). Defendant has utterly failed to show any error at all, let alone error that would support a new trial.

The District Court correctly determined "[s]tate and national standards can be persuasive of the actions required to ensure inmate safety, *Lopez v. LeMaster*, 172 F.3d 756, 761 (10th Cir. 1999), and are therefore probative of whether the Sheriff was deliberately indifferent to Ellis' medical needs." Aplt. Appx. at 356-357. The

---

it introduced testimony regarding ACA standards but insists it was error to allow testimony regarding NCCHC and Oklahoma Department of Health standards.

District Court further concluded that any risk of confusion was "not high enough to overcome the probative value, particularly where any potential confusion can be cured by a limiting instruction." *Id.* at 357.

In addition, the District Court gave the jury clear instructions – twice – regarding the legal import of these standards. When Plaintiff's counsel questioned Jail Administrator Harding regarding the Oklahoma Jail Standards, the Court instructed the jury that:

> [y]ou're going to start hearing about some jail standards… ***You are allowed to consider these, but you should not consider these standards as*** solely ***dispositive of whether the sheriff's office acted with deliberate indifference.*** So you should consider them, but you should not consider them solely dispositive.

Aplt. Appx. at 1072:14-20. Following the close of the evidence, the Court again clearly instructed the jury that "[a] violation of State law, regulation or policy may be evidence of, but by itself, would be insufficient, to show deliberate indifference or liability under § 1983." Aplt. Appx. at 974 (Instruction 21). The Court's instructions correctly state the applicable law. Defendant offers no reason to believe the jury was confused about the relevance of this evidence.

This "standards" evidence, to the extent any was admitted, was probative and the jury was clearly and correctly instructed regarding its relevance. There is no basis for Defendant's claim that the District Court abused its discretion.

**D. The District Court Did *Not* Abuse Its Discretion in Denying Defendant's Motion For Remittitur**

As detailed throughout this Response, the overwhelming, unrebutted evidence at trial clearly established that Ellis suffered a uniquely horrific and painful death at the hands of Jail staff. The pain, fear, distress, and desperation Ellis was experiencing while breathing his final breaths, alone on the floor of Holding Cell 1, are unimaginable. How does one put a "value" on suffering such as this? This was the jury's incredibly difficult task. They reached a unanimous verdict. That verdict should not be disturbed.

"The jury ha[s] wide latitude to choose an award based on the evidence." *Hill*, 815 F.3d at 668; *see also Prager v. Campbell Cty. Mem. Hosp.*, 731 F.3d 1046, 1063 (10th Cir. 2013). In this case, the jury was well within that wide latitude in awarding damages. The damages are not conscience shocking or grossly excessive. The District Court did not abuse its discretion in denying Defendant's Motion for Remittitur.

When deciding a motion for remittitur, the Court must view the evidence in the light most favorable to the prevailing party. *Burke*, 935 F.3d at 1035. "To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict. *See Therrien*, 617 F.3d at 1258 (upholding denial of remittitur where "the jury award [was] supported by sufficient evidence"); *Spahr v. Ferber Resorts, LLC*, 419 F. App'x 796, 807 (10th Cir. 2011) (unpublished); *Burke*, 935 F.3d at 1035; *Hill*, 815 F.3d at 668. This Court has held that "remittitur is

appropriate only when the jury award is so excessive ... as to shock the judicial conscience *and* to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." *Burke*, 935 F.3d at 1035 (cleaned up).[19]

On appeal, the Tenth Circuit reviews "the trial court's decision regarding remittitur for an allegedly excessive damages award for an abuse of discretion." *Palmer v. City of Monticello*, 31 F.3d 1499, 1508 (10th Cir.1994).  In the instant case, the District Court's denial of Defendant's motion for remittitur was well within its discretion.

### 1. The Jury Was Within its Wide Discretion in Awarding Compensatory Damages in this Case; Remittitur is Not Warranted

Again, the Tenth Circuit gives "wide discretion ... to juries to fix the amount of noneconomic compensatory damages."  *Racher*, 871 F.3d at 1172.  *See also Burke*, 935 F.3d at 1026.  Noneconomic damages for pain and suffering "are ***very difficult to quantify, leaving it to the jury to select a dollar amount that it believes will fairly compensate the plaintiff.***"  *Hendrickson v. Cooper*, 589 F.3d 887, 892–93 (7th Cir. 2009) (emphasis added). *See also Nevor v. Moneypenny Holdings, LLC*, 842

---

[19]    Defendant relies on a much older case, *Mason v. Texaco, Inc.*, 948 F.2d 1546 (10th Cir. 1991), to claim that even when "no passion, prejudice, corruption or other improper cause invaded the trial . . . remittitur is appropriate based on the excessiveness of the verdict alone."  *See* Op. Brief at 50.  The Tenth Circuit's much more recent opinion in *Burke* indicates that this is no longer the applicable legal standard.

F.3d 113, 121 (1st Cir. 2016). In this case, the jury was well within that wide latitude in awarding compensatory damages. With no showing that the jury's verdict was influenced by anything other than its own independent assessment of the evidence, the District Court properly upheld it.

In sum, the jury that heard the evidence had wide discretion in setting the amount of compensatory damages, and the District Court that presided over the trial had wide discretion in ruling on a motion for remittitur. Defendant cannot meet its burden of establishing that both the jury and the District Court took leave of their senses in assessing the appropriate damages in this case.

### 2. The Jury's Compensatory Damages Award Appropriately Reflects the Pain and Suffering Ellis Suffered as He Was Tortured to Death

In seeking to paint the jury's damages award as excessive, Defendant callously dismisses the sheer horror of Ellis's lingering and tortuous death. Despite a legion of unrebutted evidence of the extreme pain and psychological agony preceding Ellis's death, the Sheriff argues the award must be excessive because Plaintiff "did not introduce any evidence regarding the Decedent's burial costs, future earning capacity, or any other form of actual damages on which the jury's verdict is or could be based." Op. Brief at 60. Defendant further dismisses Ellis's pain and suffering as inconsequential because "the amount of time for which Ellis could have suffered compensable damages can only be measured in hours." *Id.* at 10.

Notably, defense counsel made precisely the same arguments at trial and the jury soundly rejected them. *See* Aplt. Appx. 1444:4-22. Moreover, there was ample evidence from which the jury could have concluded Ellis's suffered *for days* before needlessly dying. *See, e.g.*, § IV(C), *supra*.

As described more fully *infra*, there is no reason to believe the jury awarded damages based on any considerations apart from appropriately valuing "Ellis' physical and mental pain before death, loss of life, and loss of familial relationships." Aplt. Appx. 1009. The District Court properly instructed the jury on compensatory damages. *Id.* This Court may properly assume the jury followed these instructions. *See, e.g., Burke*, 935 F.3d at 1033; *Osterhout*, 10 F.4th at 92. Defendant's counsel emphasized to the jury that punitive damages were not available (*See* Aplt. Appx. 1894:16-24; 1892:22-25), and Plaintiff's counsel never requested or mentioned punitive damages. As detailed above, Mr. Smolen's remarks were at all times focused on the importance of appropriately valuing Ellis's life and his pain and suffering, to ensure that the County bore the true cost of its willful decision to prioritize saving money over protecting inmates' lives and health.

There is no indication – let alone an "irresistible inference" – that the jury's award was the product of "passion, prejudice, corruption or another improper cause." *Burke*, 935 F.3d at 1035 (cleaned up). The jury considered Plaintiff's

counsel's request for $50 million (Aplt. Appx. 1904:6-8) or more in compensatory damages and opted to award a significantly lower amount.

In addition to Ellis's extreme pain and suffering – which Defendant's own former Jail Administrator acknowledged as "torture" (Aplt. Appx. 784:9-21) – Plaintiff's damages include Ellis's loss of life and loss of familial relationships, including missing out on the life of his young child. Considering these damages, there is nothing about the jury's verdict that "shocks the conscience." Nor has Defendant offered any basis – beyond its own bald assertions – for concluding the jury disregarded the District Court's explicit, repeated instructions to award damages sufficient to compensate Ellis for the injuries he suffered at the hands of the Ottawa County Jail staff.

### 3. Comparisons to Damages Awarded in Other Cases Are Inappropriate, Particularly Given the Uniquely Horrific Circumstances of Ellis's Lingering and Tortuous Death

The Sheriff further seeks to impugn the jury's valuation of Ellis's pain, suffering, loss of life and loss of familial relationships by pointing to other cases -- in which juries rendered lower verdicts -- and arguing Ellis's lingering and tortuous death was not so bad in comparison. However, this Court has expressly discouraged the comparative approach the Sheriff urges, stating that "[i]t is a difficult and often fruitless task to compare damages in one case with those in another, and we do not

generally countenance such comparisons." *Hoskie v. United States*, 666 F.2d 1353, 1358, n. 4 (10th Cir. 1981).  As the Seventh Circuit has observed:

> [t]he problem … is that one can always find . . . cases with verdicts at different levels. This amounts to anecdotal evidence at best. … [C]aution should be the byword when looking at past awards.
>
> \*\*\*
>
> To require that a jury's damages award be no bigger than previous awards in similar cases would make every such award ripe for remittitur.  There must be room for a jury's award to exceed the relevant range of cases when the facts warrant.

*Adams v. City of Chicago*, 798 F.3d 539, 545 (7th Cir. 2015).  As observed by this Court in *Burke*, "comparisons to awards from other cases … ***yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations*** and detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence." *Burke*, 935 F.3d at 1036 (emphasis added) (cleaned up).[20]

The Sheriff's attempts to compare the award in this case to other cases only underscore the wisdom of the Tenth Circuit's holdings.  As everyone who heard the

---

[20]     For example, the City of New York recently agreed to pay a ***settlement*** of $28 million in a case in which jail staff was deliberately indifferent for eight minutes as an inmate hanged himself.  *See* "New York City reaches $28 million settlement in Rikers Island lawsuit," https://www.cbsnews.com/newyork/news/rikers-island-lawsuit-settlement-nicholas-feliciano/.  Presumably the City settled for this amount because it believed a jury might award much more at trial.  Yet this settlement is no more relevant to the reasonableness of the jury's verdict in the instant case than any of the cases cited by the Defendant.

evidence presented at trial will always remember, the circumstances of Ellis's torture and death were as horrific as they were unique.  A properly instructed jury reached a unanimous conclusion regarding how to value the pain and suffering, death, and loss of familial relations Ellis experienced at the hands of Defendant's employees because of Defendant's deliberate indifference. Nothing about that conclusion would "shock the conscience" of anyone who heard the overwhelming evidence presented at trial.

Defendant has entirely failed to meet its heavy burden of establishing that "the jury award is so excessive ... as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." *Burke*, 935 F.3d at 1035 (cleaned up).

## E. The District Court Did Not Abuse Its Discretion in Awarding Attorney Fees.

This Court reviews a district court's award of attorney fees for abuse of discretion, "which calls for review of the legal analysis de novo and factual findings for clear error." *Valdez v. Macdonald,* 66 F.4th 796, 839 (10th Cir. 2023). In reviewing attorney fee awards, this Court gives deference to the district court's "superior understanding of the litigation" and recognizes the "desirability of avoiding frequent appellate review of what essentially are factual matters." *Valdez,* 66 F.4th at 840 (cleaned up).

Mr. Ellis died in 2015. His trial occurred in 2023, following *eight years* of litigation. The District Court, which presided over the trial and heard the evidence, carefully scrutinized the hours spent by Plaintiff's counsel in prosecuting this case and reduced those hours where appropriate. *See* Aplt. Appx. 3134-3154. While Defendant disagrees with the District Court's award of attorney's fees, it offers no basis for concluding the Court abused its discretion.

## F.  The District Court Properly Denied Defendant's Motion to Reconsider

The District Court lacked jurisdiction to hear Defendant's Motion to Reconsider (Aplt. Appx. at 3165) once Defendant filed its Notice of Appeal to this Court (Aplt. Appx. at 3244) the following day.

"[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously. The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). Without a doubt, the Motion to Reconsider – which restates the arguments raised in the Motion for New Trial and Motion for Remittitur – addressed "those aspects of the case involved in the appeal." *See, e.g.*, Aplt. Appx. at 3244 and 3088. Consequently, the filing of Defendant's Notice of Appeal divested the District Court of jurisdiction to hear its Motion to Reconsider.

The District Court properly concluded Defendant's Motion to Reconsider was untimely as a motion under Rule 59. Aplt. Appx. at 3276. However, the District Court considered Defendant's Motion under Rule 60 and denied it on its merits, finding "Defendant's efforts are simply rehashed arguments previously rejected by the Court." Aplt. Appx. at 3276, n.4.

The substance of Defendant's argument was that a recent district court decision in a different case "demonstrates that the verdict size in the present matter is conscience-shocking and that remittitur would be proper on that basis." Defendant's Supp. Op. Brief at 8. This is simply not true as a matter of law, and Defendant cites no law to support this claim. There is no basis for concluding the District Court's denial of Defendant's Motion to Reconsider was "arbitrary, capricious, whimsical, or manifestly unreasonable." *U.S. v. Silva*, 889 F.3d 704, 709 (10th Cir. 2018).

## **CONCLUSION**

For the reasons stated herein, the jury's verdict, the Judgment, the District Court's denial of the Sheriff's post-trial motions and award of attorney's fees should be affirmed and upheld.

Respectfully submitted by:

/s/Robert M. Blakemore
Daniel E. Smolen, OBA #19943
danielsmolen@ssrock.com

Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Bryon D. Helm, OBA #33003
bryonhelm@ssrok.com
**Smolen & Roytman**
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone: (918) 585-2667
Fax: (918) 585-2669

***Attorneys for Plaintiff/Appellee***

## CERTIFICATE OF DIGITAL SUBMISSION

The undersigned hereby certifies that this brief as submitted in Digital Form is an exact copy of the written document filed with the Clerk, that no privacy redactions were required and the digital submission has been scanned for viruses with Intego Virus Barrier Software Version 10.9.82, and is free from viruses.

/s/ Robert M. Blakemore
Robert M. Blakemore

## STATEMENT REGARDING ORAL ARGUMENT

In the event that this appeal is not summarily affirmed, Plaintiff believes that oral argument would materially assist in the determination of this appeal and, therefore, requests the opportunity for oral argument.

/s/Robert M. Blakemore
Robert M. Blakemore

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 18,999 words.

Complete one of the following:

✓        I relied on my word processor to obtain the count and it is Microsoft Office Word for Mac Version 16.79.2 (2023).

☐        I counted five characters per word, counting all characters including citations and numerals.

I certify that the information on this form is true and correct to the best of my knowledge and belief after a reasonable inquiry.

<u>/s/ Robert M. Blakemore</u>
Robert M. Blakemore


## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of September 2024, I electronically served this Response Brief, through the Court's CM/ECF system, on all counsel of record in compliance with 10th Circuit Rule 25.4.

<u>/s/Robert M. Blakemore</u>
Robert M. Blakemore